# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,    )
    )
    v.    )    Criminal No. 13-227-01
    )
NICHOLAS TROMBETTA,    )
    )
    Defendant    )
    )

## MEMORANDUM OPINION

**CONTI, Chief District Judge**

Defendant Nicholas Trombetta ("defendant") is accused, in an eleven-count indictment, of committing mail fraud, theft or bribery concerning a program receiving federal funds, conspiracy to commit tax fraud, and filing a false tax return. (ECF No. 4.) Pending before the court is defendant's motion to dismiss or suppress evidence due to government misconduct. (ECF No. 68.) Defendant contends that the government knowingly and purposefully recorded communications between defendant and four attorneys,[1] and relied upon the content of those recordings to secure search warrants and Title III wiretap orders, "resulting in evidence tainted by government misconduct being obtained and presumably presented to the grand jury." (ECF

---

[1] Although defendant originally identified criminal defense attorney J. Alan Johnson ("attorney Johnson") as one of the attorneys whose communications were wrongfully recorded by the government, defendant did not submit any proposed findings of fact and conclusions of law about attorney Johnson, and repeatedly confined his arguments to the government's alleged intrusion into his personal attorney-client relationships with "four lawyers," i.e., Ralph Monico, Leo Daly, Joseph Askar, and Timothy Barry. (ECF No. 70 at 7; ECF No. 133 at 1; ECF No. 139 at 2.) Attorney Johnson's name is mentioned only twice in the more than 100 pages of proposed findings and conclusions filed by defendant: once to demonstrate that Barry acted as defendant's personal attorney by helping to select attorney Johnson to be defendant's defense counsel in this case (ECF No. 133 ¶ 38); and once to suggest that Askar acted as defendant's personal attorney by helping attorney Johnson's investigator gather unidentified "information" (ECF No. 133 ¶ 50). Any claim with respect to the interception of attorney Johnson's communications is unsupported by this record, and deemed abandoned.

No. 70 at 1, 10; ECF No. 133 at 1.)

The court held hearings on defendant's motion on September 30, 2014, October 20, 2014, November 10, 2014, November 12, 2014, and November 25, 2015, during which attorneys Ralph Monico, Timothy Barry, Catherine Recker, and Robert Masters, FBI agents Paul Allen and Samantha Bell, and Ed Elder, the president of The Pennsylvania Cyber Charter School ("PA Cyber") board of trustees, testified. Documentary evidence and the content of numerous conversations recorded by the government during the investigation that led to the filing of the instant indictment were entered into evidence during these hearings.

For the reasons set forth below, in the first phase of the proceedings on defendant's motion to dismiss or suppress, this court concludes that the only attorney with whom defendant proved he had a personal attorney-client relationship was attorney Timothy Barry. Defendant's attorney-client relationship with attorney Timothy Barry began no earlier than November 17, 2011, and was limited in scope to defendant's intention to perform consulting work for out-of-state entities after he left the employment of PA Cyber. In the second phase of the proceedings on defendant's motion to dismiss or suppress, defendant will be required to prove that the government was objectively aware of this personal attorney-client relationship and deliberately intruded into it and that defendant was actually and substantially prejudiced as a result. COL 4. Although the record presently before this court could not support findings in defendant's favor on any of these matters, defendant will be afforded the opportunity to present additional evidence and argument directed specifically to these matters if desired. In this jurisdiction, defendant is entitled to relief only if he proves that the government's conduct was egregious, outrageous, shocking, and intolerable. COL 5.

# I. **FINDINGS OF FACT**

## A. **The Entities**

### 1. **PA Cyber**

FOF 1)     PA Cyber is a public cyber-charter school that was founded in 2000. (Gov. Ex. 1.)

FOF 2)     As a public cyber-charter school, PA Cyber was established pursuant to state statutory law, and is subject to regulation and oversight by the Pennsylvania Department of Education and the United States Department of Education. 24 Pa Cons. Stat. § 17-1745-A; (ECF No. 118 at 51, 52.)  PA Cyber's charter is required to be periodically renewed and approved by the Pennsylvania Department of Education. (Gov. Ex. 1.)

FOF 3)     Because PA Cyber is a nonprofit entity, it is subject to oversight by the Pennsylvania Attorney General's Office with respect to certain transactions. (ECF No. 118 at 52.)

FOF 4)     As a charter school, when a student elects to attend PA Cyber instead of the schools within that student's school district, that student's school district of residency pays a set fee to PA Cyber to cover that student's cost of attendance. (ECF No. 118 at 52.)

FOF 5)     A cyber-school functions like a traditional, bricks and mortar school, but provides instruction to students over the Internet, via computer. (ECF No. 118 at 51.)

FOF 6)     Defendant was the founder and, until June 2012, was the chief executive officer, of PA Cyber. (ECF No. 109 at 133.)  Attorney Timothy Barry was PA Cyber's corporate counsel. See FOF 46.

FOF 7)     Although defendant, at times, sat on the board of trustees of PA Cyber, which is the equivalent of sitting on the school board of a traditional school district, he did not serve on the board in 2011 or 2012. (ECF No. 118 at 53.)

FOF 8)    Defendant left the employment of PA Cyber on June 30, 2012. (ECF No. 119 at 8.)

## 2. **NNDS**

FOF 9)    PA Cyber purchased curriculum products from the National Network of Digital Schools Management Foundation ("NNDS"), pursuant to an amended management agreement that guaranteed PA Cyber the best price for such products. (ECF No. 118 at 135, 137-38; ECF No. 124 at 63.)

FOF 10)    Under the amended management agreement, NNDS was paid a percentage of PA Cyber's total revenue each year. (ECF No. 118 at 135.)

FOF 11)    In 2012, NNDS owned a computer software curriculum asset called "Lincoln Interactive." (ECF No. 118 at 65-66.)

FOF 12)    Although defendant once served as NNDS's president, he was not an officer, employee, or board member of NNDS in 2012. (ECF No. 118 at 71.)

FOF 13)    Mark Elder was the director of operations of NNDS in 2012. (119 at 51; 124 at 63-64.)  Joseph Askar was NNDS's corporate counsel. See FOF 36.

## 3. **Avanti**

FOF 14)    Avanti Management Group ("Avanti") provided unidentified technical services to NNDS. (ECF No. 109 at 24; ECF No. 119 at 6.)

FOF 15)    Brett Geibel ("Geibel") was chief executive officer of Avanti in 2012.  He was not an employee of PA Cyber or NNDS at that time. (ECF No. 109 at 132; ECF No. 119 at 6-7.)

FOF 16)    Geibel became a confidential human source in 2012, and, in that capacity, recorded certain in-person conversations in which defendant, and others, participated. (ECF No. 109 at 132-33.)

**B.  The Investigation**

FOF 17)    FBI Special Agent Sandra Bell ("SA Bell") was the lead agent on the

investigation that led to the filing of the instant indictment. (ECF No. 117 at 119-20.)

FOF 18)    The investigation of this case included, among other activities, consensual

recordings made by two confidential informants, beginning in January 2012 (Gov. Ex. 41, 41A;

Def. Exs. X, A1a-c, A1-Trans.), and the interception of wire and electronic communications to

and from a cellular telephone device used by defendant, pursuant to an order obtained pursuant

to Title III of the Omnibus Crime Control Act of 1968, 18 U.S.C. §§ 2510-2520. (Def. Exs. X,

A1, A12, II.)

FOF 19)    Wire and electronic communications can be either autominimized or

manually/optionally minimized.  A communication is autominimized when, based upon certain

predetermined telephone numbers, the content of a communication is blocked before it comes

through the wiretap for law enforcement to hear. (ECF No. 117 at 60-68, 112-13.)

Communications can be manually/optionally minimized by a law enforcement agent while he or

she listens to conversations as they are being intercepted. (Id.)  Communications may be

manually/optionally minimized because they are believed to be protected by some privilege,

such as attorney-client, clergy, or spouse, or because the speakers or topics are not relevant to the

investigation. (Def. Ex. MM at 10-13; ECF No. 199 at 67-70.)

FOF 20)    Defendant presented evidence that communications between defendant and

attorney Timothy Barry were manually/optionally minimized on May 25, 2012 and June 13,

2012. (ECF No. 109 at 46-48; ECF No. 117 at 29-30, 47-50; Def. Exs. A17, AA.)  At some point

in the investigation, SA Bell was instructed by one of the Assistant United States Attorneys

supervising the investigation that led to the filing of the instant indictment, to start

autominimizing attorney Timothy Barry's communications with defendant "out of caution." (ECF No. 117 at 61, 68-69.) SA Bell could not recall the date on which she received that instruction, but explained that it would have been given "right before the first call [with Barry] that you see was autominimized." (Id.) The first evidence proffered by defendant reflecting that attorney Timothy Barry's communications were autominimized is dated June 14, 2012. (ECF No. 117 at 29-30; Def. Ex. A18.) Defendant also proffered evidence that four different communications between defendant and Barry were autominimized on July 18, 2012. (ECF No. 117 at 61, 68-69; see ECF No. 117 at 48-50; see, Def. Exs. CC-FF (not admitted into evidence at the hearings on defendant's motion, but reflective of stipulations read into the record).)

## C. The Attorneys

### 1. Ralph Monico and Leo Daly of Grogan Graffam, P.C.

FOF 21) Grogan Graffam P.C., a law firm located in downtown Pittsburgh, Pennsylvania, was retained to represent NNDS in February 2012, with respect to "matters involving review and consultation concerning various NNDS transaction issues that may relate to business structure and asset valuation or transfer" (the "2012 Grogan-NNDS Engagement"). (Gov. Ex. 20 at 1.) One such "transaction issue" was NNDS's sale of Lincoln Interactive, a software asset owned by NNDS. See FOF 11; (ECF No. 109 at 133; ECF No. 118 at 65-66, 72, 131-32, 134, 140.)

FOF 22) Grogan Graffam's representation of NNDS was set forth in a written engagement letter dated February 16, 2012, and addressed to "Mr. Mark Elder, Director of Operations, NNDS, 1000 3rd Street, Beaver, PA 15009." (Gov. Ex. 20 ("NNDS Engagement Letter"); ECF No. 119 at 51; ECF No. 124 at 63-65.)

FOF 23) Leo Daly ("Daly"), a partner at Grogan Graffam, signed the NNDS Engagement Letter on behalf of the law firm. (Gov. Ex. 20; ECF No. 119 at 51; ECF No. 124 at 63-65.)

FOF 24)    Ralph Monico ("Monico"), a senior associate, or non-equity partner, at Grogan

Graffam, drafted the NNDS Engagement Letter. (ECF No. 124 at 64-65.)

FOF 25)    Daly and Monico are the Grogan Graffam attorneys who worked with NNDS on

the matters identified in the NNDS Engagement Letter. (ECF No. 124 at 63, 65.)

FOF 26)    Invoices for professional services provided by Grogan Graffam during the 2012

Grogan-NNDS Engagement were sent to Mark Elder at NNDS. (Gov. Exs. 21 and 22; ECF No.

124 at 78-81, 96.)

FOF 27)    The record is devoid of any documentary evidence that defendant was billed for

legal services provided by Grogan Graffam during the 2012 Grogan-NNDS Engagement, or at

any other time.

FOF 28)    Monico, pursuant to a subpoena issued by the government, testified at the

hearings on defendant's suppression motion. (ECF No. 124 at 62, 83.)

FOF 29)    Defendant did not subpoena, or otherwise call, Monico or Daly to testify at the

hearings on his motion.

FOF 30)    Monico testified that he never interacted substantively with defendant during the

2012 Grogan-NNDS Engagement.  (ECF No. 124 at 77.)

FOF 31)    Monico testified that he never interacted substantively with attorney Timothy

Barry during the 2012 Grogan-NNDS Engagement.  (ECF No. 124 at 77.)

FOF 32)    Monico testified that he never submitted an invoice to defendant for legal services

during the 2012 Grogan-NNDS Engagement. (ECF No. 124 at 81.)

FOF 33)    Monico testified that he did not represent defendant personally during the 2012

Grogan-NNDS Engagement, and did not provide defendant with legal advice during the 2012

Grogan-NNDS Engagement, and specifically denied that he worked with attorneys Joseph Askar

and Timothy Barry to provide advice to defendant regarding his planned departure from PA Cyber and how defendant should structure his relationships with PA Cyber, NNDS and Avanti. (ECF No. 124 at 74-76, 81-82.)

FOF 34)    Although Daly entered the appearance of Grogan Graffam on behalf of defendant in the case captioned Rodis, LLC v. Trombetta, 2:05-cv-816, which was filed in this court on June 15, 2005, Jamie McGovern, an attorney selected and appointed by PA Cyber's insurance company, acted as lead counsel for defendant in that case. (Def. Exs. L, N; ECF No. 124 at 87-88.)  Grogan Graffam never provided any professional services to defendant in connection with that case, and the case was terminated on May 9, 2006. (Id.)  In that litigation, Rodis, LLC ("Rodis"), a limited liability company that offered professional management services to cyber-charter schools, accused defendant, identified as the chief administrative officer of PA Cyber, of causing a cyber-charter school in Ohio to terminate its business relationship with Rodis by threatening to withhold the assistance being provided to that school by PA Cyber. Rodis, LLC v. Trombetta, 2:05-cv-816, ECF No. 1 ¶¶ 10, 34, 36.  PA Cyber provided that Ohio cyber-charter school with almost all its technical resources and support, educational materials, and administrative functions. (Id. ¶ 28.)

FOF 35)    Daly entered an appearance in the case captioned Rodis, LLC v. The Western Pennsylvania Cyber Charter School, et al., 2005-10676, which was filed in the Court of Common Pleas of Beaver County, Pennsylvania on April 15, 2005. (Def. Ex. K; ECF No. 124 at 83-84, 86-89.)  In that litigation, Rodis sued PA Cyber, and ten individuals who served on PA Cyber's board of trustees or as officers of PA Cyber, for wrongful termination of a management agreement between Rodis and PA Cyber. Rodis, LLC v. Trombetta, 2:05-cv-816, ECF No. 1 ¶ 39; ECF No. 7-1 (Beaver County complaint) ¶¶ 1, 5; ECF No. 7-1 at 15-20 (management

agreement). Defendant was one of the ten individually-named defendants. (Def. Ex. K.) Daly represented all eleven defendants in that case. (ECF No. 124 at 83-88.) The Beaver County case was closed on October 7, 2010. (Def. Ex. K.)

## 2. Joseph Askar

FOF 36)    Joseph Askar ("Askar") was NNDS's corporate counsel in 2012. He was also the Beaver County solicitor at the same time. (ECF No. 109 at 133-34; ECF No. 117 at 77; ECF No. 119 at 56-57, 93; ECF No. 124 at 66.)

FOF 37)    The NNDS Engagement Letter identifies Askar as NNDS's corporate counsel. (Gov. Ex. 20.)

FOF 38)    Askar had an office in the NNDS building in Beaver, Pennsylvania, and may have serviced a private law practice from that location, based upon signage observed at that building by law enforcement officials. (ECF No. 117 at 77; ECF No. 119 at 44-45, 55-56, 82-83.)

FOF 39)    SA Bell testified that she identified no evidence during the investigation that led to the filing of the instant indictment to indicate that Askar was defendant's personal attorney at the time the consensual and Title III recordings were made. (ECF No. 119 at 85-87.)

FOF 40)    One of the confidential informants informed the government that he did not believe Askar to be defendant's personal attorney. (Def. Ex. A11 at 33.)

FOF 41)    Although Askar was subpoenaed to testify at the hearings on defendant's motion, he invoked his Fifth Amendment privilege and refused to testify. (ECF No. 117 at 13.) The government declined defendant's oral request to offer Askar defense witness immunity. (ECF No. 117 at 10-11.) Defendant immediately thereafter mentioned the possibility of offering written briefing to the court with respect to judicial use immunity, and was instructed by the court to file a written motion and submit briefing on the issue if such relief was desired. (ECF

No. 117 at 11-12.)  Defendant never filed a written motion seeking judicial use immunity in connection with Askar's testimony.

FOF 42)     Defendant produced no documentary evidence supporting his contention that Askar was his personal attorney in 2012, such as, for example, an engagement letter, fee agreement, contemporaneous correspondence, or billing statements.

FOF 43)     Askar was identified in the minimization instructions governing the Title III wiretap order at issue in these proceedings as an attorney who may participate in monitored communications. (Def. Ex. MM at 11.)  The minimization instructions indicate that "it does not appear that Attorney Askar is acting as an attorney for any of the known target subjects" but advised those monitoring the wiretap to take "great care" in the course of monitoring his conversations. (Id.)

FOF 44)     The application for the Title III wiretap order similarly stated: "Special care shall be taken to advise monitoring personnel regarding appropriate minimization procedures relative to telephone calls and/or text messages that may involve TARGET SUBJECT Attorney Joseph Askar." (Def. Ex. II at 7; ECF No. 117 at 52-53, 69-70.)  Notably, when defense counsel read this portion of the Title III application into the record, he recited the passage as stating: "Special care shall be taken to advise monitoring personnel regarding appropriate minimization procedures relative to telephone calls and/or text messages that may involve *target subject's attorney* Joe Askar." (ECF No. 117 at 70 (emphasis made by the court).)  Defense counsel's use of the possessive form of the word "subject" is a subtle, but significant, distinction.  The application was identifying Askar as a TARGET SUBJECT himself, not as the attorney for any other TARGET SUBJECT. (Accord, Def. Ex. A11 at 3-4 (identifying Askar as a TARGET SUBJECT); Def. Ex. MM at 1 (same).)  Defendant, nevertheless, relied upon counsel's

erroneous statement about the content of the Title III application in his proposed findings of fact and conclusions of law to support the proposition that Askar was defendant's personal attorney. (ECF No. 133 ¶ 47.)  In any event, the application immediately went on to explain that "there is no evidence to this point in the investigation that Attorney Askar has an attorney/client relationship with TROMBETTA (or any other TARGET SUBJECT/INTERCEPTEE)" but indicated that monitoring personnel would "remain vigilant" concerning the matter. (Def. Ex. II at 7.)

FOF 45)     SA Bell explained that Askar was a potential target of the government's investigation, was known at the time to represent NNDS and Beaver County, was known to have been involved in a transaction that resulted in a Florida property being taken out of defendant's name and transferred to a company named Palatine, and was believed to have a private law practice in NNDS's office building in Beaver, Pennsylvania, raising the possibility that Askar could personally represent defendant or others. (Def. Ex. A11 at 33; ECF No. 109 at 76; ECF No. 117 at 70-71; ECF No. 119 at 82-86, 93.)

### 3. Timothy Barry

FOF 46)     Timothy Barry ("Barry") represented PA Cyber since approximately 2002. (ECF No. 109 at 132; ECF No. 117 at 77; ECF No. 118 at 27, 30, 50-51, 144; ECF No. 124 at 32-33, 77.)

FOF 47)     Barry's representation of PA Cyber began when Robert Masters, an attorney in Beaver, Pennsylvania, contacted Barry's law partner at the time, Mr. Hough, sometime in 2002 or 2003, about Mr. Hough's law firm representing PA Cyber, which was called Western Pennsylvania Cyber Charter School at the time, in a lawsuit that had been filed by numerous school districts challenging the legal legitimacy of a cyber-charter school. (ECF No. 118 at 28-

29.)  Mr. Masters and Mr. Hough were personal friends, and at the time, Barry worked at Mr. Hough's law firm. (ECF No. 118 at 28-29.)  Barry did not know defendant before this inquiry was made by Mr. Masters to Mr. Hough. (Id.)

FOF 48)    Barry continued to represent PA Cyber through his own law firm, Barry & Worner, LLC.  Shon Worner, Barry's partner at the firm of Barry & Worner, LLC, also provided legal services to PA Cyber, as did subordinate employees who worked for that law firm. (ECF No. 118 at 54.)

FOF 49)    Barry & Worner, LLC issued monthly invoices for legal services.  The invoices were addressed to "Nick Trombetta, Ed.D., Pennsylvania Cyber Charter School," and after June 2012, to "Michael Conti, Ed.D., CEO, Pennsylvania Cyber Charter School." (ECF No. 118 at 54; Gov. Ex. 4, 7-9.)

FOF 50)    Barry met regularly with PA Cyber's board of trustees, attended board meetings, and addressed legal issues relevant to the board and the operations of PA Cyber as they arose. (ECF No. 124 at 32-34.)

FOF 51)    Sometime before 2012, the PA Cyber board of trustees asked Barry to formulate a strategy pursuant to which defendant could act as a "consultant to PA Cyber through NNDS," after defendant left the employment of PA Cyber. (ECF No. 119 at 17-20 (Barry: "that was the game plan as early as 2007"); ECF No. 124 at 50-51 (Elder: identifying timeframe as 2011).) This strategy is referred to in these proceedings as defendant's "exit strategy."  Although Ed Elder, a member of PA Cyber's board of trustees, did not testify that the board instructed Barry to assist defendant with his exit strategy, the court resolves this evidentiary conflict by relying upon Barry's testimony and finding that Barry was instructed by the board to ensure that defendant could act as a consultant to PA Cyber, through NNDS, after defendant left the

employment of PA Cyber.  In resolving this evidentiary conflict in this manner the court notes that Mr. Elder was not directly asked, by either party, whether it was the board that instructed Barry to assist defendant in this way.

FOF 52)    In his capacity as "General Counsel for… PA Cyber" Barry requested, by letter dated October 10, 2011, "an advisory opinion on behalf of PA Cyber" from the Pennsylvania State Ethics Commission ("Ethics Commission") about whether certain categories of former PA Cyber employees could provide the same services to PA Cyber, but as employees of NNDS. (Gov. Ex. 1; ECF No. 118 at 55-57, 59-60.)  In response, the Ethics Commission notified PA Cyber by letter, "that the State Ethics Act prohibits former employees of PA Cyber, who are considered to be Public Employees under the Act, from performing services for PA Cyber, pursuant to the Management Agreement with NNDS, for a period of one year after they leave the employment of PA Cyber." (Gov. Ex. 2A.)  The Ethics Commission's opinion confirmed legal research that Barry performed in September 2011, which indicated that defendant would not be permitted to act as a consultant to PA Cyber through NNDS for the first year after he left the employment of PA Cyber. (ECF No. 118 at 55-57.)  Barry forwarded the Ethics Commission's advisory opinion to defendant with a cover memorandum dated November 17, 2011, indicating that defendant would not be permitted to provide consulting services to PA Cyber through NNDS for one year after he left the employment of PA Cyber, and stating that Barry did "not recommend that PA Cyber" appeal the advisory opinion to the full Ethics Commission. (Gov. Ex. 2; ECF No. 118 at 59-60.)

FOF 53)    Barry billed PA Cyber in connection with seeking this advisory opinion from the Ethics Commission, and notifying defendant about the opinion's effect on the board's planned exit strategy for defendant. (ECF No. 119 at 39-40.)

FOF 54)    After receipt of the Ethics Commission's advisory opinion, defendant's exit strategy became that he would perform consulting work for out-of-state entities after he left the employment of PA Cyber, which for purposes of these findings and conclusions, will be referred to as defendant's "revised exit strategy." (ECF No. 119 at 17-19.)

FOF 55)    Before defendant left the employment of PA Cyber, Barry drafted an opinion memorandum, dated January 23, 2012, about defendant's ability to engage in consulting work for out-of-state entities while still serving as the chief executive officer of PA Cyber. (Gov. Ex. 3; ECF No. 118 at 60-61.)    Barry states in this memorandum that his opinion is rendered "as General Counsel for Pennsylvania Cyber." (Gov. Ex. 3.)  PA Cyber was billed for the preparation of the memorandum, and Barry presented it to the PA Cyber board of trustees at a January 23, 2012 board meeting. (Gov. Exs. 3 and 4; ECF No. 118 at 62-64, 86-87.)    Barry's opinion was that defendant could engage in consulting activities for entities outside Pennsylvania while still employed by PA Cyber without violating the Ethics Act. (Gov. Ex. 3; ECF No. 118 at 60-64, 86-87.)  The final paragraph of the January 23, 2015 memorandum reads: "Although the out-of-state consulting activities which you have described do not represent a direct conflict of interest, in the event that during the performance of such activities a potential conflict should arise, I advise you to consult with legal counsel concerning any potential conflict of interest and to make disclosure of any such situation to the Board of Trustees." (Gov. Ex. 3 at 2.)    In the memorandum, Barry refers to defendant's "legal counsel" in the third person, which would give no indication to the reader that Barry, himself, was defendant's "legal counsel."

FOF 56)    Defendant contends that Barry provided personal legal services to him, at the same time that he represented PA Cyber. (ECF No. 118 at 30-31; ECF No. 119 at 20-21.) Defendant offered Barry's testimony, and the following documentary evidence, as proof of this

personal attorney-client relationship:

> FOF 56(a):  articles of incorporation, signed by Barry in October 2003, for National Cyber School Management Corporation, a company of which defendant would be the sole owner, (Def. Ex. H; ECF No. 118 at 29-31); COL 62(a);

> FOF 56(b):  Barry's notice of appearance in the case captioned <u>Rodis Rodis, LLC v. Trombetta</u>, 2:05-cv-816 (W.D. Pa.), on November 29, 2005 (Def. Exs. L and M); COL 37, 62(b);

> FOF 56(c):  Barry's testimony that he advised defendant personally, off and on between 2007 and 2012, with respect to defendant's transition from working for PA Cyber to working in the private sector (i.e., defendant's exit strategy), (ECF No. 118 at 17-21, 31-34, 37-42); COL 63(c);

> FOF 56(d):  A consensual recording of a March 8, 2012 meeting between defendant, Barry, Askar, Geibel, and Daly, (Gov. Exs. 30, 30A; Def. Exs. X, A5, A6; ECF No. 118 at 34; ECF No. 119 at 23-24); <u>see</u> FOF 92; COL 37(b)(1), 71;

> FOF 56(e):  Barry's testimony that, in June 2012, he worked with an Ohio lawyer to form a company in Ohio called Presidio Education Network, which would be owned by defendant and be used in connection with defendant's exit strategy, (ECF No. 118 at 31-34, 38-42); COL 61(a).

FOF 57)    Barry testified that he sent a single invoice to defendant in connection with the legal advice he rendered to defendant about his exit strategy between 2007 and 2012. (ECF No.

119 at 41.) Barry testified that the invoice was sent to defendant "around the time that the search warrant was executed," which was July 12, 2012, but that defendant asked Barry to "hold" the invoice and it was never paid. (Id.) A copy of the invoice was not presented at the hearings on defendant's motion.

FOF 58)    Defendant produced no documentary evidence supporting his contention that Barry was his personal attorney, such as, for example, an engagement letter, fee agreement, contemporaneous correspondence, or billing statements.

FOF 59)    Barry testified that it was his belief that the PA Cyber board of trustees knew that he was representing defendant personally and that he discussed defendant's original and revised exit strategies with the board on numerous occasions. (ECF No. 118 at 87; ECF No. 119 at 16-21.)

FOF 60)    Barry never asked PA Cyber to waive any actual or potential conflict of interest related to his dual representation of PA Cyber and defendant. (ECF No. 118 at 108.)

FOF 61)    Ed Elder, a member of PA Cyber's board of trustees since 2001, and a past, and at the time of his testimony, current, president of the board of trustees, testified that although he was aware, in 2011, of defendant's intention to retire from PA Cyber, he was unaware that Barry represented defendant personally with respect to his exit strategy, or any other matter, and does not recall the board ever voting on whether Barry could simultaneously represent PA Cyber and defendant. (ECF No. 124 at 28-29, 34-35, 50-51.)  Mr. Elder was called to testify by the government, without a subpoena. (ECF No, 124 at 43.)  Mr. Elder testified before the grand jury that returned the indictment in this case, and was interviewed by federal law enforcement agents on several occasions concerning this case. (ECF No. 124 at 40, 42-50.)

FOF 62)   Barry did not represent NNDS. (ECF No. 118 at 144; ECF No. 119 at 7-8.)

FOF 63)   Barry did not represent Avanti. (ECF No. 118 at 83-84, 144; ECF No. 119 at 7-8.)

FOF 64)   Barry testified that NNDS's potential sale of Lincoln Interactive did not concern defendant, and was not related to Barry's alleged personal representation of defendant. (ECF No. 118 at 131-33, 140-41.)

FOF 65)   PA Cyber waived its attorney-client privilege with Barry. (Gov. Ex. 19; ECF No. 118 at 18-25; ECF No. 124 at 55-57, 59.)

FOF 66)   Defendant maintains that he holds an personal attorney-client privilege with Barry, which defendant has not waived.

FOF 67)   The government was informed for the first time in September 2012, that Barry claimed that he personally represented defendant. (ECF No. 133 ¶¶ 30-32.)   Although Barry's attorney, Catherine Recker, spoke with a government attorney in November 2012 about this case, she did not define the scope or subject matter of the alleged personal representation. (ECF No. 118 at 103-04.)  Attorney Recker first notified the government in August 2014 that Barry was claiming to have personally represented defendant with respect to defendant's "work after he left PA Cyber." (ECF No. 118 at 104-05.)

FOF 68)   Sometime before June 14, 2012, communications between Barry and defendant began to be autominimized on the Title III wiretap. See FOF 20; (Def. Ex. A18; ECF No. 117 at 61-62, 68-69.)

FOF 69)   Defendant left the employment of PA Cyber at the end of June 2012. See FOF 8; (ECF No. 119 at 8.)

### D. **Common Interest Endeavor**

### 1. **Ripeness**

FOF 70)    In his motion to dismiss or suppress, defendant contended that "the government listened to conversations with lawyers for [defendant] and elicited privileged and confidential communications, in violation of [defendant's] constitutional rights and the prosecutor's duties as officers of the Court." (ECF No. 70 at 1.)  The "lawyers for [defendant]" were identified as Monico, Daly, Askar, and Barry. (Id. at 5-7, see supra note 1 (regarding allegations concerning attorney Johnson.)   Prior to the first hearing on defendant's motion, this court entered an order indicating that it would bifurcate the hearing, and first address only whether any attorney-client privilege was established, and after that initial determination, then address the remaining issues, as appropriate. (9/29/2014 Text Order.)

FOF 71)    At the first day of hearings on defendant's motion, the court, after setting forth the applicable legal standards, stated that "the issues that the court would have before it for this hearing today" are "how does Mr. Trombetta show, one, that he is the client of any of the lawyers that are involved, and then, secondly, what is the common interest? I know there's an expression that there was a common interest. But I don't really know what the specific interest is." (ECF No. 109 at 25-29.)  During an earlier exchange, the court described the "second step" in these proceedings as determining whether the government purposefully targeted attorney-client privileged communications for recording. (ECF No. 109 at 12-13.)

FOF 72)    Both defendant and the government questioned Monico about defendant's asserted common interest theory. (ECF No. 124 at 75, 77, 93-95.)

FOF 73)    Defendant called Barry to testify, but did not directly ask him about defendant's asserted common interest theory.  At the end of Barry's testimony, which was on the fourth day

of hearings on defendant's motion, the government stated its intention to recall Barry "when we get to the disclosure portion of the hearing." Defendant stated that he had no intention to recall Barry for any reason. (ECF No. 119 at 42.)

FOF 74)    Defendant proffered two demonstrative exhibits at the beginning of the first day of hearings on defendant's motion, and described them as marshalling the evidence in support of defendant's claim of privilege. (ECF No. 109 at 15-16, 29-30.) One chart was entitled "Trombetta Attorney-Client Relationship with Timothy Barry, Esq." and the other was entitled "Community of Interest." (Def. Exs. Y and Z.)

FOF 75)    Defense counsel insisted during the hearings on defendant's motion that evidence reflecting a "continuing pattern of lawyers working together to give personal advice to Nicholas Trombetta" was relevant to the first phase of the proceedings, and acknowledged that the "next round" of hearings would address the government's alleged purposeful recording of privileged conversations. (ECF No. 117 at 36; ECF No. 119 at 94.)

FOF 76)    Defense counsel maintained throughout the hearings on defendant's motion that a March 8, 2012 conversation between Askar, Barry, defendant, Daly, and Geibel was privileged because of the common interest doctrine. (ECF No. 118 at 142.)

FOF 77)    Defendant's proposed findings of fact and conclusions of law included proposed findings with respect to the common interest doctrine, (ECF No. 133 ¶ 65), and closed with the following statement:

> On the threshold issue before the Court, the evidence establishes that Trombetta has a personal attorney-client relationship with Attorneys Barry, Askar, Daly and Monico. Accordingly, the Court should make that finding and order the parties to proceed to the next phase of the hearing, which will focus on the government's intrusion on those attorney-client relationships and the extent to which the taint from that misconduct requires suppression of evidence or dismissal of the indictment.

(ECF No. 133 at 29.)

FOF 78)    Despite these facts, in reply to the government's proposed findings of fact and

conclusions of law, defendant insisted that the court explicitly deferred "consideration of the

common interest doctrine [until after] resolution of the threshold issue of whether or not

Trombetta has established attorney-client relationships with the four attorneys at issue" and

stated:

> Although the potential applicability of the common interest doctrine was
> raised and some evidence related thereto was admitted at the hearing, that
> issue has not been fully addressed. In the event that the Court wishes to hear
> argument addressing the potential applicability of the common interest
> doctrine during this phase, rather than after resolution of the attorney-client
> relationship issues as previously directed, Trombetta respectfully requests an
> opportunity to address it in supplemental briefing.

(ECF No. 139 at 44.)  Notably, on the second page of that same document, defendant argued that

the government was attempting "to avoid judicial scrutiny of its misconduct in the next phase,"

which would follow "the first phase, which is focused on the threshold issue of whether

[defendant] has personal attorney-client relationships with the four lawyers at issue." (ECF No.

139 at 2.)

FOF 79)    The court thereafter entered an order directing defendant to "propose to the court

on or before 2:00 p.m. on May 4, 2015, a timeline for the submission of the supplemental

briefing he requests in ECF No. 139 at 44, and any other proceedings he contends are required in

order for this court to "fully address[]" the common interest doctrine at this juncture." (4/27/2015

Text Order.)

FOF 80)    In response to the court's order, defendant filed a notice stating that "the common

interest issue would be most efficiently considered after resolution of the threshold attorney-

client relationship issues that are the subject of this first phase," but stated that if the court was

nevertheless inclined to address it during phase one of the proceedings, "the common interest issue would be fully briefed with a single additional submission from [defendant] focusing on that issue." (ECF No. 143 at 1-2.) This notice was the first indication that defendant was contending that it would be "inefficient" to address the common interest doctrine during the first phase of the proceedings on defendant's motion. Despite being invited to set forth a timeline for "any other proceedings" that would be required before the court could "fully address" the common interest issue, defendant did not indicate in his notice that additional evidence, either documentary or testimonial, would need to be admitted into the record in order to "fully address" the common interest issue. See FOF 79.

FOF 81)    After the government had an opportunity to respond to defendant's notice, (ECF No. 145), the court held a telephonic conference, on May 13, 2015, to address scheduling of the supplemental submissions limited to the common interest issue requested by defendant. (ECF No. 155.) The court opened the conference by stating "I have reviewed the relevant portions of the transcript relating to this issue, and it was very clear that the common interest issue was going to be taken up at the same time as the question of the attorney-client relationship." (ECF No. 155 at 3.) The court specifically addressed defendant's contention that the court deferred the common interest issue by stating, on the third day of hearings, that the common interest issue was "another issue down the road." (ECF No. 139 at 43; ECF No. 118 at 70.) The court explained that the comment was made during an exchange between the court and counsel and concerned the procedure by which Barry, who was being cross-examined at the time, would be able to invoke defendant's personal attorney-client privilege, and was intended by the court to be a "reference to after [Barry] was finished with his cross-examination." (ECF No. 155 at 3.) The court stated: "I'm not going to fault anyone for that or whatever confusion that may have caused.

But clearly it was the intention that these would all be addressed at the same time." (Id.)
Defendant offered no comment or argument in response, and the court set a schedule for the
submission of supplemental proposed findings of fact and conclusions of law with respect to the
common interest issue. (Id. at 3-4.)

FOF 82)    In defendant's supplemental proposed findings of fact and conclusions of law,
defendant reiterated his position that he established personal attorney-client relationships with all
four attorneys at issue in this case, but stated that "in the alternative the evidence demonstrates
coordinated action and confidential communications among the lawyers with respect to matters
of common legal interest to their respective clients." (ECF No. 151 at 3.)  Defendant offered nine
additional proposed findings of fact and nine pages of additional legal briefing on the common
interest issue. (Id. at 7-16.)  In this filing, defendant made no proffer that additional evidence
concerning the common interest issue needed to be developed.

FOF 83)    In defendant's final submission, in response to arguments made by the
government in its supplemental filing on the common interest issue, defendant explained that he
did not question Barry about the common interest issue because "when Barry testified at the
hearing, undersigned counsel understood that the common interest privilege was an issue
reserved for the second phase of the hearing… a belief that this Court previously found to be
reasonable during the May 13, 2015 telephonic status conference.  Accordingly, there was no
perceived need to further develop testimony from Barry on this issue at the first phase of the
hearing." (ECF No. 153 at 3.)  Despite making this generalized assertion, defendant made no
proffer about the testimony that would be developed concerning the common interest issue if
Barry was recalled for that purpose.  Defendant's statement misconstrues the record and this
court's statements at the May 13, 2015 conference.

FOF 83(a): As previously noted, at the end of Barry's testimony, defendant did not reserve the right to recall Barry for any reason. The government reserved the right to recall Barry "when we get to the disclosure portion of the hearing." See FOF 73.

FOF 83(b): During an exchange that took place between the court and counsel during Barry's cross-examination, the court asked "Can he explain why it was privileged? I mean there's other people present here," making defendant's assertion that he understood, during Barry's testimony, that the court deferred the common interest issue without merit. (ECF No. 118 at 67.)

FOF 83(c): At the May 13, 2015 conference, the court stated that neither party would be faulted for misconstruing the "down the road" statement made by the court during Barry's cross-examination, but that it was clear throughout the hearings on defendant's motion that the common interest issue would be addressed during the first phase of the proceedings on defendant's motion. The court did not characterize defendant's belated assertion that the common interest issue had been deferred as reasonable.

FOF 84) The Court of Appeals for the Third Circuit recognizes that the common interest doctrine can be critical to establishing the confidentiality prong of the attorney-client privilege, because if persons other than the client, his attorney, and their agents are present, the privilege does not attach. COL 13.

FOF 85)   Based upon both the facts of this case, and the applicable law, the common interest issue is ripe for determination now.

## 2. **Substance**

FOF 86)   Defendant contended, in his original proposed findings of fact and conclusions of law, that PA Cyber and defendant had a common interest in defendant's original exit strategy to act as a consultant to PA Cyber after leaving the employment of PA Cyber, and that NNDS's attorneys provided advice to defendant on this subject as well. (ECF No. 133 at 2-3, 24.)

FOF 87)   In the supplemental briefing that defendant requested permission to file on the common interest issue, defendant broadened the scope of the purported common interest endeavor to be that PA Cyber, defendant, and NNDS, and its attorneys, "had a common interest in [defendant's] transition from PA Cyber and potential future relationship with PA Cyber and its downstream vendors in a way that complied with all legal restrictions – an issue that was related to the potential sale of Lincoln Interactive curriculum owned by NNDS and used by PA Cyber." (ECF No. 151 ¶ 64.)

FOF 88)   To prove that these entities, and their counsel, had a common interest, defendant relies, almost exclusively, upon statements made by various individuals during conversations that were recorded during the investigation that led to the filing of the instant indictment. (ECF No. 133 ¶ 56; ECF No. 151 ¶¶ 61-69.)  The only individuals who participated in any such recordings and testified at the hearings on defendant's motion were Monico and Barry. Defendant did not call Daly to testify. See FOF 29.  Askar asserted his Fifth Amendment right and refused to testify. See FOF 41.  Defendant produced no documentary evidence reflecting that PA Cyber, NNDS, and defendant, and their attorneys, entered into a common interest agreement concerning defendant's transition from PA Cyber, which "was related to the potential sale of

Lincoln Interactive."

FOF 89)    To reiterate: Barry was PA Cyber's corporate counsel, (See FOF 46, 56); Askar

was NNDS's corporate counsel, (See FOF 36); and Daly and Monico worked for Grogan

Graffam, a law firm hired by NNDS in February 2012 to provide legal advice with respect to

business structure, and asset valuation or transfer (See FOF 21-25).

FOF 90)    Monico denied that he personally represented defendant, or was part of a common

interest endeavor. See FOF 28, 30-33.

FOF 91)    Defendant called Barry to testify on his behalf, but never asked Barry whether he

represented defendant as part of a common interest endeavor. See FOF 73.

FOF 92)    Defendant contends that a meeting that took place on March 8, 2012, is critical to

proving his common interest theory. (ECF No. 133 ¶ 56; ECF No. 151 ¶¶ 62-64; ECF No. 153 at

1; Gov. Exs. 30, 30A; Def. Exs. X, A5, A5-Trans. and A6, A6-Trans.)  That meeting was

attended by Barry, Daly, Askar, Geibel, and defendant, and took place following a meeting of

NNDS's board of directors. (ECF No. 124 at 92-93; ECF No. 151 ¶ 62.)

> FOF 92(a):  Although Barry testified that he considered the
>
> entirety of the March 8, 2012 meeting to be privileged, he further
>
> testified that he attended that meeting in his dual capacity as counsel to
>
> PA Cyber and as personal counsel to defendant, and that much of the
>
> discussion at that meeting "had nothing to do with" his being there as
>
> defendant's personal attorney. (ECF No. 118 at 34-35, 131-32.)
>
> Given Barry's admission that the March 8, 2012 meeting concerned
>
> matters of corporate interest to PA Cyber, comments made during that
>
> meeting that attorneys for PA Cyber and NNDS were working

together, sharing information, or coordinating efforts cannot be presumed to relate to a common interest endeavor concerning defendant's personal legal interests. (Gov. Exs. 30, 30A-2 at 26 (lns.14-15), 35 (lns. 10-11).)

FOF 92(b): Barry never testified at the hearings on defendant's motion that the entities represented at that meeting were engaged in a common interest endeavor with respect to defendant's personal legal interests. Barry offered no explanation with respect to why PA Cyber (Barry), NNDS (Daly and Askar), and Avanti (Geibel), would share any common legal interest about defendant's exit strategy, which by March 8, 2012, no longer involved the possibility of immediately offering consulting services to PA Cyber through NNDS, due to the Ethics Commission's advisory opinion. Barry did testify, however, that when he spoke at that meeting about NNDS's Lincoln Interactive asset, he did so in his capacity as PA Cyber's corporate counsel, and Barry stated several times that Lincoln Interactive had no connection to and was of no personal concern to defendant. See FOF 64.

FOF 92(c): Although Barry made certain comments during the March 8, 2012 meeting that could be interpreted as indicating that Barry was personally advising defendant about his post-employment business ventures, (Def. Exs. X, A6, A6-Trans. at 20 (middle), 35 (bottom), 36 (top), 37 (top)), Barry also repeatedly stated that he was speaking on behalf of, or from the viewpoint of, PA Cyber (Gov. Exs.

30, 30A-1 at 18 (lns. 18-19, 23-24), 19 (lns. 11-24), 26 (lns. 9-16), 28 (lns. 9-14).)  Upon consideration of the content of the entire March 8, 2012 meeting, the court concludes that a line of demarcation, either temporal or contextual, was never clearly made about Barry's purported dual representation of defendant and PA Cyber.

## II.  CONCLUSIONS OF LAW

### A.  Legal Authority

#### 1. Government Intrusion into the Attorney-Client Relationship

COL 1)    Outrageous misconduct by law enforcement officers in detecting and obtaining incriminating evidence can rise to the level of a due process violation. Rochin v. California, 342 U.S. 165 (1952).  Courts are cautioned to exercise judicial restraint in this area, and the claim is rarely successfully made, and reserved for only the "most intolerable," "shocking," "outrageous," and "egregious" government misconduct that violates "that fundamental fairness… universal sense of justice" mandated by the Due Process Clause. United States v. Voigt, 89 F.3d 1050, 1065 (3d Cir. 1996) (citing decisions); see United States v. Hoffecker, 530 F.3d 137 (3d Cir. 2008) (recognizing that the court of appeals is "extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause").

COL 2)    When government misconduct is found to violate a defendant's due process rights, the indictment must be dismissed because the government conduct is deemed to render "the prosecution of the defendant fundamentally unfair." United States v. Lakhani, 480 F.3d 171, 181 (3d Cir. 2007).

COL 3)    Even where there is not a due process violation, a court may fashion a remedy for prosecutorial misconduct from its "supervisory power." United States v. Nieves, No. 97-46, 1997

WL 447992, at * 6 (E.D. Pa. July 24, 1997) (citing <u>United States v. Hasting</u>, 461 U.S. 499, 505 (1983); <u>United States v. Santana</u>, 6 F.3d 1, 9-10 (1st Cir. 1993)).  One purpose of the supervisory power is "to secure enforcement of 'better prosecutorial practice and reprimand of those who fail to observe it.'" <u>Id.</u> (citing <u>United States v. Osorio</u>, 929 F.2d 753, 763 (1st Cir. 1991)).

COL 4)     A defendant is entitled to relief based upon the government's intrusion into the attorney-client relationship if he demonstrates: (1) the government's objective awareness of an ongoing, personal attorney-client relationship; (2) deliberate intrusion into that relationship; and (3) actual and substantial prejudice. <u>Voigt</u>, 89 F.3d at 1067; <u>Hoffecker</u>, 530 F.3d at 154; <u>Nieves</u>, 1997 WL 447992, at * 5.   The burdens of both production and persuasion fall on defendant. <u>Voigt</u>, 89 F.3d at 1067, 1070.

COL 5)     Courts within the jurisdiction of the Third Circuit are "extremely hesitant" to sustain an outrageous government conduct challenge to a criminal prosecution. <u>Voigt</u>, 89 F.3d at 1065.  The challenged conduct must be "shocking, outrageous, and clearly intolerable" and the defense "is reserved for only the most egregious circumstances." <u>United States v. Nolan-Cooper</u>, 155 F.3d 221, 231 (3d Cir. 1998) (citing <u>United States v. Mosley</u>, 965 F.2d 906, 910 (10th Cir. 1992)).

COL 6)     A trial court may find that defendant's due process rights were not violated, without holding a hearing when, even assuming the movant's facts to be true, the conduct does not rise to the level necessary to establish shocking, outrageous, and clearly intolerable government misconduct. <u>United States v. Rodriguez</u>, 54 F. App'x 739, 748 (3d Cir. 2002).

COL 7)     The Court of Appeals for the Third Circuit has not sustained a due process challenge based upon outrageous government misconduct since 1978. <u>United States v. Twigg</u>, 588 F.2d 373 (3d Cir. 1978); <u>see</u> <u>United States v. Tolentino</u>, 486 F.App'x 286, 288-89 (3d Cir.

2012); United States v. Fortuna, No. 12-636, 2013 WL 1737215, at * 7-8 (D.N.J. Apr. 22, 2013).

## 2. **Attorney-Client Privilege**

COL 8)     In this criminal prosecution, federal common law governs claims of privilege.

FED. R. EVID. 501.  Rule 501 requires a federal court to engage in a case-by-case analysis.

Wachtel v. Health Net, Inc., 482 F.3d 225, 230 (3d Cir. 2007).

COL 9)     Defendant bears the burden of proving the existence of an attorney-client

relationship by a preponderance of the evidence. Voigt, 89 F.3d at 1067 n.6; see Shumaker, Loop

& Kendrick, LLP v. Zaremba, 403 B.R. 480, 484 (Bankr. N.D. Oh. 2009).

COL 10)    The privilege encourages full and frank communication between attorneys and

their clients because the administration of justice in a complex society depends upon the

availability of sound legal advice, and in turn, the soundness of legal advice depends upon

clients' willingness to present full disclosures to their attorneys. Wachtel, 482 F.3d at 231.

COL 11)    Nevertheless, the privilege obstructs the truth-finding process and should be

construed narrowly and "applied only where necessary to achieve its purpose." In re Processed

Egg Products Antitrust Litig., 278 F.R.D. 112, 117 (E.D. Pa. 2011) (citing decisions).

COL 12)    In order for the attorney-client privilege to apply, (1) a communication (2) must

be made between privileged persons, (3) in confidence and (4) for the purpose of obtaining or

providing legal advice or assistance to the client. In re Application of Chevron Corp., 650 F.3d

276, 289 (3d Cir. 2011) (citing In re Teleglobe Communications Corp., 493 F.3d 345, 359 (3d

Cir. 2007)).

COL 13)    With respect to the third requirement, a communication is not made in confidence,

and, therefore, is not privileged, if persons other than the client, the attorney, or their agents are

present. Chevron, 650 F.3d at 289 (citing In re Teleglobe, 493 F.3d at 361). "[A] client who

speaks openly or in the presence of a third party needs no promise of confidentiality to induce a disclosure." <u>Wachtel</u>, 482 F.3d at 231.

COL 14)   If an otherwise privileged communication is voluntarily disclosed to a third party by the client, then the privilege has been waived. <u>In re Teleglobe</u>, 493 F.3d at 361.

COL 15)   Because the privilege promotes the "dissemination of sound legal advice," it applies only where the advice is legal in nature, and not where the lawyer provides business or personal advice, or advice that is otherwise not legal in nature. <u>Wachtel</u>, 482 F.3d at 231; <u>Sandra T.E. v. S. Berwyn Sch. Dist, 100</u>, 600 F.3d 612, 620 (7th Cir. 2009); <u>Louisiana Mun. Police Employees Retirement Sys. v. Sealed Air Corp.</u>, 253 F.R.D. 300, 305 (D.N.J. 2008) (collecting decisions).

COL 16)   If an attorney-client relationship exists, the attorney-client privilege "only protects the disclosure of communications; it does not protect disclosure of the underlying facts." <u>Upjohn Co. v. United States</u>, 449 U.S. 383, 385 (1981).

### 3. <u>Implied Attorney-Client Relationship</u>

COL 17)   An implied attorney-client relationship is established if: (1) the purported client sought advice or assistance from the attorney; (2) the assistance sought was within the attorney's professional competence; (3) the attorney expressly or impliedly agreed to provide such assistance; and (4) it is reasonable for the putative client to believe that the attorney was representing him. <u>Capitol Surgical Supplies, Inc. v. Casale</u>, 86 F. App'x 506, 508 (3d Cir. 2004).

COL 18)   The proponent of the relationship bears the burden of establishing an implied attorney-client agreement by a preponderance of the evidence. <u>William Sklaroff Design Assoc., Inc. v. Spinneybeck Enterprises, Inc.</u>, No. 94-6748, 1996 WL 557587, at *8 (E.D. Pa. Sept. 30, 1996).

COL 19)   Although the putative client's reasonable belief is relevant to the inquiry, it is not the only factor that must be established; instead, the putative client has the burden to prove all four elements by sufficient evidence in order to establish an implied attorney-client relationship.

COL 20)   "A request for legal services, and an agreement to provide legal services, are necessary elements to form an attorney-client relationship." Capitol Surgical, 86 F. App'x at 508. The conduct of the parties "must evidence an offer or request by the client for legal services and an acceptance of the offer by the attorney.... It is clear that an attorney client relationship exists only with the consent of both parties." Hodczak v. Latrobe Specialty Steel Co., No. 08-649, 2010 WL 4137515, at * 2 (W.D. Pa. Aug. 10, 2010) (citing Minnich v. Yost, 817 A.2d 538, 542 (Pa. Super. Ct. 2003)).

COL 21)   A purported client's subjective belief that an attorney-client relationship existed, and statements by third parties to the effect that an individual was the purported client's lawyer, without more, are insufficient. Hodczak, 2010 WL 4137515, at * 5 n.4. Both the attorney and client must engage in conduct from which a contract can be implied. Id.

COL 22)   The subjective belief of the attorney is not relevant; it is the purported client's belief that the attorney was providing legal services pursuant to an attorney-client relationship that must be reasonable. Lefta Assoc. v. Hurley, 902 F. Supp. 2d 559, 581 (M.D. Pa. 2012).

**4.  Personal Attorney-Client Relationship with Corporate Counsel**

COL 23)   Where a corporate officer communicates with corporate counsel about the "officer's role and functions within the corporation," or about "corporate matters," the attorney-client privilege belongs to the corporation, not the officer. Matter of Bevill, Bresler & Schulman Asset Mng't Corp., 805 F.2d 120, 124-25 (3d Cir. 1986) (citing Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 348 (1985)).  The corporation, not the officer, has the

power to waive the corporation's attorney-client privilege with corporate counsel. Id. at 124 (citing Weintraub, 471 U.S. at 349).

COL 24)    The officer does not have a personal privilege with respect to communications with corporate counsel about matters related to his role as an officer of the corporation. Bevill, 805 F.2d at 125.    It is possible, however, for an officer of a corporation to have a personal attorney-client relationship with corporate counsel. Bevill, 805 F.2d at 124-25.  A corporate officer seeking to assert a personal attorney-client privilege with respect to communications with corporate counsel must show that: (1) he approached counsel for the purpose of seeking legal advice; (2) when he approached counsel he made it clear that he was seeking legal advice in his individual rather than in his representative capacity; (3) corporate counsel saw fit to communicate with the officer in his individual capacity, knowing that a possible conflict could arise; (4) conversations between the officer and corporate counsel were confidential; and (5) the substance of his conversations with corporate counsel did not concern matters concerning the company or its general affairs.  Bevill, 805 F.2d at 123 (3d Cir. 1986); Greene v. Phila. Housing Auth., 484 F.App'x 681, 684 n.4 (3d Cir. 2012) (noting that it is extremely unlikely that the executive director of the housing authority could establish a personal attorney-client relationship with corporate counsel under the Bevill test); United States v. Norris, 419 F.App'x 190, 195 (3d Cir. 2011) (affirming district court's application of the Bevill test to conclude that a former chief executive officer did not establish that he had a personal attorney-client relationship with the company's corporate counsel); Transcontinental Refrigerated Lines, Inc. v. New Prime, Inc., No. 13-2163, 2014 WL 2471936, * 7 (M.D. Pa. June 3, 2014)(applying Bevill test to assess which communications between a corporate officer and corporate counsel implicated the corporation's privilege, and which implicated the officer's personal privilege); see Gary Miller Imports, Inc. v.

Doolittle, No. 11-178, 2014 WL 3891629, at *1-3 (W.D. Pa. Aug. 7, 2014) (applying Bevill test to determine whether minority shareholders in a closely-held corporation established a personal attorney-client privilege with corporation's counsel).

COL 25)    The legal authority relied upon by defendant does not establish that it is error for this court to rely upon the test set forth in Bevill to determine whether defendant had a personal attorney-client relationship with Barry, who was PA Cyber's corporate counsel. (ECF No. 133 at 17-21, 23.)  None of the decisions qualify as binding precedent.  In the most recent decision, the district judge stated that "I am not as certain" that Bevill should apply in every case, but went on to apply the Bevill test. NewSpring Mezzanine Capital II, L.P. v. Hayes, No. 14-1706, 2014 WL 6908058, at *2-3 (E.D. Pa. Dec. 9, 2014).  The remaining decisions are factually and legally distinguishable. Benun v. Benun, 339 B.R. 115, 125 (Bank. D.N.J. 2006) (Bevill inapplicable because one attorney represented two clients with respect to ongoing litigation for several years); Home Care Indus., Inc. v. Murray, 154 F.Supp.2d 861, 863 (D.N.J. 2001) (law firm disqualified pursuant to Rules of Professional Conduct because, among other things, law firm failed to advise a former chief executive officer to retain individual counsel, as the law firm did in Bevill); Montgomery Acad. v. Kohn, 82 F.Supp.2d 312, 316 (D.N.J. 1999) (refusing to rely upon Bevill in deciding a motion to disqualify counsel on the ground that Bevill was legally and factually distinguishable from the case at bar).

COL 26)    The corporate officer claiming to have a personal attorney-client relationship with corporate counsel has the burden to prove each of the elements of the Bevill test and to identify the categories of personal advice that were given to him or her by corporate counsel. Bevill, 805 F.2d at 123.

COL 27)   A personal attorney-client relationship with corporate counsel can be established by implication or through circumstantial evidence, but in those situations, the court must view the record as a whole to determine whether the officer has met his or her burden of proof. Relevant evidence in determining whether a personal attorney-client relationship with corporate counsel has been established includes: testimony (in person or by way of affidavit) of corporate counsel, testimony (in person or by way of affidavit) of the corporate officer, billing statements, the location of, and who initiated, meetings between corporate counsel and the officer, whether the officer's personal liability or criminal exposure were discussed with corporate counsel, contemporaneous documentary evidence, such as letters or memoranda, whether the attorney established a relationship with the corporation or with the officer first, and whether corporate counsel advised the officer to retain a personal attorney. Bevill, 805 F.2d at 124; Transcontinental Refrigerated, 2014 WL 2471936, at *7; Norris, 722 F.Supp.2d at 636-37; Gary Miller Imports, 2014 WL 3891629, at *2-4.

COL 28)   Although third parties' beliefs about the scope of corporate counsel's representation of a corporate officer can inform the analysis, Norris, 722 F.Supp.2d at 636-37, colloquial references to a lawyer being "his attorney" or "my attorney" are particularly suspect in the corporate context because such comments can just as easily refer to the lawyer in his capacity of representing the corporation as in his capacity of personally representing the officer. United States v. Carter, 966 F.Supp. 336, 343-44 (E.D. Pa. 1997).

## 5. **Common Interest Doctrine**

COL 29)    The common interest doctrine protects communications between attorneys representing different clients that "share at least a substantially similar legal interest." Chevron, 650 F.3d at 290 n.19; In re Teleglobe, 493 F.3d at 364; United States v. Doe, 429 F.3d 450, 453 (3d Cir. 2005); In re Processed Egg Products, 278 F.R.D. at 118; see King Drug Co. of Florence, Inc. v. Cephalon, Inc., No. 06-1797, 2011 WL 2623306, at *2 n.3 (E.D. Pa. Oct. 19, 2011) (noting that the Court of Appeals for the Third Circuit's most recent and comprehensive examination of the community-of-interest doctrine was undertaken in In re Teleglobe).  The common interest doctrine is also referred to as the community-of-interst doctrine. In re Teleglobe, 493 F.3d at 364 & nn.19 and 20.

COL 30)    The party seeking to assert the privilege bears the burden of proving that the common interest doctrine applies. Bevill, 805 F.2d at 123; Processed Egg Products, 278 F.R.D. at 118.  A written agreement is not required in order to establish a common interest endeavor. In re Teleglobe, 493 F.3d at 592; MobileMedia Ideas LLC v. Apple Inc., 890 F.Supp.2d 508, 518 (D. Del. 2012).

COL 31)    "[T]he requirement that the parties to the communication share 'at least a substantially similar legal interest' prevents abuse of the privilege and 'unnecessary information sharing.'" Processed Egg Products, 278 F.R.D. at 118 (quoting In re Teleglobe, 493 F.3d at 365).

COL 32)    The substantially similar interest must be legal, and not business, commercial, factual, or strategic. In re Teleglobe, 493 F.3d at 365; Processed Egg Products, 278 F.R.D. at 118 (citing King Drug, 2011 WL 2623306, at *3).

> COL 32(a):  Growth and development of businesses is primarily a
>
> commercial interest, one that just happens to have legal concerns as a

secondary, if not tertiary, concern. <u>Net2Phone, Inc. v. Ebay, Inc.</u>, No. 06-2469, 2008 WL 8183817, at *8-9 (D.N.J. June 26, 2008).  Indeed, one can hardly imagine a legitimate business entity discussing future business endeavors without some expression of concern that such efforts transpire in a legal manner.  That legal aspect, however, simply does not drive the forward movement; instead, the driver is the commercial matter at hand, growing and developing a viable business capable of competing successfully in the marketplace. <u>In re Diet Drugs Products Liability Litig.</u>, MDL No. 1203, 2001 WL 34133955, at *7 (E.D. Pa. Apr. 19, 2001) (finding that the only common interest was commercial because if the drug was descheduled sales would increase, and that legal advice on the matter does not bring the communication within the protection of the common interest doctrine).

COL 32(b): The common interest doctrine does not apply where a communication is designed to further a commercial transaction instead of a common legal strategy, or when a joint business strategy includes, as one of its elements, a concern about litigation or liability. <u>McLane Foodservice, Inc. v. Ready Pac Produce, Inc.</u>, No. 10-6076, 2012 WL 1981559, at *4-5 (D.N.J. June 1, 2012).

COL 33)    The communications must be between the attorneys representing the clients that have the substantially similar legal interest, and not between the clients themselves. <u>In re Teleglobe</u>, 493 F.3d at 364-65.  "'The attorney-sharing requirement helps prevent abuse by ensuring that the common-interest privilege only supplants the disclosure rule when attorneys, not clients, decide to share information in order to coordinate legal strategies.'" <u>Processed Egg</u>

Products, 278 F.R.D. at 118 (quoting In re Teleglobe, 493 F.3d at 365).

COL 34)    In order for the common interest doctrine to protect, as privileged,

communications disclosed to a third party, the communications must be privileged in the first

place. In re Diet Drugs, 2011 WL 34133955, at *5.

## B.  Legal Analysis

### 1.  Attorney-Client Relationships

COL 35)    The only evidence offered by defendant in support of his assertion that he had

personal attorney-client relationships with Daly, Monico, Askar, and Barry, other than items

created by the government during the investigation that led to the filing of the instant indictment

(e.g., consensual recordings, and wiretap recordings, applications and affidavits, and

demonstrative exhibits related thereto), is: (1) the testimony of two FBI agents, called as adverse

witnesses; (2) the testimony of Barry (and his counsel, attorney Recker); (3) four documents

relating to Daly's and Barry's entry of appearances in the Rodis litigations; (4) minutes from a

November 2014 meeting of the board of trustees of PA Cyber concerning the board's waiver of

PA Cyber's attorney-client privilege with Barry; and (5) the articles of incorporation for National

Cyber School Management Corporation, signed by Barry in 2003.

### a. Grogan Graffam, P.C. - Leo Daly and Ralph Monico

COL 36)    There is no evidence that Daly or Monico had an express attorney-client relationship

with defendant in 2012.

> COL 36(a):  The documentary evidence contradicts a finding that Daly or
>
> Monico had a personal attorney-client relationship with defendant in 2012
>
> because the 2012 Grogan-NNDS Engagement letter explicitly states that
>
> NNDS was the client of Daly and Monico's law firm at that time. See FOF

21-24.

COL 36(b):  The documentary evidence contradicts a finding that Daly or Monico had a personal attorney-client relationship with defendant in 2012 because invoices for professional services provided by Daly and Monico in 2012 were sent to NNDS. See FOF 25-27.

COL 36(c):  The testimonial evidence contradicts a finding that Daly or Monico had a personal attorney-client relationship with defendant in 2012 because the only attorney from Grogan Graffam to testify stated that he had no interaction with defendant or Barry, did not bill defendant for legal services, did not provide legal advice to defendant, and was not part of a team that provided legal advice to defendant in 2012. See FOF 30-33.

COL 37)    The evidence relied upon by defendant is insufficient to establish that defendant had an implied, personal attorney-client relationship with Daly or Monico in 2012. (ECF No. 133 at 26-27.)

COL 37(a):  Daly's entry of appearances in the Rodis litigation filed in 2005 in the United States District Court for the Western District of Pennsylvania and in the Court of Common Pleas of Beaver County, Pennsylvania are not probative of an implied, personal attorney-client relationship between defendant and Daly or Monico in 2012 because:

COL 37(a)(1):  Grogan Graffam attorneys provided no legal services to defendant in the federal case; defendant was represented by counsel appointed by PA Cyber's insurance carrier. See FOF 34.

COL 37(a)(2):  Both <u>Rodis</u> cases were terminated by the end of

2010. <u>See</u> FOF 34-35.

COL 37(a)(3):  Both <u>Rodis</u> cases involved PA Cyber's corporate,

contractual relationships and obligations. <u>See</u> FOF 34-35.

COL 37(b):  The content of recordings made by a confidential informant on

March 8, 2012, (ECF No. 133 ¶¶ 52-53, 55), and March 12, 2012, (ECF No. 133 ¶

57), are not probative of an implied, personal attorney-client relationship between

defendant and Daly or Monico in 2012 for the following reasons:

COL 37(b)(1):  Daly, defendant, Barry, Askar, and Geibel

participated in the March 8, 2012 recorded conversation.  Barry was the

only participant to testify at the hearings on defendant's motion.

COL 37(b)(1)(A):  Barry's expressed belief that the

March 8, 2012 conversation was privileged, (ECF No.

133 ¶ 55), is not probative that defendant had a personal

attorney-client relationship with Daly or Monico.  Barry

testified that he participated in that meeting both as PA

Cyber's attorney, and as defendant's personal attorney,

and spoke on some issues on behalf of PA Cyber, and on

others personally on behalf of defendant. <u>See</u> FOF 92.

Given Barry's dual role at this meeting, his generalized

comment that the meeting was "privileged" is not

probative that defendant had an implied, personal

attorney-client relationship with Daly or Monico.

COL 37(b)(1)(B): Askar's comment during the March 8, 2012 meeting, that "we're all speaking here confidentially," (ECF No. 133 ¶ 55), is not probative that defendant had an implied, personal attorney-client relationship with Daly or Monico for two reasons. First, the confidentiality of a conversation does not mean that that a privileged, attorney-client communication occurred. COL 12. Business meetings, even where attorneys are present, can be considered confidential without being protected by the attorney-client privilege. COL 15, 32. Second, Askar makes this comment about confidentiality at a point in the conversation when the participants are discussing PA Cyber's business relationships with Avanti and NNDS. (Gov. Exs. 30, 30A-1 at 21 (lns. 5-6.); Def. Exs. X, A6, A6-Trans. at 55-57.) As such, the confidentiality comment cannot be relied upon to establish that defendant had an implied, personal attorney-client relationship with Daly or Monico, the two attorneys who were hired by NNDS to advise it with respect to corporate asset valuation and transaction issues.

COL 37(b)(2): Geibel, Askar, and an unidentified third person, participated in the March 12, 2012 recorded conversation. None of these participants testified at the hearings on defendant's motion. On the recording, viewed as a whole, Askar explains that he intended to speak with Daly about questions raised by Monico during a previous meeting (held in Washington, D.C.) about NNDS's business relationship with Avanti, and to have a "heart to heart" with defendant about Avanti, Palatine, and corporate ownership of certain assets, such as a private plane and a house. (Def. Exs. X, A7, A7-Trans. at 20-21.) The excerpt of this conversation relied upon by defendant does nothing to establish an implied, personal attorney-client relationship between defendant and Monico or Daly. Defendant made no showing that he had personal ownership interests in any of the assets being discussed. Defendant was not an owner, officer, or employee of any of the corporations being discussed. The comment made by Geibel later in the recording that defendant intended to meet with Barry about exit strategy does nothing to establish an implied, personal attorney-client relationship between any Grogan Graffam attorney and defendant concerning defendant's exit strategy. (Def. Exs. X, A7, A7-Trans. at 24.)

COL 38) The proffered facts that defendant was not an attorney and was never informed that Grogan Graffam represented NNDS only, do not prove that defendant sought legal advice from Daly or Monico and that Daly or Monico agreed to provide such advice to him. COL 17-22; (ECF No. 133 at 26.)

COL 39)    The proffered fact that defendant was not an officer or employee of NNDS in 2012 contradicts defendant's assertion that he had an implied, personal attorney-client relationship with Daly or Monico in 2012, because their law firm was expressly retained by NNDS to provide legal services to that entity during that time period. See FOF 21-26; (ECF No. 133 at 26.)  As such, even if defendant had established the other three requirements to prove that he had an implied, personal attorney-client relationship with Daly or Monico, he could not establish that his belief that Grogan Graffam was personally representing him in 2012 was reasonable under the circumstances.

COL 40)     The evidence proffered by defendant is insufficient to establish that defendant sought legal advice from Daly or Monico that fell within an area of expertise, that Daly or Monico agreed to provide such advice, and that it was reasonable for defendant to believe that Daly or Monico was personally representing him in 2012. COL 17-22.  The court, therefore, concludes that defendant did not have an implied, personal attorney-client relationship with Daly or Monico in 2012.

### b.  Joseph Askar

COL 41)    There is no documentary or testimonial evidence that Askar had an express personal attorney-client relationship with defendant in 2012. See FOF 37, 39, 42-54.

COL 42)    Although Askar was NNDS's corporate counsel in 2012, at that time defendant was not an officer or employee of NNDS. See FOF 12, 37.  Defendant, therefore, cannot claim to have any attorney-client relationship with Askar that is derivative of or based upon Askar's corporate representation of NNDS.

COL 43)    The record establishes that, in 2012, Askar was NNDS's attorney and the Beaver County solicitor. See FOF 36-37.  Law enforcement was aware that Askar had an office in the

NNDS building in Beaver, Pennsylvania, and possibly maintained a private law practice there, based upon signage observed at that building. See FOF 38. The lead agent testified, however, that there was no evidence discovered during the investigation that Askar was defendant's personal attorney. See FOF 39-40.

COL 44)    Askar was a target of the investigation that led to the instant indictment. See FOF 44-45.

COL 45)    The evidence relied upon by defendant is insufficient to establish that defendant had an implied, personal attorney-client relationship with Askar in 2012. (ECF No. 133 at 25-26.)

> COL 45(a):   Askar's involvement in transferring a condominium located in Florida out of defendant's name and into the name a company called Palatine, (ECF No. 133 ¶ 41), is not probative of an implied, personal attorney-client relationship between defendant and Askar in 2012 because:
>
> > COL 45(a)(1):  Askar's involvement in that transaction occurred in October 2011. (Def. Ex. A11 at 33.)
> >
> > COL 45(a)(2):  The only evidence in the record about that transaction is that Askar told defendant to transfer the property in order to avoid paying taxes on it, and mailed a check to a third-party business to have the name on the deed changed. (Def. Ex. A11 at 33.)
>
> COL 45(b):  Defendant's references to Askar as "my Lebanese attorney" and as "my attorney," (ECF No. 133 ¶ 43), are not probative of

an implied, personal attorney-client relationship between defendant and Askar for the following reasons:

COL 45(b)(1): No participant in either conversation testified at the hearings on defendant's motion about the meaning of the statements.

COL 45(b)(2): Defendant's subjective belief that an attorney-client relationship existed with Askar, without more, is insufficient to carry defendant's burden of proving that he had an implied, personal attorney-client relationship with Askar. COL 21.

COL 45(b)(3): The "my Lebanese attorney" comment was made during a facetious personal exchange between defendant and Askar about various ethnic groups, which follows a conversation between Askar, defendant, and an unidentified male about setting up a time for defendant to meet with the unidentified male about "defendant's buddy." No legal advice of any kind is requested by defendant or given by Askar during this conversation. (Gov. Exs. 62, 62A at 2; Def. Exs. X, A15, A15-Trans. at 2.) In context, defendant's colloquial reference to Askar as "my Lebanese attorney" is not probative of an implied, personal attorney-client relationship.

COL 45(b)(4):  Defendant's explanation to a female, whose call interrupts a conversation between Askar and defendant, that defendant is "on the phone with Joe Askar, my attorney" is not probative of an implied, personal attorney-client relationship between Askar and defendant. (Gov. Exs. 40, 40A at 10; Def. Exs. X, A20, A20-Trans. at 11.)  Before the call is interrupted, Askar and defendant are discussing matters concerning the relationships between PA Cyber, NNDS, and Avanti, including the reason NNDS was formed, NNDS's provision of cellular telephones to its employees, and the sharing of employees between the companies, as well as a request made by an unidentified third party for each companies' tax records. (Gov. Exs. 40, 40A at 2-10; Def. Exs. X, A20, A20-Trans. at 2-11.) Defendant's colloquial reference to Askar as "my attorney" in the context of an extended conversation between NNDS's corporate counsel and PA Cyber's chief executive officer about the relationships and interactions between those two companies, and an apparent investigation into both, is not probative of an implied, personal attorney-client relationship between defendant and Askar.

COL 45(c): Askar's statement to defendant that "I'm representing you," (ECF No. 133 ¶ 44; Gov. Exs. 42, 42A at 6; Def. Exs. X, A13, A13-Trans.

at 6), is not probative of an implied, personal attorney-client relationship between defendant and Askar. Neither Askar nor defendant testified at the hearings on defendant's motion to explain the meaning of this statement. During the conversation from which this statement is excerpted, Askar is informing defendant about his intention to arrange for Beaver County, his client, to rent a portion of the NNDS office building in Beaver, Pennsylvania. (Gov. Exs. 42, 42A at 1-5; Def. Exs. X, A13, A13-Trans. at 1-5.) Askar explains that he will ensure that the building is rented to Beaver County for the same price that he knows the County is being offered to rent a different building in Beaver, Pennsylvania, "but you can't tell anybody that because I don't want that to come up as a conflict of interest because I'm supposed to be representing the County and I'm representing you, you know what I mean." (Id.) There is no evidence in the record that defendant had a personal ownership interest in NNDS's office building. Defendant was not an officer or employee of NNDS at the time this conversation took place. Whatever meaning can be ascribed to Askar's statements to defendant about how he will negotiate the terms of a lease for the NNDS building, the statements cannot be probative of an implied, personal attorney-client relationship between Askar and defendant. Regardless, Askar's subjective belief about whether he was prioritizing the business interests of Beaver County or defendant does not establish an implied, personal attorney-client relationship between defendant and Askar. COL 22.

COL 45(d):   Statements made by a confidential informant that Barry and Askar are "trying to protect [defendant]" and about Barry or Askar coming up with ideas for defendant are inapposite with respect to whether defendant satisfied his burden to prove that he had an implied, personal attorney-client relationship with Askar. (ECF No. 133 ¶ 45.)

COL 45(d)(1):  No participant in either conversation testified at the hearings on defendant's motion about the meaning of those statements.

COL 45(d)(2):  Even if protecting or coming up with ideas for someone could be indicative of an implied, personal attorney-client relationship, a third-party's subjective belief that an attorney-client relationship existed between defendant and Askar, without more, is insufficient to carry Barry's burden of proving that he had an implied, personal attorney-client relationship with Askar. COL 21

COL 45(d)(3):  Neither statement made by the confidential informant, on its face and in context of the entire recorded conversation, indicates, or presupposes, that personal, legal advice was being provided to defendant by Askar. (Def. Exs. X, A5, A5-Trans. at 2, A8, A8-Trans. at 26.)

COL 45(e):  Other portions of recorded conversations relied upon by defendant to purportedly prove that Askar provided personal, legal advice to defendant about his exit strategy do not establish that Askar and

defendant had an implied, personal attorney-client relationship. (ECF No. 133 ¶¶ 42, 57.)

COL 45(e)(1):  In the first conversation that defendant relies upon, Askar states that defendant "listened to [Barry] and I" and "did create an Ohio corporation." (Def. Exs. X, A10, A10-Trans. at 10.)  Neither participant in this conversation testified at the hearings on defendant's motion to provide context to these statements.  Although the record reflects that Barry helped defendant form Presidio, an Ohio company, in June 2012, this conversation took place in April 2012, making Askar's comments, even in hindsight, not probative of an implied, personal attorney-client relationship between Askar and defendant.  <u>See</u> FOF 56(e).  Regardless, Askar's unilateral, and isolated, statement, made outside the presence of defendant, about what he believes defendant did, or why he did it, is not probative of an implied, personal attorney-client relationship between Askar and defendant.

COL 45(e)(2):  In the second conversation that defendant relies upon, Askar tells defendant that "Barry and I had a lengthy discussion about it Friday … any information has got to flow directly through [Barry] and I." (Gov. Exs. 64, 64A at 6; Def. Exs. X, A23, A23-Trans. at 4.)  No participant in the conversation testified at the hearings on defendant's motion to

provide explanation or context. The content of this July 2, 2012 conversation, however, reflects that local media was investigating the business activities of PA Cyber, NNDS, and Avanti around that time. Notably, July 2, 2012, was the first business day following the termination of defendant's employment with PA Cyber. <u>See</u> FOF 8. The conversation does not address defendant's exit strategy, or reflect Askar providing legal advice to defendant about any personal matter. This statement, without more, is not probative of an implied, personal attorney-client relationship with Askar.

COL 45(e)(3): For the same reasons that this court explained that a March 12, 2012 conversation between Geibel, Askar, and an unidentified third person could not be probative of an implied, personal attorney-client relationship between defendant and Daly or Monico, that same conversation is not probative of an implied, personal attorney-client relationship between defendant and Askar. COL 37(b)(2).

COL 45(e)(4): Although defendant relies upon certain statements made during the March 8, 2012 meeting to establish that defendant had an implied, personal attorney-client relationship with Askar, (ECF No. 133 ¶ 56 and at 25), those statements, in defendant's own words, however, reflect that Askar was engaged in a "common endeavor" on

defendant's behalf, not in an implied, personal attorney-client
relationship with defendant. (ECF No. 133 ¶ 56.)  For that
reason, those statements will be discussed below in Section
II.B.2.  Regardless, as the court explained previously, COL
37(b)(1), the subject matter of that meeting, at the point that
these comments are made, concerned corporate matters and
corporate interests, and, therefore, cannot be probative of an
implied, personal attorney-client relationship between
defendant and Askar.

COL 46)   The proffered facts that defendant was not an attorney, Askar maintained a private

law practice, and defendant was never informed that Askar represented NNDS only are not

probative of an implied, personal attorney-client relationship between defendant and  Askar.

COL 17-22; (ECF No. 133 at 25.)

COL 47)   The proffered fact that defendant was not an officer or employee of NNDS in

2012 is inapposite to defendant's assertion that he had an implied attorney-client relationship

with Askar at that time. (ECF No. 133 at 25.)  Although this fact makes the <u>Bevill</u> test

inapplicable, defendant still bears the burden of establishing that he had an implied, personal

attorney-client relationship with Askar. COL 17-22.

COL 48)   The evidence proffered by defendant is insufficient to establish that defendant

sought legal advice from Askar that fell within his area of expertise, Askar agreed to provide

such advice, and it was reasonable for defendant to believe that Askar was representing him

personally. COL 17-22.  The court, therefore, concludes that defendant did not have an implied,

personal attorney-client relationship with Askar in 2012.

### c. __Timothy Barry__

COL 49)    Because Barry was PA Cyber's corporate counsel, and defendant was PA Cyber's chief executive officer, the <u>Bevill</u> test applies, and defendant must establish the following five elements in order to prove that he had a personal attorney-client relationship with Barry: (1) he approached counsel for the purpose of seeking legal advice; (2) when he approached counsel he made it clear that he was seeking legal advice in his individual rather than in his representative capacity; (3) corporate counsel saw fit to communicate with the officer in his individual capacity, knowing that a possible conflict could arise; (4) conversations between the officer and corporate counsel were confidential; and (5) the substance of his conversations with corporate counsel did not concern matters concerning the company or its general affairs.  COL 23-27.

COL 50)    Barry's representation of PA Cyber predated any purported personal representation of defendant. <u>See</u> FOF 46-47.

COL 51)    PA Cyber paid Barry for the legal services performed by him, and other members of his law firm. <u>See</u> FOF 48-49, 53.

COL 52)    Defendant never paid Barry for legal services, and Barry only issued a single invoice to defendant, sometime around July 12, 2012, which was not paid. <u>See</u> FOF 57.  This invoice was not offered into evidence at the hearings on defendant's motion. <u>See</u> FOF 57.  As reflected in other findings of this court, by July 2, 2012 defendant, and other individuals associated with PA Cyber, NNDS, and Avanti, were aware that the local media was investigating the business activities of those entities. COL 45(e)(2).

COL 53)    Barry met regularly with the PA Cyber board of trustees, attended board meetings, and addressed legal issues relevant to the board and PA Cyber. <u>See</u> FOF 50.

COL 54)    Sometime before 2012, the PA Cyber board of trustees instructed Barry to formulate a strategy to ensure that defendant could act as a consultant to PA Cyber, through NNDS, after defendant left the employment of PA Cyber. <u>See</u> FOF 51.  The record, therefore, actually contradicts a finding that defendant approached Barry to seek legal advice about his exit strategy.

COL 55)    In furtherance of completing the board's assigned task, Barry communicated with the Ethics Commission, in late 2011, about whether former PA Cyber employees could provide services to PA Cyber through NNDS. <u>See</u> FOF 52.  Barry identified himself as PA Cyber's corporate counsel in these communications. <u>See</u> FOF 52.  PA Cyber was billed for this work. <u>See</u> FOF 53.

COL 56)    Defendant presented no documentary evidence, such as engagement letters, fee agreements, contemporaneous correspondence, or billing statements, indicating that Barry represented him personally. <u>See</u> FOF 58.  Barry's January 23, 2012 memorandum to defendant cannot qualify as this kind of evidence because, even though the subject matter of the memorandum was defendant's ability to do consulting work for out-of-state entities, the memorandum explicitly presumed that defendant remained an employee of PA Cyber while doing so and stated that Barry was proffering his opinion in his capacity as corporate counsel for PA Cyber. <u>See</u> FOF 55.  Moreover, Barry explicitly advised defendant in that memorandum to consult "legal counsel" should a conflict of interest arise while defendant was working for both PA Cyber and out-of-state entities, which is incongruent with a claim that Barry, himself, was defendant's "legal counsel." <u>See</u> FOF 55.  Barry billed PA Cyber for the work reflected in this memorandum. <u>See</u> FOF 55.

COL 57)    Defendant presented no documentary evidence that Barry notified the PA Cyber board of trustees that he was personally representing defendant.  Although Barry testified that he believed that the board was aware of his personal representation of defendant, Ed Elder denied such knowledge. <u>See</u> FOF 59, 61.  There is no evidence, documentary or testimonial, that Barry specifically asked the PA Cyber board to waive any conflicts of interest in connection with his simultaneous representation of PA Cyber and defendant. <u>See</u> FOF 60.

COL 58)    There is no evidence in the record about where defendant and Barry met, or who initiated meetings.

COL 59)    Barry testified that he personally represented defendant, off and on between 2007 and 2012, with respect to his exit strategy. <u>See</u> FOF 56(c).

COL 60)    Upon consideration of the <u>Bevill</u> test, COL 24, and the kinds of evidence that this court is to consider in relation thereto, COL 27, this court observes that the evidence weighs heavily against a finding that defendant had a personal attorney-client relationship with Barry. <u>See</u> FOF 50-52, 54-57.  The only evidence that supports a finding that defendant had a personal attorney-client relationship with Barry is Barry's testimony to that effect. <u>See</u> FOF 58.   Barry's testimony did not include details about many of the <u>Bevill</u> factors.  The court, instead, must infer from Barry's testimony that he engaged in personally privileged conversations with defendant that defendant approached Barry for legal advice, making the personal nature of his request clear, and that Barry saw fit to confidentially communicate with defendant in his individual capacity, about matters that did not concern PA Cyber. COL 23-27, 49.   Barry is an officer of the court, and testified cautiously and credibly, and the court is compelled to assign significant weight to his testimony.  The court, therefore, concludes that Barry and defendant had a personal attorney-client relationship.  In reaching this conclusion, the court recognizes that this record could

likewise support a reasonable conclusion that defendant failed to prove that he had a personal attorney-client relationship with Barry. Because the standard of proof that defendant must meet is a preponderance of the evidence, COL 9, and although it is a close question, this court concludes that, based upon the evidence adduced, defendant met his burden of proof and it is more likely than not that Barry and defendant had a personal attorney-client relationship in 2012.

COL 61)    With respect to the scope and subject matter of Barry's personal representation of defendant in 2012, the only reasonable conclusion that reconciles Barry's testimony with the remainder of the record is that Barry advised defendant personally with respect to his exit strategy, but (1) only after the Ethics Commission issued its advisory opinion in November 2011 and (2) only with respect to defendant's revised exit strategy to do consulting work for out-of-state entities after leaving the employment of PA Cyber. See FOF 51-54.

COL 61(a): The record contains circumstantial evidence, such as Barry's involvement in forming Presidio in Ohio, and conversations at the time about Barry forming an Ohio company for defendant, that corroborate this conclusion. See FOF 56 and 56(e); (Def. Exs. X, A6b, A6-Trans. at 13 (See, ECF No. 133 ¶ 28), A6f, A6-Trans. at 36 (See, ECF No. 133 ¶ 27), A7b, A7-Trans. at 24 (See, ECF No. 133 ¶ 24.)

COL 61(b): Even though defendant's revised exit strategy may have eventually and tangentially benefitted PA Cyber's corporate interests, because after defendant's one-year waiting period was over defendant could then act as a consultant to PA Cyber, once the Ethics Commission opined that the board's original exit strategy for defendant was unacceptable, the board's immediate, legitimate, legal concern with the

matter terminated. Whether defendant consulted with out-of-state cyber schools for that year, engaged in unrelated work, or did no work at all, had no direct effect on PA Cyber. There is no evidence that the PA Cyber board instructed Barry to ensure that defendant worked with out-of-state entities for the first year after he left the employment of PA Cyber. The court's assumption to the contrary would be to the detriment, not the benefit, of defendant. If the court was to assume, for the sake of argument, that the PA Cyber board of trustees instructed Barry to ensure that that defendant worked with out-of-state entities for the first year after he left the employment of PA Cyber, that instruction would defeat defendant's claim that Barry personally represented him because it would be impossible for defendant to prove, under prong five of the <u>Bevill</u> test, that any of Barry's advice "did not concern matters concerning the company or its general affairs." COL 24.

COL 61(c): Even assuming that defendant had a personal attorney-client relationship with Barry, that relationship could not have been formed before November 17, 2011, when Barry notified defendant about the Ethics Commission's advisory opinion, and likely was not formed until after January 23, 2012, because Barry was rendering advice to defendant on that date about defendant's ability to engage in out-of-state activities while still employed by PA Cyber, in Barry's capacity as PA Cyber's general counsel. <u>See</u> FOF 55. There is no corroboration for Barry's assertion that he represented defendant

personally about exit strategies "off and on" since 2007, and the court will not rely upon Barry's unsubstantiated testimony on this point.

COL 61(d): Although the January 23, 2012 letter cannot be indicative of a personal attorney-client relationship between defendant and Barry, and actually contradicts an inference that one was formed before that date, the letter reflects that Barry's advice to defendant as PA Cyber's corporate counsel was closely related to Barry's personal legal advice to defendant. Defendant's revised exit strategy to do consulting work for out-of-state entities after leaving the employment of PA Cyber is nearly indistinguishable from, and somewhat derivative of, defendant's ability to do consulting work for out-of-state entities while still employed by PA Cyber.

COL 61(e): It is important to note that even after the time that defendant and Barry formed a personal attorney-client relationship about defendant's revised exit strategy, Barry remained corporate counsel for PA Cyber, and defendant remained chief executive officer of PA Cyber. Defendant, therefore, could engage in privileged communications with Barry either in his personal or his corporate capacity, depending upon the subject matter of a particular conversation. To the extent Barry and defendant discussed matters of concern to PA Cyber, however, that privilege belongs to PA Cyber, not defendant, and PA Cyber, not defendant, has the power to waive it (which PA Cyber has done in connection with these proceedings). See FOF 65; COL 23.

COL 62)    Although defendant contends that Barry and he established a personal attorney-client relationship as early as 2003, with respect to broader, but unspecified, subject matter, the record does not support defendant's assertions. (ECF No. 133 at 24.)

COL 62(a):  Barry's signature on the articles of incorporation for National Cyber School Management Corporation, in October 2003, is not probative that Barry rendered personal legal services to defendant at that time.  Although the record reflects that the corporation was to be owned entirely by defendant, there was no other evidence offered to explain the purpose of the company, or who directed that it be formed. See FOF 56(a).

COL 62(b):  For the same reasons set forth above, COL 37, Barry's appearance on behalf of defendant in the federal Rodis case is not probative of an expansive personal attorney-client relationship between defendant and Barry in 2012.  The attorney selected by PA Cyber's insurance carrier was lead counsel on that case, the matters raised in that case involved PA Cyber's contractual rights and obligations, and the case was terminated in May 2006. See FOF 34.

COL 62(c):  Barry's testimony that he personally represented defendant, off and on between 2007 and 2012 about his exit strategy, cannot be relied upon because it is contradicted by Barry's acknowledgment that it was the PA Cyber board of trustees that instructed him to establish an exit strategy for defendant, making the representation corporate, and not personal. See FOF 51, 56, and 56(c).

Even if the court was to accept Barry's testimony on this point, and assume, for the sake of argument, that Barry's personal representation of Barry about his exit strategy began in 2007, that assumption would actually defeat defendant's claim that Barry personally represented him before November 2011. Prior to the Ethics Commission's advisory opinion about defendant's inability to act as a consultant to PA Cyber immediately after leaving its employment, PA Cyber's legal interests were aligned with defendant's legal interests with respect to defendant's exit strategy, making it impossible for defendant to prove, under prong five of the <u>Bevill</u> test, that any of Barry's advice "did not concern matters concerning the company or its general affairs." COL 24.

COL 62(d): Comments made by third parties, in February and June 2012, to the effect that Barry was "working with" defendant, keeping defendant "out of trouble," and forming companies for defendant were offered without the testimony of any participant in the conversations to provide context or explanation. (ECF No. 133 ¶ 35.) The entire content of these recorded conversations, however, are consistent with the conclusion that Barry began providing personal legal advice to defendant in late 2011 or early 2012 about defendant's revised exit strategy. (Gov. Exs. 54, 54A; Def. Exs. X, A2a and A2b, A2-Trans. (February); Gov. Exs. 59, 59A; Def. Exs. X, A21a and A21b, A21-Trans. (June).) Nevertheless, comments made by third parties about a

corporate attorney working with or for a corporate officer are always suspect, and cannot, standing alone, be probative of an expansive personal attorney-client relationship between defendant and Barry. COL 28.

COL 62(e): The comments made by defendant to Geibel on January 9, 2012, were offered without the testimony of any participant in the conversations to provide context or explanation. Given the timing of the comments, which refer to Barry's advice with respect to defendant's ability to service out-of-state entities, the comments appear, in context, to refer to defendant's activities while still employed by PA Cyber, which was the subject of Barry's January 23, 2012 memorandum. See FOF 55; (ECF No. 133 ¶ 34; Gov. Exs. 40, 40A at 1-2; Def. Exs. X, A1a and A1c, A1-Trans. at 40-41, 65.) That issue related to and concerned PA Cyber's corporate interests and employees, not defendant's personal interests. See FOF 55; COL 56. Defendant's comments, therefore, cannot be probative of an expansive personal attorney-client relationship between defendant and Barry.

COL 62(f): Defendant's colloquial references to Barry as "my counselor" cannot be probative of a personal, instead of corporate, attorney-client relationship, under the circumstances of this case and based upon this record. (ECF No. 133 ¶ 33; Gov. Exs. 69, 69A at 1; Def. Exs. X, A12, A12-Trans. at 1.) There is no dispute that defendant and Barry worked together, on behalf of PA Cyber, for approximately

ten years before the investigation that led to the filing of the instant indictment occurred. Defendant's reference to PA Cyber's attorney as "my counselor" is, therefore, without significance. See FOF 6, 46.

COL 62(g): The fact that certain communications between defendant and Barry were minimized during the Title III wiretap is, likewise, not probative of a personal, instead of a corporate, attorney-client privilege. (ECF No. 133 ¶ 36.)

COL 62(g)(1): As PA Cyber's chief executive officer, defendant's confidential communications with Barry could be privileged even if defendant never claimed to have a personal attorney-client relationship with Barry.

COL 62(g)(2): Defendant's Exhibit BB, which indicates that a call was minimized because it was expected that defendant would have a conference call with his attorney, cannot be probative of a personal attorney-client relationship between defendant and Barry because, contrary to defendant's assertion, Barry's telephone numbers are not associated with or reflected on that exhibit. (ECF No. 133 ¶ 36; ECF No. 117 at 47-48, 111-16.)

COL 62(h): Although SA Bell was instructed to begin autominimizing Barry's communications with defendant sometime in mid-June 2012, there is no evidence about whether this decision was made because Barry was believed to be defendant's personal attorney at the time. See FOF 20;

(ECF No. 133 ¶ 37.)

COL 63)    The proffered facts that defendant was not an attorney and that Barry never informed defendant that he represented PA Cyber only are not probative with respect to any of the five factors that defendant must establish under the <u>Bevill</u> test. (ECF No. 133 at 24.)

COL 64)    The court concludes that, at most and with every reasonable inference made in defendant's favor, the evidence is sufficient to establish that defendant formed a personal attorney-client relationship with PA Cyber's corporate counsel sometime after November 17, 2011, and likely after January 23, 2012, with respect to defendant's revised exit strategy to perform consulting work for out-of-state entities after he left the employment of PA Cyber.

COL 65)    Even if the <u>Bevill</u> test was not applicable, the court would reach the same conclusion with respect to whether defendant proved that he had an implied, personal attorney-client relationship with Barry.  Based upon the documentary evidence, (Gov. Exs. 1-3), and the record as a whole, the only reasonable belief that defendant could have had was that Barry personally represented him after the Ethics Commission disapproved of the PA Cyber board of trustee's original strategy to have defendant work as its consultant, through NNDS, after defendant left the employment of PA Cyber.

## 2. <u>Common Interest</u>

COL 66)    Defendant failed to satisfy his burden of proving that PA Cyber, defendant, and NNDS, and its attorneys, "had a common interest in [defendant's] transition from PA Cyber and potential future relationship with PA Cyber and its downstream vendors in a way that complied with all legal restrictions – an issue that was related to the potential sale of Lincoln Interactive curriculum owned by NNDS and used by PA Cyber." <u>See</u> FOF 87; (ECF No. 151 ¶ 64.)

COL 67)   Only two lawyers who represented clients that purportedly had this common interest testified:

> COL 67(a):  Monico denied that he substantively interacted with defendant or Barry in 2012, or that he was a member of a team providing legal advice to defendant personally during that time. See FOF 30-33, 90.

> COL 67(b):  Barry offered no testimony that could be indicative of a common interest endeavor concerning defendant.  As previously explained, Barry's assertion that the entirety of the March 8, 2012 meeting was privileged is not probative of a common interest endeavor because he attended that meeting in his capacity as counsel to both PA Cyber and defendant, and testified that certain areas of discussion, including, specifically, NNDS's sale of Lincoln Interactive, related to his representation of PA Cyber, and not to his personal representation of defendant. See FOF 91-93.

COL 68)   The only corporate employee or representative of PA Cyber or NNDS to testify at the hearings on defendant's motion was Ed Elder, who was called by the government. See FOF 61.  Mr. Elder denied knowing that Barry personally represented defendant, and offered no testimony that could support a finding that PA Cyber, NNDS, and defendant were members of a common interest endeavor about any matter concerning defendant's personal legal interests, including defendant's exit strategy. Id.

COL 69)   The record directly contradicts defendant's assertion that there was a common interest endeavor with respect to the sale of Lincoln Interactive:

COL 69(a): Barry explicitly, and repeatedly, denied that Lincoln

Interactive involved defendant's personal legal interests. <u>See</u> FOF 64,

93; COL 66(b).

COL 69(b): Defendant had no ownership interest in Lincoln

Interactive, and, in 2012, was not an employee or officer of NNDS,

which did own that asset. <u>See</u> FOF 11-12, 21.

COL 70) Although NNDS, PA Cyber, and defendant may have had a shared interest in

formulating an exit strategy that would allow defendant to act as a consultant to PA Cyber,

through NNDS, after defendant left the employment of PA Cyber, defendant made no showing

that this shared interest was legal, and not business, commercial, factual, or strategic. COL 15,

31-32. In any event, the record reflects that these entities' shared interest in defendant's exit

strategy, whatever its character, ended by November 17, 2011, when defendant was informed

that the Ethics Commission opined that former employees could not act as consultants to PA

Cyber through NNDS for one year. <u>See</u> FOF 51-53. Defendant made no showing that PA

Cyber, or NNDS, had any continued, legitimate, shared legal interest in defendant's revised exit

strategy to engage in consulting work for out-of-state entities immediately after leaving the

employment of PA Cyber once the Ethics Commission's advisory opinion was issued. <u>See</u> FOF

54. Barry's January 23, 2012 opinion memorandum about defendant's ability to do consulting

work for out-of-state entities while still employed by PA Cyber cannot be evidence of such a

purported continued, shared interest because that opinion was proffered by Barry in his capacity

as general counsel to PA Cyber, and related to limitations on defendant's activities while he was

still employed by PA Cyber, not after he left the employment of PA Cyber. <u>See</u> FOF 55. The

record is devoid of any evidence that NNDS, PA Cyber, and defendant shared an interest, of

whatever character, in defendant's exit strategy after November 17, 2011.

COL 71)    None of the portions of consensual or Title III recordings relied upon by defendant to prove the existence of a common interest endeavor change the court's analysis or ultimate conclusion. (ECF No. 133 ¶ 56; ECF No. 151 ¶¶ 61-67.)

> COL 71(a):  Just as Askar's comment that the March 8, 2012 meeting was "confidential" cannot establish any implied, personal attorney-client relationships, it cannot, despite defendant's assertion that Askar's comment is "an important piece of evidence," sustain defendant's burden of proving that a common interest endeavor existed. COL 37(b)(1)(B); (ECF No. 131 ¶ 56; ECF No. 151 ¶ 62, ECF No. 153 at 1.) Barry testified that the March 8, 2012 meeting addressed matters of corporate concern to NNDS and PA Cyber, separate and apart from matters of personal concern to defendant. See FOF 92(a).  Askar's comment, therefore, without further explanation or corroboration, cannot be evidence that the participants were engaged in a common interest endeavor with respect to matters of legal concern personal to defendant. Regardless, a comment, even made by a lawyer, that a conversation is confidential does not establish that the participants share a substantially similar legal, as opposed to business interest, or that any communications satisfy the requirements to establish that the attorney-client privilege attaches to the communications in the first place. COL 12, 15, 32, 34, 37(b)(1)(B).

COL 71(b): Because the March 8, 2012 meeting addressed matters of corporate concern to NNDS and PA Cyber, separate and apart from matters of personal concern to defendant, any comments made by Askar, Barry, or others during that meeting about sharing case law and legal opinions, and working "together" are not, without further explanation or corroboration, probative of a common interest endeavor with respect to any matter of personal, legal concern to defendant, including his exit strategy. <u>See</u> FOF 92; COL 37(b)(1), 45; (ECF No. 131 ¶ 56; ECF No. 151 ¶¶ 63-64.) Any purported follow-up meetings about these matters are, likewise, not probative . (ECF No. 131 ¶ 56; ECF No. 151 ¶¶ 65-66.)

COL 71(c): Comments made to or by Askar on February 2, 2012, and July 2, 2012, are not probative of a common interest endeavor with respect to defendant's exit strategy. (ECF No. 133 ¶ 56; ECF No. 151 ¶¶61, 67.) The February 2, 2012 meeting concerned business transactions between NNDS and Avanti. (Def. Exs. X, A3, A3-Trans. at 21.) There is no dispute that Daly and Monico were hired by NNDS to provide advice about "NNDS transaction issues" and "asset valuation or transfer." <u>See</u> FOF 21. In that context, Askar's comment that Daly and Monico should act as the "quarterback" is not probative of a common interest endeavor with respect to any matter of personal, legal concern to defendant, including his exit strategy. The court previously explained the context in which the July 2, 2012 conversation took place, COL

45(e)(2). The matters raised during that conversation, which took place less than two weeks before the government executed search warrants in connection with the investigation that led to the filing of the instant indictment, do not concern any matter of personal, legal concern to defendant, including his exit strategy and, therefore, cannot be probative of a common interest endeavor in that regard.

COL 72)   In any event, even if PA Cyber, NNDS, and defendant shared a common interest with respect to defendant's exit strategy, defendant's own evidence reflects that Geibel, who was an employee of Avanti, participated in many of the purported common interest endeavor meetings recorded by the government. (ECF No. 133 ¶ 56; ECF No. 151 ¶¶ 61-67.)   Defendant makes no showing that Avanti had a common interest with respect to defendant's exit strategy.

COL 72(a):  Defendant contends that Geibel is not a third-party to the purported common interest endeavor because: (1) he is aligned with, or representative of, NNDS; (2) Geibel's deception cannot result in a knowing waiver of confidentiality; and (3) Geibel's presence is as a result of government misconduct. (ECF No. 151 at 13-16; ECF No. 153 at 6-7.)

COL 72(a)(1)   In support of his first argument, defendant contends that NNDS lawyers consulted Geibel regarding NNDS-related issues and points out that Geibel attended NNDS board meetings. (ECF No. 151 ¶¶ 68-69.)  The evidence, however, does not support a finding that, although Geibel was an Avanti employee, he was actually a

representative of NNDS.

COL 72(a)(1)(A):  The record contradicts a finding that Geibel was a de facto representative of NNDS with respect to the purported common interest endeavor regarding defendant's exit strategy.  The recorded conversations on which defendant relies reflect that Geibel was the only individual aligned with Avanti during various meetings at which PA Cyber-NNDS-Avanti business relationships and asset transfers were discussed.  Under the circumstances, Geibel was a representative of Avanti, and, therefore, cannot be deemed a de facto NNDS representative during such meetings. (e.g., Def. Exs. X, A3, A3-Trans. and A4, A4-Trans.)

COL 72(a)(1)(B):  Geibel's attendance and participation in NNDS board meetings is offered without further information or explanation, and cannot establish that Geibel was a de facto NNDS representative in the purported common interest endeavor concerning defendant's exit strategy.

COL 72(a)(2):  Geibel's deception is inapposite to whether defendant can prove that PA Cyber, NNDS, and defendant shared a common

interest with respect to defendant's exit strategy. Although Geibel is now known to have been acting as a confidential informant to the government at the time the investigation that led to the filing of the instant indictment took place, defendant and the attorneys at issue knew Geibel to be an employee of Avanti. They permitted him to participate in meetings and conversations even though defendant does not assert that Avanti shared a substantially similar legal interest with defendant, PA Cyber, and NNDS with respect to defendant's transition from PA Cyber. An Avanti official, therefore, could not be a member of the asserted common interest endeavor. Defendant makes no assertion that Geibel misrepresented his status as an Avanti official at the time in order to gain unauthorized access to communications between defendant and any attorney. This court, therefore, must consider the effect of Geibel's presence on any purported common interest endeavor based upon the objective facts known to the participants in the purported common interest endeavor at the time. Geibel was understood at the time to be an Avanti employee. Because defendant made no showing that Avanti had a shared, legitimate, common interest in defendant's personal legal affairs, the presence of an Avanti official would destroy the common interest endeavor that defendant advances in this case.

COL 72(a)(3):  Defendant's final contention that Geibel's

participation in communications involving or about attorneys is

probative of government misconduct is a matter to be addressed in the

second phase of the proceedings on defendant's motion.

### 3. <u>Summary of Findings and Next Phase</u>

COL 73)    To summarize this court's findings and conclusions: Defendant failed to meet his

burden to prove that he had implied, personal attorney-client relationships with Monico, Daly, or

Askar. <u>See</u> FOF 21-45; COL 17-22, 36-48.  The court, relying heavily on Barry's testimony

(although recognizing that the record could support a contrary conclusion), found that defendant

established that he had a personal attorney-client relationship with Barry in 2012, but that it

could not have been created before November 17, 2011 and was limited in scope to defendant's

revised exit strategy to perform consulting work for out-of-state entities after defendant left the

employment of PA Cyber. <u>See</u> FOF 46-69; COL 23-28, 49-65.  The court recognized that the

subject matter of Barry's personal representation of defendant was closely related to, and nearly

indistinguishable from, Barry's representation of PA Cyber, which corporate advice included

securing defendant's services for PA Cyber as a consultant through NNDS, and, later, advising

defendant about the propriety of doing consulting work for out-of-state entities while still

employed by PA Cyber. <u>See</u> FOF 51-52, 54-55; COL 54-56, 61.

COL 74)    To summarize this court's findings and conclusions:  Defendant failed to prove

that PA Cyber, NNDS, and defendant were members of a common interest endeavor with respect

to defendant's exit strategy. <u>See</u> FOF 86-92; COL 29-34, 66-72.  In any event, this court found

that any alignment of interests, of whatever character, ended by November 17, 2011, which is

before the government began recording conversations in connection with the investigation that

led to filing of the instant indictment. <u>See</u> FOF 16, 52, 54; COL 70.

COL 75)     Given these findings and conclusions, the only possibly actionable misconduct would be if the government purposefully recorded conversations between Barry and defendant, and *only* Barry and defendant, or otherwise wrongfully intruded into that relationship.  The communications between Barry and defendant must have been made for the purpose of obtaining or providing legal advice about defendant's revised exit strategy to perform consulting services for out-of-state entities after he left the employment of PA Cyber, and otherwise must satisfy each legal requirement for establishing a privileged attorney-client communication. COL 8-16.

COL 76)     A court has the power, pursuant to the Due Process Clause, to dismiss an indictment, or suppress evidence, based upon the government's intrusion into the attorney-client relationship, if defendant establishes: (1) the government's objective awareness of an ongoing, personal attorney-client relationship; (2) deliberate intrusion into that relationship; and (3) actual and substantial prejudice and the court finds that the misconduct is egregious, shocking, outrageous, and clearly intolerable. COL 1-2, 4-5.  Courts are to exercise restraint in finding such violations to have occurred, as evidenced by the fact that the Court of Appeals for the Third Circuit has not sustained a due process challenge based upon such governmental misconduct since 1978. COL 2, 7.

COL 77)     A court has the inherent supervisory power to dismiss an indictment or suppress evidence, if prosecutors are found to have otherwise engaged in misconduct that must be discouraged or punished. COL 3.

COL 78)     Defendant is only entitled to relief if the government's conduct rises to the level of being egregious, shocking, outrageous, or intolerable. COL 5-6.

COL 79)    Defendant acknowledges that the government manually/optionally minimized communications between Barry and defendant in May and June 2012, and by mid-June instructed law enforcement to autominimize such communications. See FOF 19-20; COL 79.

COL 80)    Defendant concedes that the government was not informed before September 2012, that Barry professed to be defendant's personal attorney, and was not notified about the subject matter of that purported personal representation until August 2014. See FOF 67.  Given that conversations between Barry and defendant were being autominimized by June 2012, Barry's notice to the government, in September 2012, that he was claiming to be defendant's personal attorney cannot be probative of government misconduct in this case.  There is no evidence in the record that the government recorded any conversations between Barry and defendant after June 2012.

COL 81)    The record presently reflects two communications between Barry and defendant, on May 25, 2012, that were not minimized in their entirety. See FOF 20; (Gov. Exs. 69, 69A; Def. Exs. X, A12, A12-Trans. (version originally attached to defendant's motion, ECF No. 83-13), ECF No. 117 at 47; Def. Ex. AA.)  The first conversation, intercept number 00725, includes a factual discussion that could be related to Barry's personal representation of defendant, such as forming an Ohio corporation, but does not reflect the substance of any legal advice. (Gov. Exs. 69, 69A at 1-2; Def. Exs. X, A12, A12-Trans. at 1; ECF No. 83-13 (original A12-Trans.) at 1-2.) Following some discussion of a scheduling matter, Barry begins to discuss some changes made to a "letter for Freedom," after which the recording abruptly ends. (Gov. Exs. 69, 69A at 3; ECF No. 83-13 (original A12-Trans.) at 4.)  It would appear, from the court's review, that the conversation was manually minimized at that point.  The second conversation, intercept number 00729, reflects that portions of the conversation between Barry and defendant were manually

minimized because they were believed to involve legal matters. (Def. Ex. AA.)  The court, upon independent review, can find no mention of the content of these May 25, 2012 communications in the affidavit that was submitted in support of the second Title III wiretap order, which recounted other conversations that were recorded around May 25, 2012. (Def. Ex. A19.)  The evidence about these communications does not support defendant's claim of governmental misconduct, but, instead, reflects that the government was exercising reasonable caution with respect to communications between Barry, known at the time to be PA Cyber's corporate counsel, and defendant, known at the time to be the chief executive officer of PA Cyber.

COL 82)    The record, as it currently stands, would not support a finding that the government wrongfully intruded into the personal attorney-client relationship between Barry and defendant. It follows that the record, as it currently stands, would not warrant dismissal of the indictment or suppression of evidence based upon egregious, outrageous, shocking, and intolerable government misconduct.

COL 83)    Out of an abundance of caution, however, and recognizing that the court instructed the parties that the proceedings on defendant's motion to dismiss or suppress would be bifurcated, the court will provide defendant with the opportunity to supplement the record, with additional evidence or argument, in an effort to establish his government misconduct claim.  A hearing will be conducted, if necessary. COL 6.

### III.    <u>CONCLUSION</u>

The only possible basis for defendant's government misconduct claim is if the government deliberately intruded into the personal attorney-client relationship between Barry and defendant, as it has been defined by this court. Although the current record does not demonstrate a due process violation or prosecutorial misconduct warranting reprimand under this court's supervisory powers, the court will permit defendant an opportunity to supplement the record.

Because the court did not rely upon the testimony of Monico that defendant objected to on hearsay grounds, the issues raised in the briefing filed at ECF Nos. 126 and 127 need not be ruled upon.

Dated:   July 20, 2015                                  BY THE COURT:

                                                      <u>*/s/ Joy Flowers Conti*</u>
                                                      Joy Flowers Conti
                                                      Chief U.S. District Judge