## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 13-227-01 |
| | ) | |
| NICHOLAS TROMBETTA, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## OPINION

**CONTI, Chief District Judge**

Defendant Nicholas Trombetta ("defendant") is accused, in an eleven-count indictment, of committing mail fraud, theft or bribery concerning a program receiving federal funds, filing a false tax return, and conspiracy to commit tax fraud. (ECF No. 4.) Defendant filed a motion to dismiss the indictment or suppress evidence based upon the government's alleged intrusion into his attorney-client relationships with four different attorneys (hereinafter "Defendant's Motion"). (ECF Nos. 68, 70, 83 at 5-7.) The court bifurcated the proceedings concerning Defendant's Motion, with the first phase focusing on the existence and scope of defendant's purported personal attorney-client relationships with each of the attorneys whose conversations he claimed were wrongfully recorded by the government. (ECF No. 165 ¶¶ FOF 70-85, ¶¶ COL 29-34, 66-72.) In an opinion issued on July 20, 2015, the court found that defendant established a personal attorney-client relationship with only one of the four attorneys at issue, attorney Timothy Barry ("Barry"). (ECF No. 165 at 1 n.1, ¶¶ COL 49-62.)[1]

---

[1] The court presumes that the reader is familiar with the factual background set forth in the July 20, 2015 opinion (ECF No. 165), and with the legal conclusions reached therein.

Having defined the scope of defendant's personal attorney-client relationships, the proceedings on Defendant's Motion advanced to the second phase, during which the three elements of defendant's governmental misconduct claim, i.e., objective awareness of the attorney-client relationship, deliberate intrusion into the attorney-client relationship, and actual and substantial prejudice, would be considered. (Id. ¶ COL 83.)  After the court scheduled an evidentiary hearing focusing on the actual and substantial prejudice prong of defendant's governmental misconduct claim, the government moved for a ruling that the hearing is not warranted, based upon this court's July 20, 2015 opinion and the undisputed record. (ECF No. 168, hereinafter the "Government's Motion".)  Because there are no material facts in dispute with respect to defendant's ability to demonstrate actual and substantial prejudice, the government is correct that a further evidentiary hearing is unnecessary.  The Government's Motion must be granted, and Defendant's Motion must be denied.

I.      **Applicable Law**

   A. **Governmental Misconduct Claim - General Principles**

When governmental misconduct is found to violate a defendant's due process rights, the indictment must be dismissed if the government conduct renders "the prosecution of the defendant fundamentally unfair." United States v. Lakhani, 480 F.3d 171, 181 (3d Cir. 2007).  This claim is reserved for only the most intolerable, shocking, outrageous, and egregious governmental misconduct; that which violates "that fundamental fairness, shocking to the universal sense of justice mandated by the Due Process Clause." United States v. Voigt, 89 F.3d 1050, 1065 (3d Cir. 1996); see United States v. Hoffecker, 530 F.3d 137, 154 (3d Cir. 2008) (recognizing that the court of appeals is "extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause"); United States v. Nolan-Cooper,

155 F.3d 221, 231 (3d Cir. 1998) (noting that the defense "is reserved for only the most egregious circumstances").  As evidence of the exceptionality of this claim, the Court of Appeals for the Third Circuit has not sustained a due process challenge based upon governmental misconduct since 1978. United States v. Twigg, 588 F.2d 373 (3d Cir. 1978); see United States v. Tolentino, 486 F.App'x 286, 288-89 (3d Cir. 2012); United States v. Fortuna, No. 12-636, 2013 WL 1737215, at *7-8 (D.N.J. Apr. 22, 2013).

Even where there is not a due process violation, a court may fashion a remedy for governmental misconduct from its supervisory power. United States v. Nieves, No. 97-46, 1997 WL 447992, at *6 (E.D. Pa. July 24, 1997) (citing United States v. Hasting, 461 U.S. 499, 505 (1983) and United States v. Santana, 6 F.3d 1, 9-10 (1st Cir. 1993)).  One purpose of the court's supervisory power is "to secure enforcement of 'better prosecutorial practice and reprimand of those who fail to observe it.'" Nieves, 1997 WL 447992, at *6 (citing United States v. Osorio, 929 F.2d 753, 763 (1st Cir. 1991)).

**B.  Governmental Misconduct Claim - Elements**

A governmental misconduct claim can be based upon allegations that the prosecutors, or their investigative agents, intruded into or violated a defendant's attorney-client relationship during the investigation of a case.  A defendant is entitled to relief based upon the government's intrusion into his attorney-client relationship if he demonstrates: (1) the government's objective awareness of an ongoing, personal attorney-client relationship; (2) deliberate intrusion into that relationship; and (3) actual and substantial prejudice. Voigt, 89 F.3d at 1067; Hoffecker, 530 F.3d at 154; Nieves, 1997 WL 447992, at *5.

The burdens of both production and persuasion fall on defendant. Voigt, 89 F.3d at 1067, 1070.

### C.  **Governmental Misconduct Claim - Actual and Substantial Prejudice**

An affirmative showing of prejudice is essential to prevailing on any governmental misconduct claim.  In United States v. Voigt, the Court of Appeals for the Third Circuit rejected the argument that intrusion into the attorney-client relationship, standing alone, is per se prejudicial, and instead held that "a claim of outrageous government conduct premised upon deliberate intrusion into the attorney-client relationship will be cognizable where the defendant can point to actual and substantial prejudice." Voigt, 89 F.3d at 1066, 1070-71.  Even where governmental misconduct is proven to be deliberate, defendant must nevertheless demonstrate prejudice to obtain a remedy. Id. at 1071 n.9 (citing United States v. Morrison, 449 U.S. 361, 365-66 (1981) (finding, in a Sixth Amendment[2] case, that there is no basis for a remedy absent some impact on the criminal proceeding)).

It is the defendant's duty to "demonstrate that he suffered [] ill effects flowing from the government's allegedly improper investigative activity." Voigt, 89 F.3d at 1070. Voigt leaves no doubt that a defendant's failure to make an affirmative and specific showing of actual and substantial prejudice is fatal to his governmental misconduct motion. Id. at 1066, 1070-71.  Defendant recognizes that Voigt sets forth the legal standards pertinent to his motion to dismiss or suppress. (ECF No. 171 at 5.)

---

[2] Before a defendant is indicted, he is protected against governmental misconduct under the Fifth Amendment's Due Process Clause.  After indictment, the protections of the Sixth Amendment attach to the attorney-client relationship and afford relief for wrongful intrusion into it.  The legal principles, however, are the same under both amendments, and the case law is interchangeable for purposes of the present proceedings on Defendant's Motion. United States v. Brodie, 250 F.Supp.2d 466, 469, 470 (E.D. Pa. 2002) (citing Moran v. Burbine, 475 U.S. 412, 432 (1986)).

Prejudice may manifest itself in a number of ways, including the government's use of evidence gained by intercepting privileged communications, destruction of the attorney-client relationship, or other actions designed to give the government an unfair advantage at trial. United States v. Marshank, 777 F.Supp. 1507, 1521 (N.D. Cal. 1977). The actual and substantial prejudice requirement, however, does not include "some vague notion of unfairness;" instead, it imposes upon a defendant the duty to demonstrate that the criminal proceedings were adversely affected in some concrete way. United States v. Renzi, 722 F.Supp.2d 1100, 1131 (D. Ariz. 2010) (citing decisions in which prejudice consisted of lost evidence, substantial influence on a grand jury's decision to indict, or impairment of defendant's ability to defend himself).

Defendant cites two decisions in his brief in opposition to the Government's Motion to support his contention that he "has been prejudiced to the extent that the government used recordings that it should not have made to develop its case:" United States v. Marshank, 777 F.Supp. 1507 (N.D. Cal. 1977) and United States v. Nieves, No. 97-046, 1997 WL 447992 (E.D. Pa. July 24, 1997). (ECF No. 171 at 5-6.) Instead of supporting defendant's assertion that he is entitled to relief in this case, these decisions reinforce the concept that identifying and substantiating actual and substantial prejudice is essential to any claim of governmental misconduct.

In Marshank, defendant's attorney, Ron Minkin ("Minkin"), provided information to government agents about his client's whereabouts and criminal activity both before and after defendant was indicted. Marshank, 777 F.Supp. at 1512-18. The court found that the government was aware of Minkin's conflict of interest, failed to notify the court or defendant about it, and "went so far as to participate in efforts to mask the conflict of interest

from the defendant." Id. at 1519-20.  The district court concluded that it was "clear that [defendant] was prejudiced" by the government's intrusion into his attorney-client relationship with Minkin because "most, if not all" of the government's evidence against him came from Minkin, and without Minkin's cooperation, the defendant would not have been indicted. Id. The court held that being indicted qualifies as actual and substantial prejudice and dismissed the indictment. Id. at 1523, 1524, 1528, 1530.

The district court reached a similar conclusion in Nieves.  In that case, Nieves' codefendant, who shared an attorney with Nieves, volunteered privileged information to government agents during their investigation, and agreed to record future conversations of the same nature for the government. Nieves, 1997 WL 447992, at *5-6.  The court faulted the government for suggesting that Nieves' codefendant raise "[c]ounsel as a topic for his phone conversations" with defendant, and for failing to discourage the codefendant's disclosure of privileged communications. Id.  Relying upon the investigating agent's admission that money laundering charges were added to Nieves' indictment based upon the privileged conversations that Nieves' codefendant disclosed to the government, the district court concluded that "[a] criminal indictment surely constitutes 'actual and substantial prejudice.'" Id. at *6.  Notably, the court did not dismiss the indictment in Nieves, but only excluded certain recorded telephone conversations and investigative reports that revealed the content of privileged conversations. Id. at *7.

Marshank and Nieves stand for the proposition that being indicted causes a defendant actual and substantial prejudice.  This conclusion is not subject to reasonable debate. In both cases, however, there was no factual dispute that criminal charges were filed only because the government acquired privileged information.  In Marshank, the defendant would

not have been indicted absent the government's misconduct.  In <u>Nieves</u>, money laundering

charges would not have been added to the indictment absent the government's misconduct.

Given those facts, the district courts concluded that each defendant made the required showing

of actual and substantial prejudice to sustain his governmental misconduct claim.  Contrary to

defendant's contention in this case, these decisions do not permit a defendant to establish a

governmental misconduct claim based upon generalized accusations that the government

"used" information to "develop its case."

       The only other decision referenced by defendant is <u>United States v. Terzado-</u>

<u>Madruga</u>, 897 F.2d 1099 (11th Cir. 1990).  Defendant points out that <u>Marshank</u> cites <u>Terzado-</u>

<u>Madruga</u> for the proposition that the "'the fruit of the poisonous tree' doctrine applies to

evidence obtained in violation of the Sixth Amendment right to counsel as well as the Fifth

Amendment right to due process." (ECF No. 171 at 6.)  This point of law is not subject to

dispute, or particularly relevant to the issues before this court.  To the extent defendant

references <u>Marshank</u>'s citation to <u>Terzado-Madruga</u> only to substantiate the point of law, the

decision need not be discussed further.  To the extent, however, that defendant cites <u>Terzado-</u>

<u>Madruga</u> as supportive of his motion to dismiss or suppress, further examination is warranted.

The district court did not dismiss the indictment in <u>Terzado-Madruga</u> and the appellate court

specifically stated that "the government's actions do not warrant the dismissal of the

indictment." <u>Terzado-Madruga</u>, 897 F.2d at 1117.  The appellate court instead found that the

district court's severance of the drug distribution charges from the murder-for-hire charges

"sufficiently remedied the violation of [defendant's] right to counsel." <u>Id.</u>  For this reason

alone, the decision in <u>Terzado-Madruga</u> could not support defendant's assertion in this case

that the court should dismiss the indictment or suppress evidence.

Terzado-Madruga is distinguishable from the instant case in several additional ways. First, the government was not accused in Terzado-Madruga of recording privileged conversations during its investigation. The constitutional violation, instead, was the use of a confidential informant to induce defendant, who was being held in pretrial detention, to make incriminating statements about charges for which he was already indicted, without counsel present, which is a violation of a defendant's Sixth Amendment right. Id. at 1105-06, 1110. Relevant to the facts of the instant case, in which all the allegedly improper recordings were made before the indictment was filed, the appellate court noted that it is proper for an informant to elicit incriminating statements about crimes for which defendant has not been indicted, because his Sixth Amendment right is not yet attached to those crimes. Id. at 1111. Defendant makes no allegation in this case that the confidential informants induced him to make incriminating statements, without an attorney present, about crimes for which he was already indicted, in violation of his Sixth Amendment rights, making Terzado-Madruga factually distinguishable. Second, the court in Terzado-Madruga ultimately permitted much of the information learned from the confidential informant's improper interactions with defendant to be admitted into evidence based upon the inevitable disclosure and independent source exceptions to the fruit of the poisonous tree doctrine, making Terzado-Madruga legally inapposite. Id. at 1114-15, 1117.[3]

The decision in Terzado-Madruga does not support defendant's assertion that the indictment must be dismissed or evidence must be suppressed because the "government used recordings it should not have made to develop its case." (ECF No. 171 at 5.) That decision is factually distinguishable, and legally inapposite to the question to be decided by

---

[3] The court discusses these legal doctrines later in this opinion. See supra III.B.4.

this court.

### D. **Governmental Misconduct Claim – Need for an Evidentiary Hearing**

Defendant is correct that the court of appeals' decision in <u>Voigt</u> announces the standard to be applied when determining whether a district court should conduct a pretrial evidentiary hearing on a claim of governmental misconduct. (ECF No. 171 at 5 (citing <u>Voigt</u>, 89 F.3d at 1067).)  Defendant is likewise correct that the movant's papers must demonstrate a "colorable claim," one that consists of more than bald-faced allegations of misconduct, in order for a hearing to be required on a claim of governmental misconduct. (<u>Id.</u>)

Defendant, however, does not include the remainder of the court's pertinent reasoning in <u>Voigt</u>.  The court of appeals further explained that in order to obtain a hearing on a claim that the government intruded into the attorney-client relationship, a defendant's submissions must demonstrate an issue of fact material to each of the three elements of such a claim, including actual and substantial prejudice. <u>Voigt</u>, 89 F.3d at 1067.  Although the district court's failure to conduct a pretrial evidentiary hearing was ultimately deemed to be harmless error in <u>Voigt</u>, the court of appeals concluded that a hearing should have been held because "there were *some* disputed factual issues raised by Voigt's motion that needed to be resolved." <u>Voigt</u>, 89 F.3d at 1067-68 (emphasis in original).

According to <u>Voigt</u>, a defendant is entitled to a pretrial evidentiary hearing where the governmental misconduct claim consists of more than mere bald-faced allegations of misconduct and there are disputed factual issues that are material to each element of the claim. Without factual disputes, a hearing is not needed, regardless whether a governmental misconduct claim is colorable.

## II.    Background Facts

In support of his motion to dismiss or suppress, defendant argued that the government violated his constitutional rights by deliberately recording conversations between or among four attorneys and defendant, as well as other conversations in which confidential legal advice and attorney-client communications were discussed. (ECF No. 83 at 26.)  The court presided over five days of hearings, hearing testimony from numerous witnesses, and admitting documentary evidence and wiretap and consensual recordings into evidence with respect to defendant's assertion that he had personal, attorney-client relationships with each attorney. (ECF No. 165 at 1-2.)

In findings of fact and conclusions of law issued on July 20, 2015, this court found that the only attorney with whom defendant proved that he had any personal attorney-client relationship was Timothy Barry ("Barry"), who was corporate counsel for The Pennsylvania Cyber Charter School ("PA Cyber"), of which defendant was the chief executive officer at the relevant time. (ECF No. 165 at 1-2; ¶ FOF 46, ¶¶ COL 49-65.)  The court found that defendant formed a personal attorney-client relationship with Barry sometime after November 17, 2011, and only with respect to defendant's revised exit strategy to perform consulting work for out-of-state entities after he left the employment of PA Cyber. (Id. ¶¶ COL 61, 64.)  The court concluded that defendant's assertions that he had personal attorney-client relationships with Joseph Askar, Ralph Monico, and Leo Daly, and that all four attorneys shared a common interest with respect to their personal representation of him, were unsupported by the record. (Id. ¶¶ COL 36-48, 66-72.)  It follows, therefore, that Defendant's Motion is now limited to assessing whether the government improperly intruded into defendant's personal attorney-client relationship with Barry, as that relationship was narrowly defined in the court's July 20,

2015 opinion. (<u>Id.</u> ¶¶ COL 61, 64, 75.)

In the July 20, 2015 opinion, the court noted that the record included only two conversations between Barry and Trombetta that were not minimized in their entirety. (<u>Id.</u> at ¶ COL 81.)  Both conversations took place on May 25, 2012, and the court made the following observations about them:

> The first conversation, intercept number 00725, includes a factual discussion that could be related to Barry's personal representation of defendant, such as forming an Ohio corporation, but does not reflect the substance of any legal advice. (Gov. Exs. 69, 69A at 1-2; Def. Exs. X, A12, A12-Trans. at 1; ECF No. 83-13 (original A12-Trans.) at 1-2.)  Following some discussion of a scheduling matter, Barry begins to discuss some changes made to a "letter for Freedom," after which the recording abruptly ends. (Gov. Exs. 69, 69A at 3; ECF No. 83-13 (original A12-Trans.) at 4.)  It would appear, from the court's review, that the conversation was manually minimized at that point.  The second conversation, intercept number 00729, reflects that portions of the conversation between Barry and defendant were manually minimized because they were believed to involve legal matters. (Def. Ex. AA.)

(<u>Id.</u> ¶ COL 81.)  The court concluded that these two conversations would not support a finding that the government wrongfully intruded into the personal attorney-client relationship between Barry and defendant, and could not warrant dismissal of the indictment or suppression of evidence based upon egregious, outrageous, shocking, and intolerable governmental misconduct. (<u>Id.</u> ¶¶ COL 82-83.)  The court, however, recognized that the parties were instructed that the proceedings on Defendant's Motion would be bifurcated, and, therefore, provided defendant with the opportunity to supplement the record, with additional evidence or argument, in support of his governmental misconduct claim. (<u>Id.</u>)  In doing so, the court indicated that a hearing would be conducted only if necessary. (<u>Id.</u> ¶ COL 83.)

On July 27, 2015, the court held a status conference with the parties. (ECF No. 172.)  At that conference, defendant indicated that further hearings would be required on his motion, and that he intended to examine various witnesses, including the lead FBI agent assigned to this case, two confidential informants, and the Assistant United States Attorneys working on this case about "what the government knew and when with respect to the relationship between Mr. Trombetta and Mr. Barry," an exercise that the government characterized as a "deep sea fishing expedition." (ECF No. 172 at 4-5, 8.)  During the conference, the court questioned defendant about his ability to prove actual and substantial prejudice where the record included only two recorded conversations between Barry and defendant, both of which were predated by conversations between participants other than Barry about the same subject matter. (Id. at 10-11, 23-25, 28-31.)  Defendant explained that the government, by intercepting conversations between Barry and defendant, could have used the newly-acquired information as a lead to gather additional evidence, which evidence could have been presented to the grand jury, in order to obtain an indictment, or to the court, in order to obtain search warrants. (Id. at 12-14, 17, 27-28.)  Although defendant initially argued at the conference that the burden would then shift to the government to demonstrate that it had an independent source for the same evidence, he later argued, without explanation or citation to supporting authority, that he would be entitled to relief even if the government had prior, independent knowledge about the same information. (Id. at 11-14, 18-19, 30.)

The court scheduled a hearing focused solely on the actual and substantial prejudice prong of defendant's governmental misconduct claim.[4] Based upon the government's stated intention to challenge defendant's right to that hearing, the court also set a deadline for the government to file such a motion. (Id. at 24-25, 31-32.) In accordance with that schedule, the government filed a motion for a ruling that no evidentiary hearing is warranted (the "Government's Motion"), to which defendant responded. (ECF Nos. 168, 171.) The matter is ripe for decision. For the reasons set forth below, the court grants the Government's Motion, and, therefore, denies Defendant's Motion.

## III. <u>Analysis</u>

### A. <u>The Three Intercepted Conversations between Defendant and Barry</u>

It is undisputed that the record contains a total of three recorded conversations exclusively between Barry and defendant. These three conversations occurred on defendant's cellular telephone device and were recorded pursuant to an order obtained in compliance with Title III of the Omnibus Crime Control Act of 1968, 18 U.S.C. §§ 2510-2520. (ECF No. 83-20 at 9-10.) One conversation occurred on May 23, 2012. Two conversations occurred on May 25, 2012. The three conversations, together, last approximately twelve minutes and based upon the extensive evidentiary record previously considered by this court, are clear in their context, content, and participants. Each recorded conversation will be examined in detail below.

The government submitted a compact disk ("CD") containing these three recordings as Attachment A to the Government's Motion. (ECF No. 168; 8/18/2015 Remark.) Defendant does not object to the government's submission of these recordings, dispute their authenticity or

_____

[4] That hearing was postponed several times at defendant's request and with the government's consent. (ECF Nos. 173-75.)

content, or present opposing summaries or transcripts of the conversations provided by the government. Defendant previously offered into evidence both May 25, 2012 conversations, either as a recording, with transcript (Def. Exs. X, A12, A12-Trans.), or as a synopsis (Def. Ex. AA). (ECF No. 165 ¶ COL 81.) The court concluded in the July 20, 2015 opinion that the first May 25, 2012 conversation is not privileged and the second May 25, 2012 conversation was manually minimized by the wiretap operator because it may have been privileged. (ECF No. 165 ¶¶ COL 81-83.) The May 23, 2012 conversation was not offered into evidence during the prior evidentiary hearings on Defendant's Motion.

1. **The May 23, 2012 Conversation** (Recording No. 309)

The May 23, 2012 conversation is identified as Recording No. 309, and is approximately one minute long. (ECF No. 168, Attach. A (No. 309).) Barry initiates the call to defendant. Upon answering the telephone, defendant states "this [] retirement is killing me," and "I don't know how I'm gonna deal with it," which comments are followed by an exchange about retirement generally and laughter by both Barry and defendant. (Id. at :20.)[5] Defendant then tells Barry that he cannot talk now because he is being interviewed by the Pittsburgh Post-Gazette about special education, to which Barry responds that the interview is more important, but that defendant should call him back because he wants to talk about a couple things. (Id. at :42.)

This conversation is not privileged. In order for the attorney-client privilege to apply, (1) a communication (2) must be made between privileged persons, (3) in confidence and (4) for the purpose of obtaining or providing legal advice or assistance to the client. In re Application of Chevron Corp., 650 F.3d 276, 289 (3d Cir. 2011) (citing In re Teleglobe

---

[5] In this opinion, the court cites to the approximate time on the recording at which a particular statement is made, or topic of conversation begins. The citation is intended to be a generalized aid to the reader and listener, especially for those conversations which are several minutes long.

Communications Corp., 493 F.3d 345, 359 (3d Cir. 2007)). Defendant bears the burden of proving these elements preponderance of the evidence. Voigt, 89 F.3d at 1067 n.6. Failure to demonstrate that information obtained by the government was in fact privileged is fatal to defendant's claim that the government engaged in outrageous misconduct by intruding into the attorney-client relationship. Id. at 1070.

The May 23, 2012 conversation includes no discussion about any substantive matter; Barry and defendant engage in a jovial exchange about retirement and defendant tells Barry that he cannot talk further. This exchange could not be characterized as a communication made for the purpose of obtaining or providing legal advice or assistance. Although it is conceivable that Barry called defendant intending to discuss legal matters of personal consequence to defendant, defendant was unavailable to have that privileged conversation at that time. The short exchange that does occur is not privileged. For this reason, the May 23, 2012 conversation will not be further discussed in this opinion.

   2. **The Two May 25, 2012 Conversations** (Recording Nos. 725 and 729)

Two conversations took place between Barry and defendant on May 25, 2012. Both calls are Title III intercepts of communications occurring on defendant's cellular telephone device. The first conversation, which is approximately six minutes long, is identified as Recording No. 725 (hereinafter the "first May 25, 2012 conversation"). Recordings and transcripts of this conversation were entered into evidence during the prior hearings on Defendant's Motion, and are identified in this court's findings of fact and conclusions of law as Government Exhibits 69 and 69A, and Defense Exhibits X, A12, and A12-Trans. (ECF No. 165 ¶ COL 81.) The second conversation, which is approximately five minutes long, is identified as

Recording No. 729 (hereinafter the "second May 25, 2012 conversation"). Defendant entered a synopsis of this conversation into evidence, as Defense Exhibit AA, during the prior hearings on Defendant's Motion. (ECF No. 165 ¶ COL 81.) Based upon the electronic identifiers on the CD provided to the court by the government and the content of the conversations themselves, the second call occurred approximately five minutes after the first call, and was made because the first call was unintentionally disconnected.

### a. **Prior Findings and Conclusions about the May 25, 2012 Conversations**

The court reached the following conclusions in the July 20, 2015 opinion about the May 25, 2012 conversations:

> COL 81) The record presently reflects two communications between Barry and defendant, on May 25, 2012, that were not minimized in their entirety. <u>See</u> FOF 20; (Gov. Exs. 69, 69A; Def. Exs. X, A12, A12-Trans. (version originally attached to defendant's motion, ECF No. 83-13), ECF No. 117 at 47; Def. Ex. AA.) The first conversation, intercept number 00725, includes a factual discussion that could be related to Barry's personal representation of defendant, such as forming an Ohio corporation, but does not reflect the substance of any legal advice. (Gov. Exs. 69, 69A at 1-2; Def. Exs. X, A12, A12-Trans. at 1; ECF No. 83-13 (original A12-Trans.) at 1-2.) Following some discussion of a scheduling matter, Barry begins to discuss some changes made to a "letter for Freedom," after which the recording abruptly ends. (Gov. Exs. 69, 69A at 3; ECF No. 83-13 (original A12-Trans.) at 4.) It would appear, from the court's review, that the conversation was manually minimized at that point. The second conversation, intercept number 00729, reflects that portions of the conversation between Barry and defendant were manually minimized because they were believed to involve legal matters. (Def. Ex. AA.) The court, upon independent review, can find no mention of the content of these May 25, 2012 communications in the affidavit that was submitted in support of the second Title III wiretap order, which recounted other conversations that were recorded around May 25, 2012. (Def. Ex. A19.) The evidence about these communications does not support defendant's claim of governmental misconduct, but, instead, reflects that the government was exercising reasonable caution with respect to communications between Barry, known at

the time to be PA Cyber's corporate counsel, and defendant, known at the time to be the chief executive officer of PA Cyber.

COL 82) The record, as it currently stands, would not support a finding that the government wrongfully intruded into the personal attorney-client relationship between Barry and defendant. It follows that the record, as it currently stands, would not warrant dismissal of the indictment or suppression of evidence based upon egregious, outrageous, shocking, and intolerable government misconduct.

COL 83) Out of an abundance of caution, however, and recognizing that the court instructed the parties that the proceedings on defendant's motion to dismiss or suppress would be bifurcated, the court will provide defendant with the opportunity to supplement the record, with additional evidence or argument, in an effort to establish his government misconduct claim. A hearing will be conducted, if necessary. COL 6.

(ECF No. 165 ¶¶ COL 81-83; Id. at 73 (noting that "the current record does not demonstrate a due process violation or prosecutorial misconduct warranting reprimand under this court's supervisory powers").) In summary, the court reached two conclusions about the May 25, 2012 conversations: (1) the first conversation is not privileged and the second conversation was manually minimized to avoid listening to possibly privileged communications; and (2) the record at the time, which consisted of only two private conversations between Barry and defendant, was insufficient to establish that the government wrongfully intruded into defendant's personal attorney-client relationship with Barry.

In the face of these two seemingly dispositive conclusions, defendant contends that an additional evidentiary hearing, focusing on the government's use of unlawful recordings, is required. According to defendant, the critical issue before the court is whether defendant "has been prejudiced to the extent that the government used recordings that *it should not have made* to develop its case." (ECF No. 171 at 5 (emphasis added).) Defendant's statement of the issue

presented recognizes that before prejudicial use becomes relevant, defendant must demonstrate that the government recorded a conversation that it "should not have" recorded. In light of this court's July 20, 2015 findings of fact and conclusions of law, the only conversations that defendant has standing to claim that the government "should not have" recorded are exchanges involving Barry and defendant, and only Barry and defendant, about defendant's revised exit strategy. (ECF No. 165 ¶ COL 75.)

There is no dispute that the record consists of only three private conversations between Barry and defendant about any subject matter: the May 23, 2012 conversation and the two May 25, 2012 conversations. (ECF No. 168, Attach. A (Nos. 309, 725, 729).) This court concluded in the July 20, 2015 opinion that the first May 25, 2012 conversation was not privileged and that the second conversation was manually minimized because it may have been privileged. (ECF No. 165 ¶ COL 81.) Defendant does not acknowledge or address these prior findings in his brief in opposition to the Government's Motion. Defendant likewise does not explain how the May 23, 2012 conversation could possibly be privileged so that it can support his governmental misconduct claim. Based upon the court's analysis in section III.A.1, the May 23, 2012 conversation cannot qualify as a privileged communication under any circumstances and need not be discussed further.

Defendant does address, in a footnote of his opposition brief, this court's prior finding in the July 20, 2015 opinion that the record at the time was insufficient to sustain defendant's governmental misconduct claim. In response, defendant states that it is "not surprising" that the record "did not demonstrate a due process violation or prosecutorial misconduct" because "no hearings focusing on the government's misconduct have yet been held." (ECF No. 171 at 4 n.3.) Defendant claims that the record is replete with "evidence of misconduct" and urges this court not to permit the government's misconduct to escape judicial

scrutiny. (Id. at 5-6.) Although defendant asserts that "the Court should… give him the opportunity to show prejudice at an evidentiary hearing," he does not identify a single recorded conversation between Barry and defendant that was not previously admitted into evidence that purportedly evidences prejudice. (Id. at 5.) There is no dispute that defendant possesses the pertinent recordings needed to identify any allegedly prejudicial conversations; in fact, Defendant's Motion relied almost exclusively upon the consensual and wiretap recordings made by the government during its investigation of this case. (ECF No. 83.) Defendant's failure to identify additional recordings that allegedly caused him prejudice in opposition to the Government's Motion is significant.

The way in which defendant defines the source of his prejudice is similarly significant. Defendant contends that the government improperly learned about "the creation of a new Ohio company, Presidio Education Network LLC, and a potential transaction with Franciscan University" by listening to his conversations with Barry. (ECF No. 171 at 6.) Defendant identifies one page of the indictment and two pages of a Title III affidavit that reference Presidio, an Ohio company, and Franciscan University as evidence of prejudice. (Id.) Although the court will address defendant's allegations about prejudice in detail in section III.C. of this opinion, it is important to note at the outset that defendant unilaterally restricts the scope of potential prejudice to a single subject matter: defendant's formation of Presidio, in Ohio, to transact business with Franciscan University.

Even though the court examined the two May 25, 2012 conversations in the July 20, 2015 opinion, and concluded that they could not form the basis of defendant's governmental misconduct claim, the court will reexamine each conversation before ruling on the Government's Motion. Prior to doing so, the court notes that defendant never explains in his brief in opposition

19

to the Government's Motion the circumstances under which he holds a personal, attorney-client privilege in the two May 25, 2012 conversations. Defendant, instead, skips the preliminary (but essential) step of establishing that a privileged communication exists, and asserts that further evidentiary hearings are required because the government *used* information about defendant's intent to contract with Franciscan University through Presidio, and fails to "disavow any *use*" of that information. (ECF No. 171 at 6, 7 (emphasis added).) As stated previously in this opinion, however, unless defendant can establish that the government intercepted privileged conversations, the government's use of information divulged during recorded conversations is legally inconsequential. Voigt, 89 F.3d at 1070. Despite this fundamental, and dispositive, deficiency in defendant's opposition to the Government's Motion, the court will proceed with the analysis of defendant's governmental misconduct claim.

**b. Reexamination of the May 25, 2012 Conversations**

**(i) The First May 25, 2012 Conversation (Recording No. 725)**

The first May 25, 2012 conversation is initiated by Barry, who informs defendant that arrangements have been made with a law firm in Ohio to form "an LLC," (a limited liability company) in Ohio. (ECF No. 168, Attach. A (No. 725) at :50.) Barry tells defendant what the Ohio law firm will charge, that the Ohio lawyer is a "friend of Sean's," and that the Ohio law firm will ensure that the new company is compliant with Ohio law. (Id. at 1:40.) Barry states that defendant and he will need to meet in the coming weeks to sign forms, set up bank accounts, and get defendant an employee identification number so that "you are ready to go certainly by the end of June." (Id. at 1:30, 2:40.) After providing defendant with this information, Barry asks defendant if there is any reason defendant does not want to "proceed with that Ohio LLC," to which defendant responds, "I need it for the purpose of Franciscan. I'm meeting with them all

next week and, we are, um, I gotta have a contract with them, I gotta be able to say 'my company'." (Id. at 3:00.)  After defendant makes the comment, Barry replies "Ok, that's fine. Then we're good.  I just want to make sure that you know that we're pulling the trigger on that. So that's the first thing." (Id. at 3:22.)

Barry immediately states that the "second thing" he wants to discuss is setting up an in-person meeting at his office "to go over the state of the union as far as your exit is concerned." (Id. at 3:40.)  Barry then states that he recently played golf with "Mike" and "Andrew" and "Sean," and comments that "Mike" and "Andrew" are "all ready to go" and that "things are moving along pretty well." (Id. at 3:55.)  Barry tells defendant that he "certainly wants to hear what's on your mind." (Id. at 4:15.)  Defendant suggests June 5, 2012 for the meeting with Barry. (Id. at 5:00.)  After confirming a time for the meeting, Barry discusses a "letter to Freedom" for approximately twenty seconds, at which point the conversation abruptly ends. (Id. at 5:25.)

This first May 25, 2012 conversation includes three topics: (1) formation of an Ohio company; (2) defendant's "exit;" and (3) a letter to Freedom.  According to Barry's testimony, the third topic concerns PA Cyber's dispute with Freedom School District, and does not implicate defendant's personal legal interests. (ECF No. 118 at 91.)  The letter to Freedom will be addressed in more detail in section III.A.2.b(ii)'s discussion about the second May 25, 2012 conversation.  It is sufficient to note here that this portion of the first May 25, 2012 conversation is about PA Cyber, which has waived its attorney-client privilege with Barry, not about defendant personally. Defendant, therefore, cannot assert a personal, attorney-client privilege in this portion of the conversation and cannot base his governmental misconduct claim upon it. Voigt, 89 F.3d at 1070.

In the July 20, 2015 opinion, this court defined the scope of Barry's personal representation of defendant as "defendant's revised exit strategy to perform consulting work for out-of-state entities after he left the employment of PA Cyber." (ECF No. 168 ¶ COL 64; see also Id. ¶ FOF 54, COL ¶ 61.)  The other two topics discussed during the first May 25, 2012 conversation, i.e., the formation of an Ohio company and defendant's "exit," could relate to Barry's personal representation of defendant.  The court, therefore, reconsiders the conversation between Barry and defendant about these two topics to determine whether it could be privileged and support defendant's governmental misconduct claim.  To reiterate, the court concluded in the July 20, 2015 opinion that no portion of this conversation is privileged, but is reexamining that conclusion out of an abundance of caution. (ECF No. 165 ¶ COL 81.)

The first May 25, 2012 conversation does not include any privileged communication about topic two, i.e., defendant's "exit" from PA Cyber.  In the conversation, Barry tells defendant that he wants to meet with him to discuss this topic and defendant selects a date for that meeting.  Barry volunteers that two individuals are "ready to go" and "things" are "moving along."  These communications do not reveal the substance of any legal advice and are not made for the purpose of securing legal advice. Chevron, 650 F.3d at 289 (citing In re Teleglobe, 493 F.3d at 359); Montgomery County v. MicroVote Corp., 175 F.3d 296, 301 (3d Cir. 1999); United States v. Amerada Hess Corp., 619 F.2d 980, 986 (3d Cir. 1980); In re Processed Egg Products Antitrust Litig., 278 F.R.D. 112, 117 (E.D. Pa. 2011) (citing In re Ford Motor Co., 110 F.3d 954, 965 n.9 (3d Cir. 1997)); Nationwide Mut. Ins. Co. v. Fleming, 924 A.2d 1259, 1264 (Pa. Super. Ct. 2007).  More specifically, selecting a date for an attorney and a client to meet to discuss defendant's exit strategy is not a privileged communication.  Barry's comments about things being "ready to go" and "moving along" are general and do not reveal anything of substance

about defendant's "exit," let alone disclose Barry's legal advice or opinions about the issue. The fact that defendant was preparing to retire from PA Cyber around this time does not disclose the substance of Barry's legal advice, and, in any event, was publicly disclosed by defendant prior to May 2012, breaking any possible attorney-client confidentiality about that fact. (ECF No. 118 at 33; ECF No. 124 at 50-51.); In re Processed Egg Products, 278 F.R.D. at 117 (attorney-client privilege does not apply where a client speaks openly about a matter). Because the first May 25, 2012 conversation includes no privileged communication about defendant's "exit," defendant's governmental misconduct claim cannot be based upon this portion of the conversation. Voigt, 89 F.3d at 1070.

The first May 25, 2012 conversation does not include any privileged communication about topic one, i.e., forming an Ohio company. Barry's statement about ministerial details related to forming the Ohio company do not disclose any legal advice about forming such a company. Chevron, 650 F.3d at 289 (privilege applies only to communications made for the purpose of providing legal advice or assistance to the client). Barry's comment that the law firm in Ohio will ensure that the new company is compliant with Ohio law does not disclose legal advice; it is a statement of (obvious) fact. Barry's comments about defendant needing to set up bank accounts and obtain an employee identification number do not disclose the substance of any advice about these matters. Even if they did, such comments would not be protected by the attorney-client privilege because they concern business, not legal, matters. Wachtel v. Health Net, Inc., 482 F.3d 225, 231 (3d Cir. 2007) ("Because the privilege promotes the 'dissemination of sound legal advice,' it applies only where the advice is legal in nature, and not where the lawyer provides non-legal business advice"); In re Processed Egg Products, 278 F.R.D. at 117 (same). This portion of

the first May 25, 2012 conversation is not privileged and cannot support defendant's governmental misconduct claim.

Defendant's statement to Barry that he wants to create the Ohio company because he needs it in order to contract with Franciscan University does not transform this portion of the first May 25, 2012 conversation into a privileged communication. The record contradicts any suggestion that defendant made the statement to Barry in order to obtain legal advice, or that Barry relied upon that statement in order to provide legal advice to defendant. Instead, Barry's response to defendant's statement is to explain that he just wanted to be sure that defendant knew that he (Barry) was "pulling the trigger on that" and to move immediately to the next topic of conversation. (ECF No. 168, Attach. A (No. 725) at 3:22.) Barry does not offer legal advice in response to defendant's statement about why he needs to create the Ohio company. Defendant allows Barry to begin the next topic of conversation, i.e., setting up an in-person meeting about his "exit," without interrupting to request that Barry provide legal advice about defendant's need to create the Ohio company. This progression of the conversation confirms that defendant did not offer the statement about using the new company to contract with Franciscan University in order to obtain legal advice from Barry about whether, or how, to form a new company, or whether or how to contract with Franciscan University. Defendant, instead, either did not need legal advice about these issues, or received it before May 25, 2012. Because the first May 25, 2012 conversation includes no privileged communication about the formation of an Ohio company, defendant's governmental misconduct claim cannot be based upon this portion of the first May 25, 2012 conversation. <u>Voigt</u>, 89 F.3d at 1070.

The court, therefore, reaffirms the conclusion reached in the July 20, 2015 opinion that the first May 25, 2012 conversation does not reveal any privileged communications between Barry and defendant, making it legally inconsequential to defendant's governmental misconduct claim. Id.; (ECF No. 165 ¶ COL 81.)  The court's analysis of the first May 25, 2012 conversation's effect on defendant's governmental misconduct claim could end here as a result of this finding.  The court will nevertheless proceed with the analysis, assuming for the sake of argument that the portion of this conversation about defendant using an Ohio company named Presidio[6] to contract with Franciscan University is privileged and was "used" by the government, which is the position that defendant advances in opposition to the Government's Motion. (ECF No. 171 at 6.)

**(ii)  <u>The Second  May 25, 2012 Conversation</u> (Recording No. 729)**

The second conversation on May 25, 2012 begins with a female voice answering the telephone "Barry and Worner" and defendant asking to speak to Tim, explaining that they were just talking but got cut off. (ECF No. 168, Attach. A (No. 729) at :08.)  After music plays for several seconds, Barry answers and defendant and Barry speak about a letter concerning Freedom School District, an individual named Sofo, and unidentified false statements made on a website and in brochures. (<u>Id.</u> at :25.)  The parties discuss the possibility of taking legal action under the Political Subdivision Tort Claims Act and whether Freedom will pay Sofo's legal bills

---

[6] Although this issue will be addressed in more detail later in this opinion, it is worth noting here that the first May 25, 2012 conversation does not reveal the name of the Ohio company to be Presidio Education Network, LLC.  The word "Presidio," in fact, is not uttered by either Barry or defendant during this conversation.  Although this is a critical flaw in defendant's position, the court accepts defendant's assertion that the government wrongfully learned that defendant planned to create a new Ohio company, named Presidio Education Network, LLC, that would do business with Franciscan University by listening to the first May 25, 2012 conversation, even though that assertion is directly contradicted by the record.

after "he leaves." (Id. at 1:50.)  Barry suggests that defendant not send an email that defendant drafted because "if we actually go to court that won't help us." (Id. at 2:10.)  Barry indicates that he will send the letter to Freedom that day. (Id. at 3:20.)  The conversation closes with a sociable exchange about golf, wine, and defendant's plans to take a group of priests associated with Franciscan University to Bonita Springs, Florida. (Id. at 3:35.)

This conversation includes privileged communications about potential litigation against Freedom School District and Sofo.  In the July 20, 2015 opinion, this court found that the government agent listening to the wiretap minimized the majority of this conversation because "legal action" and "legal matters" were being discussed. (ECF No. 165 ¶ COL 81 (citing Def. Ex. AA).)  Only the first forty-five seconds (introductory remarks about the letter to Freedom) and the last minute (sociable exchange) of the conversation between Barry and defendant are summarized or transcribed in the synopsis of this conversation that defendant offered into evidence during the prior proceedings on his motion to dismiss or suppress. (ECF No. 168, Attach. A; Def. Ex. AA.)  The synopsis reflects that although the second May 25, 2012 conversation was not autominimized, the majority of it was manually minimized by the government agent monitoring the wiretap interceptions at or near the time they occurred. (ECF No. 165 ¶¶ FOF 19-20, 68, ¶ COL 79.)  Under the circumstances, the record contradicts any finding that the government unlawfully used this recording during its investigation and development of this case.

Defendant, in fact, does not ask this court to reach such a finding.  In his brief in opposition to the Government's Motion, defendant does not contend that he was prejudiced by the government's use of information about Freedom School District or Sofo.  Defendant contends that he was prejudiced by the government's use of information about his plans to form

26

Presidio in Ohio and to use the company to contract with Franciscan University. (ECF No. 171 at 6.)  The second May 25, 2012 conversation is not about Presidio, and, therefore, could not support defendant's claim, as a factual matter.

Even if defendant attempted to rely upon this second May 25, 2015 conversation to support his governmental misconduct claim, his attempt would be futile.  Barry testified unequivocally that the dispute involving Freedom School District and Sofo was "a PA Cyber issue" that had nothing to do with defendant personally. (ECF No. 118 at 91.)  The record reflects that defendant participated in this conversation with Barry on behalf of PA Cyber, as its chief executive officer, not personally on behalf of himself. (ECF No. 165 ¶ FOF 6.)  It follows that any privilege attaching to the second May 25, 2012 conversation belonged to PA Cyber, not to defendant.  Defendant cannot rely upon an alleged violation of PA Cyber's attorney-client privilege with Barry to support his governmental misconduct claim. Voigt, 89 F.3d at 1071 (defendant's governmental misconduct claim could not be based upon communications between counsel for a trust, and defendant, who operated the trust, concerning the workings of the trust because that privilege belonged to the trust).  PA Cyber waived its privilege with Barry during the prior proceedings on Defendant's Motion. (ECF No. 165 ¶ FOF 65.)

The final portion of the second May 25, 2012 conversation includes a short discussion about golf, wine, and defendant's plans to travel to Florida with a group of priests from Franciscan University.  This exchange is social and jovial and includes no dialogue about legal issues or concerns.  It is not privileged.  It is not apparent whether the trip referred to during this portion of the second May 25, 2012 conversation is related to defendant's statement during the first May 25, 2012 conversation that he would be "meeting with [Franciscan] all next week" about a contract. (ECF No. 168, Attach. A (No. 725 at 3:00).)  This uncertainty is without

consequence, however, because this portion of the conversation is not a privileged communication, and, therefore, could not support defendant's governmental misconduct claim. Voigt, 89 F.3d at 1070.

The court's analysis of the second May 25, 2012 conversation could end here as a result of the findings that PA Cyber holds any privilege in the majority of the conversation, and that the final exchange about defendant's plans to travel to Florida, although possibly related to his intent to negotiate a contract with Franciscan University, is not a privileged communication. The court will nevertheless proceed with the analysis, and in doing so will assume that the trip to Florida with a group of priests from Franciscan University mentioned at the end of the second May 25, 2012 conversation is related to defendant's statement in the first May 25, 2012 conversation that he would be meeting with Franciscan officials to negotiate a contract "all next week." The second May 25, 2012 conversation will not be discussed separately in this opinion going forward. Instead, the reader should understand that any reference to the first May 25, 2012 conversation in this opinion includes the comments made at the end of the second May 25, 2012 conversation about travelling to Florida with a group of priests from Franciscan University.

**B. Conversations Intercepted before May 25, 2012 about an Ohio Company named Presidio and Franciscan University**

Defendant opposes the Government's Motion on the ground that the government used the information it learned about "the creation of a new Ohio company, Presidio Education Network, LLC ("Presidio"), and a potential transaction with Franciscan University" to secure search warrants and an indictment against him. (ECF No. 171 at 6.) Defendant concedes in his brief in opposition to the Government's Motion that the only allegedly "unlawful" source of this information is the first May 25, 2012 conversation, which was a Title III intercept. (ECF No. 171

at 6, 7.)  In its motion, the government identifies three consensual recordings of conversations in which the confidential informants participated that took place before May 25, 2012, that disclose information about the creation of an Ohio company, named Presidio, and Presidio's anticipated business relationship with Franciscan University. (ECF No. 168 at 9-18.)  According to the government, because it knew about Presidio before May 25, 2012, the government's interception of the first May 25, 2012 conversation could not have prejudiced defendant.

The three conversations identified by the government occurred on March 26, 2012, March 28, 2012, and April 30, 2012, and are respectively identified as recording numbers 1D-18, 1D-19, and 1D-36. (ECF No. 168 at 9-18.)  The government submitted a CD containing recordings of all three conversations with its motion, and attached rough transcripts of the recordings as listening aides to its brief. (ECF No. 168 at 11 n.11, Attach. B; 8/18/2015 Remark.) During the prior proceedings on Defendant's Motion, defendant offered into evidence and relied upon the March 26, 2012 conversation. (ECF No. 71-9; Def. Exs. X, A8, A8-Trans.)  The March 28, 2012 and April 30, 2012 conversations were not previously offered into evidence. Defendant, however, does not object to the authenticity or content of these two recordings in his brief in opposition to the Government's Motion.  The court, therefore, can consider all three recordings in deciding the Government's Motion.  The court notes, however, that the March 26, 2012 recording, which defendant previously offered into evidence, is sufficient to support the court's disposition of the Government's Motion.

1. **The March 26, 2012 Conversation** (Recording 1D-18)

The March 26, 2012 conversation is a fourteen-minute exchange between defendant and one of the confidential informants, who was, at the time, an officer and owner of Avanti. (ECF No. 168, Attach. B (No. 1D-18); ECF No. 168-1; 8/18/2015 Remark; see also Def. Exs. X, A8, A8-Trans.) Defendant submitted a transcript and recording of this conversation into evidence during the prior proceedings on his motion to dismiss or suppress. (Def. Exs. X, A8, A8-Trans.) Toward the beginning of the conversation defendant states that "I have something to show you" and volunteers that "I'm creating a new company called Presidio. The Presidio Education Group."[7] (ECF No. 168, Attach. B (No. 1D-18) at :05.)

During the discussion that follows, defendant explains to the confidential informant that Presidio will be wholly owned by defendant, provide Franciscan University with the services that Avanti used to provide it, and develop relationships with entities outside Pennsylvania. (Id. at 1:00.) Defendant indicates that Presidio could put Avanti out of business, which is why "they" are recommending that "Avanti buy shares into [Presidio]." (Id. at 6:00, 7:00.) Defendant and the confidential informant discuss that in three years the "next contract"

---

[7] The transcript offered into evidence by defendant during the prior proceedings on his motion to dismiss or suppress reflects that defendant states that the company's name will be "Presidia." (ECF No. 83-9 at 3.) According to the transcript attached to the Government's Motion, however, defendant calls the company "Presidio." (ECF No. 168-1 at 2.) Based upon the court's review of the recording, defendant appears to refer to the company as "Presidio," although the recording is somewhat distorted, and, at times, it is possible that defendant uses the name "Presidia." Defendant did not assert in opposition to the Government's Motion that "Presidia" is a different company than "Presidio," even though this discrepancy was evident in the record at the time. There is no evidence in the record to support the notion that "Presidio" and "Presidia" are two different companies. Whether defendant was considering a slightly different name at this time, merely misspoke about the name of the company during this conversation, or was saying "Presidio," but it sometimes sounds like "Presidia" on the recording, is not individually or collectively material to the court's resolution of the Government's Motion. The court will refer to the company as "Presidio" going forward, as do the parties.

will go to Presidio, instead of Avanti. (Id. at 12:30.)  They also talk about how certain assets, such as a house in Florida and a plane, will be handled, how mergers and venture capital contributions work, and how defendant's business activities will change six and twelve months after his retirement from PA Cyber. (Id. at 6:30, 7:30.)  In the conversation, defendant seeks the informant's advice on certain matters, and comments about how much the informant knows even though he never attended college. (Id. at 11:45.)

About five minutes into the conversation, after defendant discloses his intent to create Presidio, how he plans to structure Presidio's business relationships with Avanti, Franciscan University, and various out-of-state entities, how monies will flow to Presidio, and that these plans and relationships will be in place for the first six months to one year after he retires from PA Cyber, defendant spontaneously states "That's what the attorneys are saying." The conversation continues for another eight minutes, during which time defendant and the confidential informant continue to discuss the same, and related, topics.

This conversation demonstrates several things:

First, defendant willingly divulged detailed information about Presidio and its intended business operations to the confidential informant.  The record belies any suggestion that the confidential informant extorted information from defendant about Presidio or induced defendant to disclose details about his post-retirement plans that defendant would not have otherwise voluntarily disclosed to him.  Defendant, instead, initiates the conversation and divulges numerous details to the informant, at times even seeking the informant's input and advice, and at other times advising the confidential informant about how he should proceed given that Presidio would put Avanti out of business.

Second, defendant likewise willingly and voluntarily shared information purportedly given to him by attorneys with the confidential informant. Defendant injects the notion of attorneys into the conversation by explaining to the informant that "the attorneys" are telling him what relationships Presidio (and he) can have with Avanti and out-of-state entities for the first six months to a year after he retires from PA Cyber. The confidential informant did not broach the issue of attorneys or prompt defendant's spontaneous statement that "That's what the attorneys are saying." In this context, the confidential informant's follow-up questions about which attorney offered certain instructions, and how defendant's relationship with Avanti, of which the informant was an officer, would be affected in the six-month to one-year time-frame could not form the basis of defendant's governmental misconduct claim. The confidential informant did not induce or encourage defendant to make the initial disclosure that he was making post-retirement plans based upon the advice of attorneys.[8] The record would not support an inference that the government inserted the confidential informant into this conversation, or other conversations, with defendant in order to extract privileged information that defendant would not have been otherwise willing to disclose. To the contrary, even assuming for the sake of argument that the government did attempt to use the confidential informant in this way, the record reflects that defendant required no inducement to openly and voluntarily discuss with the informant the instructions that he was receiving from attorneys. In other words, the government's misconduct, assuming it occurred, would have had no causal connection to

---

[8] Defendant does not specifically argue, in opposition to the Government's Motion, that the confidential informants induced defendant to disclose information or instructions that he obtained from his attorneys, either unilaterally or at the behest of the government investigators. Defendant, however, alluded to such an argument in the brief he originally filed in support of his motion to dismiss or suppress. (ECF No. 83 at 1.) Although defendant's failure to raise this argument in opposition to the Government's Motion could be construed as a waiver, because the court is deciding this matter on the papers, the court will address the argument here.

defendant's disclosure of privileged communications, assuming defendant disclosed such communications. Moreover, defendant's willingness to disclose this advice to third parties destroys any privilege that would otherwise attach. In re Processed Egg Products, 278 F.R.D. at 117.

Third, this conversation includes crucial details about the operations of Presidio and Presidio's relationship to Avanti that are not revealed in the first May 25, 2012 conversation. For instance, defendant explains to the confidential informant that Franciscan University, and others, will contract with Presidio, instead of Avanti, and that Presidio will put Avanti of business in a few years. As will be demonstrated below, this kind of information was revealed in the indictment and the affidavits submitted to the court in this case. The first May 25, 2012 conversation does not include these details about Presidio and, logically, could not be the source of this information.

### 2. The March 28, 2012 Conversation (Recording 1D-19)

The March 28, 2012 conversation is between one of the confidential informants and Neal Prence, defendant's codefendant and accountant. The recording is approximately 90 seconds long. The conversation begins with the informant and Prence discussing defendant's plans to retire from PA Cyber at the end of May 2012. (ECF No. 168, Attach. B (No. 1D-19) at :10.) The informant tells Prence that he (the informant) spoke with defendant two days ago (March 26, 2012) about his post-retirement plans, to which Prence responds that he (Prence) is "gonna quickly form another company for [defendant] to start using, a company to deal with Avanti." (Id. at :25.) The informant responds "Oh, you formed the Presidio." (Id. at :47.) Prence states that he is "going to" do that, and the participants then discuss that Prence suggested to defendant that he not use a pre-existing Pennsylvania company for this purpose, but should

33

instead use a "fresh" company created in another state. (Id. at :50.)  The informant states that defendant "said it might be an Ohio company," and Prence responds "and then start taking the money out." (Id. at 1:17.)  At this point the conversation ends.

This conversation indicates that by March 28, 2012, Prence and the confidential informant had both spoken to defendant about his plans to form a new company named Presidio, possibly in Ohio, to "deal with Avanti" after defendant retired from PA Cyber.  The fact that the confidential informant is openly discussing this information with defendant's accountant indicates that defendant's post-retirement plans were not secret or confidential, at least with respect to these two individuals.  The conversation corroborates the fact that the confidential informant had first-hand knowledge about defendant's post-retirement plans, and was therefore able to share such information with the government during its investigation.  In addition, this conversation, like the March 26, 2012 conversation, includes more specific information about Presidio and how it would be used in relationship to Avanti than does the first May 25, 2012 conversation.  The conversation finally reflects that defendant openly and voluntarily discussed these matters with the confidential informant, further contradicting any suggestion that the confidential informant extorted such information at the direction of, or on behalf of, the government. See supra n.8.

### 3.  The April 30, 2012 Conversation (Recording 1D-36)

The April 30, 2012 conversation is among two confidential informants, both of whom were owners and officers of Avanti, and defendant.  The recording is just over two minutes long. (ECF No. 168, Attach. B (No. 1D-36).)  Defendant begins the conversation by suggesting that the three participants "make a deal" or "make a commitment" for "five more years," and a discussion then ensues about other people and their work ethics. (Id. at :05.)

Toward the end of the conversation, in response to an unintelligible statement by one of the confidential informants, defendant states "please remember in a year from now Presidio will be the new management company, I think, that of PA Cyber." (Id. at 1:30) The informants respond "Well that makes sense," and "It will work. We moved mass people once, we can do it again." (Id. at 1:36.) The conversation ends with defendant stating that he is done on the thirty-first and "We just gotta stick together guys. We are almost there." (Id. at 2:00.)

This conversation demonstrates that by April 30, 2012, defendant expected both confidential informants to understand what Presidio was and how it would interact with PA Cyber and Avanti after he retired. The opening exchange reflects that defendant sought to solidify a long-term business relationship with the confidential informants, revealing a motivation for defendant to voluntarily disclose details about his post-retirement plans to these individuals. Again, this conversation reveals details that are not disclosed in the first May 25, 2012 conversation, and contradicts any notion that the confidential informants were inducing defendant to reveal information to them about Presidio that defendant otherwise would not have been willing to share.

4. **Defendant's Response**

In response to the government's identification of these three pre-May 25, 2012 conversations, defendant contends that additional hearings are required on his motion to dismiss or suppress because it is the government's *use* of the information disclosed during the first May 25, 2012 conversation that "is material" and must be the "focus" of further proceedings. (ECF No. 171 at 5-6, 7 (emphasis added).) Defendant argues that although these three recordings establish that the government was "in possession" of information about Presidio and Franciscan University before May 25, 2012, the government made no showing that its agents "listened to

and knew the contents of those recordings prior to its interception of the May 25, 2012 communication between Barry and [defendant]." (Id. at 7.)  Defendant additionally contends that the government's failure to "disavow any use of the information derived from [the first May 25, 2012] communication" necessitates further inquiry by the court. (Id.)  These arguments are factually and legally flawed.

Defendant's first argument, i.e., that the government may not have listened to the three pre-May 25, 2012 conversations, is contradicted by the record.  At the prior hearings on defendant's motion, in response to questions posed by defendant to Special Agent Samantha Bell ("SA Bell"), SA Bell testified that she listened to all recordings made by the confidential informants within seven days of their creation, and discussed the content of the recordings with other governmental agents and the Assistant United States Attorneys working on the investigation. (ECF No. 109 at 110-12, 125-26, 128.)  It was important for defendant to establish these facts at the prior proceedings because Defendant's Motion was based upon the fundamental premise that the government listened to privileged conversations recorded by the confidential informants and spoke to the confidential informants about privileged information throughout the investigation of this case, and used the knowledge gained by this alleged misconduct to build a case against him.

For example, defendant contends in the brief originally filed in support of his motion that "the government was fully aware of all of the information it had obtained through" the confidential informants and had listened to "four months' worth of recordings" before submitting a May 21, 2012 application to initiate Title III interceptions on defendant's cellular telephone device. (ECF No. 83 at 15-16.)  Similarly, defendant maintains in that filing that the June 19, 2012 application to continue those Title III interceptions was "also based on

36

information from [the confidential informants] and their recordings." (Id. at 20; see also id. at 23 (search warrant based upon "information from the government informants and conversations they recorded").) In his original reply brief, defendant explains that the government knew that he had a personal attorney-client relationship with Joseph Askar at the time it was "recording and intercepting calls" because the "government listened to those [recorded] conversations." (ECF No. 94 at 10.) Under these circumstances, defendant's current position that the government "possessed" but did not listen to the March 26 and 28, 2012, and April 30, 2012 recordings made by the confidential informants is contradicted by the record and without merit. This argument need not be further considered.

Defendant's second argument, i.e., that the government failed to "disavow any use" of the first May 25, 2012 conversation, similarly fails. As an initial matter, defendant cites no legal authority to support his assertion that the government has the burden to disavow use of the first May 25, 2012 conversation under the circumstances of this case. It is defendant's burden to prove that the government's use of privileged communications caused him prejudice. Voigt, 89 F.3d at 1067, 1070. At least one court of appeals, citing Voigt but considering different facts involving the crime-fraud exception and grand jury testimony, held that actual and substantial prejudice could not be established where the government had prior knowledge about the same information disclosed during an allegedly privileged conversation. United States v. Thompson, 518 F.3d 832, 861-62 (10th Cir. 2008). This holding, which appears to be based upon causation principles, is well reasoned, and applies to the facts of the instant case. The March 26 and 28, 2012, and April 30, 2012 conversations provided the government with much more detailed information about the Ohio company, including the company's name, its purpose, and its relationship to Avanti, Franciscan University, PA Cyber, and other entities than the first May

25, 2012 conversation did. The pre-May 25, 2012 conversations contain the kind of detailed information that was revealed about Presidio in the indictment and the Title III affidavit, as will be demonstrated in sections III.C.1. and III.C.2. of this opinion. Defendant could not demonstrate that the government's interception of the first May 25, 2012 conversation caused him actual and substantial prejudice under the circumstances. The undisputed record reflects that the government had alternative sources of the same, and in fact much more detailed information.

Even if defendant could establish all the elements of his governmental misconduct claim, including actual and substantial prejudice, it would not follow that the information gathered from intercepting the first May 25, 2012 conversation, and all evidence flowing from it, should be excluded. Instead, in that situation, the burden would shift to the government, not to disavow use, but to establish an independent or inevitable source for the same information. The exclusionary rule has no application where the government learns of evidence from a source independent from the alleged governmental wrongdoing. Nix v. Williams, 467 U.S. 431, 443-44 & n.3 (1984); Wong Sun v. United States, 371 U.S. 471, 487-88 (1963); United States v. Mooty, No. 12-616, 2015 WL 1072041, at *17-18 (E.D. Pa. Mar. 10, 2015). Similarly, where the government can prove that the same information ultimately or inevitably would have been discovered by lawful means, the exclusionary rule does not apply. Nix, 467 U.S. at 444. These principles will be discussed in context during the following discussion of the government's alleged prejudicial use of the first May 25, 2012 conversation. For present purposes, however, it is sufficient to find that defendant's argument that further evidentiary hearings are required because the government fails to disavow use of the May 25, 2012 conversation is not only conclusory, but also unsupported by, and contrary to, law.

### C.  **The Government's Alleged Prejudicial Use of Privileged Conversations**

Defendant contends that he was prejudiced by the government's use of "intercepted communications between Barry and Trombetta discussing the creation of a new Ohio company, Presidio Education Network, LLC, and a potential transaction with Franciscan University." (ECF No. 171 at 6.)   The only conversation to which defendant's contention could possibly relate is the first May 25, 2012 conversation.[9]  The substance of that conversation was summarized above, but to review, Barry informs defendant about various ministerial details related to forming a new Ohio company, and defendant confirms that he wants the company formed, explaining that he needs the company in order to contract with Franciscan University, with whom he will meet soon.

It is critical to reiterate that the first May 25, 2012 conversation does not include any reference to what the Ohio company will be named, and the words "Presidio Education Network" or "Presidio" are never uttered by defendant or Barry during that conversation. Defendant, nevertheless, insists that the government used two categories of information that it learned from the first May 25, 2012 conversation to his detriment: (1) a new Ohio company named Presidio would be created; and (2) Presidio would potentially transact with Franciscan University. (ECF No. 171 at 6.)  Although it is illogical that the government could learn anything about Presidio from a conversation that includes no reference to a company by that name, the court accepts defendant's assertions as true for the sake of argument, and interprets his allegations of prejudice stemming from the government's interception and use of the first May 25, 2012 conversation as broadly as possible.  In doing so, the court likewise sets aside the

_____

[9] To reiterate, any reference to the first May 25, 2012 conversation includes the discussion at the end of the second May 25, 2012 conversation about defendant's plans to travel to Florida with a group of priests from Franciscan University.

dispositive conclusion, reached twice in this case, that the first May 25, 2012 conversation includes no privileged communications between Barry and defendant. See supra III.A.2.b.(i); (ECF No. 165 ¶ COL 81); Voigt, 89 F.3d at 1070 (failure of a defendant to demonstrate that the government obtained privileged information is fatal to a claim of governmental misconduct).

With these significant caveats stated, the next step in the analysis is to assess whether defendant identifies disputed facts that are material to his claim of actual and substantial prejudice that warrant a further evidentiary hearing on his motion. According to defendant, he suffered prejudice as a result of the government's use of information about his intention to use a new Ohio company, named Presidio, to contract with Franciscan University, and factual disputes about the government's *use* of this information must "be resolved after an evidentiary hearing." (ECF No. 171 at 6-7 (emphasis added).) In his brief in opposition to the Government's Motion, defendant asserts that prejudice is apparent because the indictment includes an averment that the creation of Presidio Education Network, LLC was an overt act in furtherance of the tax fraud conspiracy between defendant and codefendant Prence. (Id. at 6.) Defendant additionally contends that the information "may have been used in [the June 19, 2012] affidavit in support of the government's application for continuation of its Title III wiretap authority." (Id.) In that regard, defendant points out that the affidavit discusses defendant's "plans to meet with representatives of Franciscan University and use 'a new Ohio corporation' to conduct business with Franciscan University." (Id.) The court will examine the indictment and the Title III affidavit below to assess whether a further evidentiary hearing is required to resolve disputed facts material to defendant's contentions.

The court will likewise examine three other affidavits submitted in support of obtaining warrants to search defendant's email account and various physical locations. Although defendant does not allege in his brief in opposition to the Government's Motion that these documents reflect prejudicial, governmental use of the first May 25, 2012 conversation, defendant alleges in the brief he originally filed in support of his motion to dismiss or suppress that they did. (ECF No. 83 at 18, 22-23, 32, 37-38.) In the interest of completeness, therefore, the court will examine these documents.

The court will also consider defendant's allegations that the information learned by the government through the interception of the first May 25, 2012 conversation was "no doubt" disclosed to the grand jury, was used as a "lead" in the investigation, and affected the government's decisions about how to investigate this case and under what theories it would prosecute this case. (ECF No. 83 at 37-38; ECF No. 94 at 31; ECF No. 172 at 13-14, 19, 27.) Finally, the court will examine defendant's claims that he is entitled to a remedy because the government engaged in generalized wrongdoing and unethical behavior, such as recording other clients' privileged conversations, refusing to grant immunity to a witness, and making misrepresentations to the court. (ECF No. 171 at 1-5, 7 nn.4-5.)

As will be demonstrated in detail in the sections that follow, none of these arguments satisfy defendant's burden to demonstrate actual and substantial prejudice. The facts regarding these matters are not in dispute, and a further evidentiary hearing is unnecessary. For these reasons, defendant's governmental misconduct claim is not sustainable, and the Government's Motion must be granted.

1.  **The Indictment**

Defendant contends that the government used the knowledge gained by intercepting the first May 25, 2012 conversation between Barry and defendant in the indictment. In his brief, defendant supports his argument by citing to page 34 of the indictment, "which alleges that the creation of Presidio Education Network LLC was an overt act in furtherance of the conspiracy between Trombetta and Prence." (ECF No. 171 at 6). Two paragraphs on page 34 of the indictment mention Presidio. (ECF No. 3 at 34.) Those paragraphs are the last of the thirty-four overt acts listed in the tax fraud conspiracy charged in Count Six. (ECF No. 3 at 19, 34.) These two paragraphs state:

> gg) Presidio Education Network, LLC, located at 922 Rhovanion Drive, East Liverpool, Ohio 43920, was created by Defendant NICHOLAS TROMBETTA in or around July of 2012.
>
> hh) On or about June 25, 2012, Defendant NICHOLAS TROMBETTA and Defendant NEAL PRENCE discussed the manner and means of getting money out of [Avanti] and into Presidio.

(ECF No. 3 ¶ 67(gg) and (hh).)

Upon review of the indictment, the court identified one additional reference to Presidio, in paragraph 65 of the indictment, which reads:

> It was part of the conspiracy that Defendant NICHOLAS TROMBETTA and Defendant NEAL PRENCE, in and around June and July 2012, collaborated on the creation of a company called Presidio Education Network, LLC, a company that was to be wholly owned by Defendant NICHOLAS TROMBETTA. This company was to be used by Defendant NICHOLAS TROMBETTA to send invoices to [Avanti] to drain away the money that had accumulated in the [Avanti] bank accounts.

(Id. ¶ 65.) Defendant does not cite to or rely upon this paragraph in his brief in opposition to the Government's Motion.

All three references to Presidio appear in Count Six of the indictment which alleges a tax fraud conspiracy, from in and around January 2006 and continuing until in and around July 2012, involving defendant and codefendant Neal Prence. (ECF No. 3 at 19-34; ECF No. 4 at 1.) The indictment explains that the tax fraud conspiracy was directed at diverting public monies paid to PA Cyber through Avanti, Palatine, and One2One (which were for-profit companies that defendant allegedly owned and controlled), to defendant without disclosing to PA Cyber that he controlled those entities and was benefitting personally from their income. (ECF No. 3 ¶¶ 51-56.) According to the indictment, defendant directed Avanti and Palatine to purchase homes for him and to issue checks to One2One for services that were never performed so that he could access the funds, and caused third parties to make payments to One2One that should have been made to him directly, without claiming the revenue on his personal income tax returns. (Id. ¶¶ 57-60.) The income was instead claimed by the "on paper" owners of Avanti and One2One, allegedly resulting in more than $8,000,000 in income attributable to defendant being shifted from defendant to the individuals listed as owners of Avanti and One2One between 2006 and 2012. (Id. ¶¶ 61-64, 66.) At the end of the factual recitation, the indictment avers that defendant and codefendant Prence collaborated on the creation of Presidio Education Network, LLC in June and July 2012, which would be used to divert money from Avanti. (Id. ¶ 65.) In other words, according to the indictment, Presidio would be used to extract money from Avanti for defendant's personal benefit, in a manner similar to how defendant was using Palatine and One2One.

Count Six of the indictment lists thirty-four overt acts in furtherance of this tax fraud conspiracy. These overt acts include a) the deposit of specifically-identified payments from third parties into One2One's bank account by defendant, b) aggregate, and specific, payments from Avanti to One2One between 2008 and 2012, c) the preparation and filing of false tax returns for

43

the owner of One2One between 2006 and 2011, d) the preparation and filing of false tax returns for the owners of Avanti in 2011 and 2012, and e) the creation of Presidio in July 2012. (Id. ¶ 67.)

According to defendant, the references in the overt acts section of the indictment to Presidio are evidence that he was prejudiced by the government's interception of the first May 25, 2012 conversation. (ECF No. 171 at 6-7.)  This argument is not supported by the record, and is, in large part, contradicted by it.  As referenced above, the first May 25, 2012 conversation does not reveal the name of the Ohio company to be Presidio Education Network, LLC.  The indictment, however, refers to a company by that name.  Similarly, the only detail revealed about the Ohio company in the first May 25, 2012 conversation is that defendant will use it to contract with Franciscan University.  The indictment, however, makes no connection between Presidio and Franciscan University, and instead alleges that Presidio would be used for an entirely different purpose, i.e., as a vehicle to drain funds out of Avanti.  Avanti, however, is not even mentioned during the first May 25, 2012 conversation.  In addition, while the first May 25, 2012 conversation reflects that the decision to form the Ohio company had already been made by that time, and that the company's creation was imminent, the indictment indicates that defendant and codefendant Prence did not discuss the creation and purpose of Presidio until June 25, 2012, and that Presidio was not created until July 2012.  Based upon the disparities between these timelines, and if no other information was known, the Ohio company discussed in the first May 25, 2012 conversation and the company identified in the indictment as Presidio could plausibly be two entirely different business ventures.  Simply put, it is illogical that the government learned the information set forth in the indictment by intercepting the first May 25, 2012 conversation, which does not disclose such information.

In comparison to the discrepancies between the information revealed in the first May 25, 2012 conversation and the facts averred in the indictment, the March 26, 2012 conversation between defendant and one of the confidential informants divulged critical details that are set forth in the indictment, i.e., that the new company will be named Presidio and that it will be used as a vehicle to put Avanti out of business. In light of these facts, the record contradicts any suggestion that the two overt acts and the one paragraph in the indictment that reference Presidio were based upon the government's interception of the first May 25, 2012 conversation.

Putting aside this conclusion, in any event, the three paragraphs of the indictment that mention Presidio are not integral to the tax fraud conspiracy charged therein. As defendant recognizes in his recitation of the facts in his original brief in support of his motion to dismiss or suppress, the indictment is based upon his purported control over PA Cyber, NNDS, Avanti, and One2One, and the alleged diversion of his personal income to Avanti, One2One, and their owners. (ECF No. 83 at 3-4.) The tax evading conduct alleged in the indictment exists independently of Presidio's creation or operation. Barry confirmed this fact by testifying that Presidio never actually conducted any business operations. (ECF No. 118 at 38-39.) Defendant could have been charged with the same tax fraud conspiracy even if the government never learned about Presidio. Under these circumstances, defendant could not demonstrate that he suffered prejudice because the government intercepted the first May 25, 2012 conversation and learned that defendant intended to form a new company in Ohio, named Presidio, to potentially contract with Franciscan University. Compare Nieves, 1997 WL 447992 at *5-6 (defendant would not have been charged with money laundering were it not for the government's intrusion into his attorney-client relationship); Marshank, 777 F.Supp. at 1521 (defendant would not have been indicted were it not for the

45

government's intrusion into his attorney-client relationship).

Under the circumstances, the three references in the indictment to Presidio could not satisfy defendant's burden to establish actual and substantial prejudice. The facts about this issue are not in dispute and no hearing is required with respect to this allegation of prejudice.

### 2. The June 19, 2012 Title III Affidavit

Defendant contends that the government "may also have… used [information from the first May 25, 2012 conversation] in an affidavit in support of the government's [June 19, 2012] application for continuation of its Title III wiretap authority." (ECF No. 171 at 6.) In his opposition brief, defendant cites to pages 59 and 60, i.e., paragraph 77, of the affidavit in support of this argument. (Id.) Paragraph 77 appears in a section of the affidavit that summarizes conversations and text messages that were intercepted between May 23, 2012 and June 15, 2012, pursuant to a Title III wiretap order that was signed on May 21, 2012. (ECF No. 71-20 at 69-82, ¶ 12(a).)

Paragraph 77 begins on page 59 with the affiant, SA Bell, reproducing a text message sent by defendant at 8:11 a.m. on May 29, 2012, while defendant was in Florida with representatives of Franciscan University, to an individual who appears to be associated with Franciscan University that reads:

> Bob just discovered my agenda didn't get out to you but it is simple
> Discuss length of contract and a timeline to create FUSO courses. 60-40
> split and transfer of all current leftover funds over to new entity to get
> this going. Also I'm thinking lease agreement ties into contract. All
> rights of content to FUS and we agree to give new entity authority to
> develop curriculum for FUS. I'm sure lawyers have more. Looking
> forward to our time. Grilling steaks tonight.

(ECF No. 71-20 ¶ 77.) After reproducing that text message, the affiant explains that the confidential informants told the government that defendant planned "to create a new corporate

entity which will eventually take over the contracts and functions of [Avanti], including Avanti's contract with Franciscan University." (Id.)  The affiant states that the text message's reference to "leftover funds" is evidence of defendant's intent, as confirmed by the confidential informants, to move Avanti's funds to the new company and "to transfer assets of NNDS to a new Ohio company as well." (Id.)  This is the only reference in the affidavit to "a new Ohio company."

Although defendant does not cite paragraph 76[10] in his brief in opposition to the Government's Motion, that paragraph provides important context.  In paragraph 76 of the affidavit, the affiant recounts a pair of text messages sent by defendant to a friend on May 28, 2012 about his ability to "net" between $10 and $13.5 million from "Franciscan University online." (ECF No. 71-20 ¶ 76.)  The affiant then states that one of the confidential informants explained to the government that Franciscan University had a contract with Avanti to develop online classes, but, at defendant's direction, that contract "is now with [defendant]" and "the money from the contract will go to [defendant]." (Id.)  According to the affiant, the confidential informant did not know who would actually provide services to Franciscan University under the new contract. (Id.)

The only other reference to Franciscan University is in paragraph 50 of the affidavit which avers that defendant exerts control over a residence located in Florida even though defendant transferred ownership of the property to a company called Palatine in 2011. (ECF No. 71-20 ¶¶ 45-47, 50.)  As examples of defendant's control, the affiant states that defendant's daughter used the property for a spring break trip, defendant recently entertained personnel from

_____

[10] There are two paragraphs numbered paragraph 76 in the June 19, 2012 affidavit.  The first one, appearing on page 57 should be numbered paragraph 75.  The second one, appearing on page 58, is properly numbered paragraph 76.  The court's citation to paragraph 76 is to the second paragraph labeled paragraph 76.

Franciscan University at the property, with the object of negotiating a contract between defendant and the university that would financially benefit him, and defendant and his daughter are listed as the residents of the property on the homeowner association paperwork. (Id. ¶ 50.) Defendant does not cite paragraph 50 in his brief in opposition to the Government's Motion. Although defendant refers to his plans to travel to a house in Florida to negotiate a contract with Franciscan University during the first May 25, 2012 conversation, that conversation does not include any of the details about ownership or control of the property that are set forth in paragraph 50. As such, the first May 25, 2012 conversation cannot be the source of the averments set forth in that paragraph of the affidavit.

The court could not locate any reference to Presidio in the affidavit. Defendant does not identify any such reference in his opposition brief.

According to defendant, the references in paragraph 77 of the wiretap affidavit to "[defendant's] plans to meet with representatives of Franciscan University and use 'a new Ohio corporation' to conduct business with Franciscan University" are evidence that he was prejudiced by the government's interception of the first May 25, 2012 conversation. (ECF No. 171 at 6.) This argument is not supported by the record.

As an initial matter, paragraphs 77 and 76, on their face, state that the averments made therein are based upon an intercepted text messages sent by defendant and information provided to the government by the confidential informants. (ECF No. 71-20 ¶¶ 76-77.) Neither paragraph references the content of any intercepted telephone conversations, including any occurring on May 25, 2012. Defendant's assertion that the averments made in paragraph 77 were based upon the first May 25, 2012 conversation is, therefore, contradicted by the affidavit itself.

Putting this discrepancy aside, and allowing for a suggestion that the government was misrepresenting the source of its knowledge, it is nevertheless illogical that the content of paragraphs 77 or 76, was gleaned from the government's interception of the first May 25, 2012 conversation. These paragraphs contain significant information that is not disclosed in the first May 25, 2012 conversation, including, for example, that Presidio would be used to take over Avanti's contracts, including Avanti's contract with Franciscan University, and would move Avanti's funds to that new company. (ECF No. 71-20 ¶¶ 76-77.) An individual listening to the first May 25, 2012 conversation would not know that the contract with Franciscan University referenced by defendant in that discussion would replace a preexisting contract between Avanti and Franciscan University, as alleged in the wiretap affidavit. An individual listening to the first May 25, 2012 conversation would not know that the new company would be used to move funds from Avanti, or NNDS, to defendant, as alleged in the wiretap affidavit. It is illogical that the averments set forth in paragraphs 76 and 77, which include these details, were based upon the first May 25, 2012 conversation that does not include those details.

In contrast, the March 26 and 28, 2012 and April 30, 2012 conversations reflect the kinds of details set forth in the Title III affidavit. (Def. Exs. X, A8, A8-Trans.; ECF No. 168, Attach. B; 8/18/2015 Remark.) The confidential informants participated in those conversations with defendant and codefendant Prence. The affidavit indicates that these two Avanti officials were cooperating with the government and providing information and documents to facilitate its investigation of defendant's suspected crimes and that the informants were found to be reliable, and their information was corroborated. (ECF No. 71-20 ¶¶ 15-17.) Based upon the undisputed record, the confidential informants had specific, first-hand knowledge about defendant's plans to form a new company that would take over Avanti's existing contracts, and eventually put Avanti

49

out of business. To suggest, in this context, that the government used the first May 25, 2012 conversation, instead of information revealed by the confidential informants, consensual recordings and earlier Title III intercepts, and other investigative sources, to craft the averments set forth in paragraphs 76 and 77 is illogical. For these reasons, the references in the wiretap affidavit to defendant's plans to use an Ohio company to take over Avanti's contract with Franciscan University and to move the funds of Avanti and NNDS to that company cannot be attributable to the first May 25, 2012 conversation and cannot demonstrate actual and substantial prejudice. The facts about this issue are not in dispute and no hearing is required with respect to this allegation of prejudice.

Putting aside this conclusion, which is dispositive with respect to defendant's claim of governmental misconduct, defendant makes no assertion that the June 19, 2012 affidavit would have lacked probable cause if the three references to Franciscan University and the Ohio company were excised from paragraphs 50, 76, and 77. Defendant's control over the Florida property, which he directed Palatine to purchase and maintain for him, would have been adequately demonstrated based upon the remaining allegations in paragraph 50, and the surrounding paragraphs about the purchase, and later transfer, of the property, and the personal use of the property by defendant's family members. (ECF No. 71-20 ¶¶ 44-50.) These averments were based upon information provided to the government by the two confidential informants, state property and tax records, consensual recordings, and documents provided to the government by the confidential informants. (Id.) Removing the reference in paragraph 50 to defendant's use of the house in Florida to meet with officials from Franciscan University would not defeat the government's contention that defendant exercised control over a house in Florida even though he did not own it.

Likewise, probable cause to investigate defendant's "methods of operation in channeling federal and state funds directed to [PA Cyber] to other companies [defendant] controls such as NNDS, [Avanti], One 2 One and Palatine and eventually to his own use" would still exist even if paragraphs 76 and 77 were entirely removed from the affidavit. (Id. ¶ 18; see also ¶¶ 68-69.)  According to the government, creating a new company (Presidio) to replace Avanti was the next step in defendant's criminal scheme; but it was not the first step.  The government's probable cause showing to continue the Title III wiretap was not dependent upon defendant's creation or use of a new company, instead of Avanti, One2One, or Palatine to execute his suspected criminal activity.  For these additional reasons, defendant cannot rely upon this affidavit to prove actual and substantial prejudice.

### 3.  **The Search Warrant Affidavits**

Defendant does not contend, in opposition to the Government's Motion, that the government used information gained by intercepting the first May 25, 2012 conversation in any affidavit submitted in order to obtain warrants to search email accounts or physical places. (ECF No. 171.)  In the brief defendant originally filed in support of his motion to dismiss or suppress, however, defendant alleged that the government violated his constitutional rights by relying upon privileged recordings in order to obtain warrants to search "a number of residences and offices and [defendant's] personal email account." (ECF No. 83 at 2, 18-25.)  The court, therefore, examines the affidavits submitted in order to obtain such warrants to determine whether they could support any assertion that defendant was actually and substantially prejudiced by the

government's interception of the first May 25, 2012 conversation.[11]

The court concludes that these search warrant affidavits could not support defendant's governmental misconduct claim. In making this assessment the court, again, reviews the documents for references to defendant's plan to create a new Ohio company, named Presidio, to transact business with Franciscan University, which is how defendant defines the prejudice purportedly caused by the government's interception of the first May 25, 2012 conversation. (ECF No. 171 at 6.) The court does so even though the first May 25, 2012 conversation never mentions the name Presidio, and even though this court concluded, twice, that the first May 25, 2012 conversation is not a privileged communication, which is a dispositive finding. See supra III.A.2.b.(i); (ECF No. 165 ¶ COL 81.)

### a. **Warrant to Search Yahoo Email Account**

On June 7, 2012, the government submitted an affidavit in support of an application for a warrant to search a personal email account belonging to defendant. (ECF No. 71-28.) The affidavit makes no reference to Presidio or to an Ohio company. The affidavit refers to Franciscan University once. (Id. ¶ 24(b).) In ¶ 24(b), the affiant recounts the content of a March 30, 2012 email, and related emails, concerning defendant's directive to one of the

_____

[11] The court recognizes that defendant's failure to cite to and rely upon these affidavits in opposition to the Government's Motion could have been a purposeful response to the court's July 20, 2012 opinion. Defendant originally alleged that he had personal attorney-client relationships with four attorneys, all of whom represented him pursuant to a community of interest, and that the government recorded many hours of conversations between these attorneys and defendant, and used the wealth of information gathered by doing so to build its case against defendant. (ECF No. 83 at 1-8; ECF No. 165 ¶¶ FOF 86-92) The court found that defendant could only establish that he had a personal attorney-client relationship with one attorney and that no community of interest existed, which significantly reduced the scope of defendant's motion. (ECF No. 165 ¶¶ COL 64-72.) It is undisputed that the record consists of approximately twelve minutes of recorded conversations exclusively between Barry and defendant. Based upon these facts, it is possible that defendant purposefully no longer relies upon these documents to establish prejudice. The court, however, reviews these affidavits in the interest of completeness.

confidential informants that Avanti donate $10,000 to Franciscan University Century Club. (Id.) There is no indication in the affidavit, or elsewhere in the record, that this donation concerns defendant's intent to form an Ohio company, named Presidio, to transact business with Franciscan University. Because there is no apparent relationship between the donation and the prejudice alleged, and because defendant does not even rely upon this search warrant affidavit to establish prejudice in opposition to the Government's Motion, the affidavit cannot establish actual and substantial prejudice.

### b. <u>Warrant to Search Offices and Residences (PA and OH)</u>

On July 11, 2012, the government submitted applications for warrants to the United States District Courts for the Western District of Pennsylvania and the Northern District of Ohio to search various offices and homes associated with defendant and his businesses. (ECF Nos. 71-27 and 71-29.) Based upon the court's review, these two affidavits contain identical averments, and they will, therefore, be collectively discussed.[12] Citations will be made to the affidavit submitted to this court, ECF No. 71-27, with the understanding that any citation would apply equally to the affidavit submitted to the Ohio court, ECF No. 71-29.

Presidio or Franciscan University is mentioned in four paragraphs of the search warrants. The court identified no reference to "an Ohio company" that is not directly associated with Presidio. The four relevant paragraphs are reproduced below:

> 31. Most recently [defendant] has formed a new company in Ohio called Presidio. [Defendant] has told the Avanti "owners" that

---

[12] There is significant overlap between the averments made in the June 19, 2012 wiretap affidavit, which this court already considered, and these two search warrant affidavits. See supra III.C.2. By way of example only, paragraphs 16, 33, 36, 58, 63, 70, and 74 of the search warrant affidavits (ECF No. 71-27 and 71-29) correspond to paragraphs 21, 38, 39, 44, 51, 34, and 54 of the wiretap affidavit (ECF No. 71-20). The court will address any commonality of consequence in the body of this opinion.

Presidio will take over the contracts of Avanti and that if they wish to continue in their present work then will have to go to work for him (at Presidio). This action would appear to be consistent with [defendant's] long held and stated plan to "take over" Avanti after his retirement from [PA Cyber].

…

62. [Confidential informant #1 and confidential informant #2] advised that the Florida property is used mainly by [defendant] and infrequently, at the direction of [defendant], by other persons. During the spring break season of 2012 [defendant] required Avanti to pay for air transportation for [defendant's] daughter and two friends to travel to the condo for spring break. In June 2012, [defendant] used the [Florida] property to entertain personnel from Franciscan University of Steubenville, Ohio, the ultimate object of which is a contract between [defendant] (through an entity controlled by him) and the university which will inure to [defendant's] financial benefit. Furthermore, [confidential informant #1] advised that [defendant] and his daughter are listed on the homeowner association paperwork as the residents of the home. According to [confidential informant #1], Palatine currently pays for all repairs and fees associated with the Florida condo (using Avanti funds). This has been confirmed by reviewing Palatine's bank records.

…

73. On June 15, 2012, [defendant] engaged in a telephone call with [confidential informant #1]. During the call, they discussed the percentage of profit from a contract between Avanti and Franciscan University of Steubenville, Ohio. They discussed the flow of the funds and whether they should go to Avanti or Presidio. Presidio is a company recently created by [defendant]. [Defendant] informed [confidential informant #1] that the money should go to Presidio and told [confidential informant #1] that he just wanted the money, wanted to get paid and "Get the money buddy".

…

96. On June 25, 2012, Neal Prence called [defendant] regarding the flow of cash on hand at Avanti to [defendant's] new company (Presidio) and how Avanti will be left will [sic] no profit for 2012. Prence opined that there needed to be sufficient funds left with Avanti to pay the four owners' quarterly taxes. Prence offered that it might be preferable to set up a company in [defendant's] sister's

name to get the profits out of Avanti.  [Defendant] at one point
asked Prence how much money they were talking about removing
from Avanti to Presidio (after paying quarterly taxes on non-
existent distributions to the four owners).  Prence talked about an
amount near $3,000,000.

(ECF No. 71-27 ¶¶ 31, 62, 73, and 96.)   The court will examine each of these paragraphs below

to determine whether any could support defendant's claim that he suffered actual and substantial

prejudice as a result of the government's interception of the first May 25, 2012 conversation.

Paragraph 62 of the affidavit is similar in content to paragraph 50 of the June 19,

2012 wiretap affidavit. See supra III.C.2.; (ECF No. 71-20 ¶ 50.)  Paragraph 62 concerns

defendant's control over a house located in Florida. (ECF No. 71-27.)  One example of

defendant's control, among several, is that he used the property in June 2012 to secure a contract

with Franciscan University that would inure to his personal benefit.  Other examples are listed,

such as defendant's direction that his daughter be flown to Florida to spend spring break at the

property, and that defendant and his daughter were listed as the residents of the property.

The record does not support the contention that the government relied upon the

information disclosed in the first May 25, 2012 conversation to craft the averments set forth in

paragraph 62 of the search warrant affidavit.   Paragraph 62, instead, states that the information set

forth therein was disclosed to the government by the confidential informants, and was corroborated

by reviewing bank records. (ECF No. 71-27 ¶ 62.)  Paragraph 62 does not reference the content of

any intercepted telephone conversations, including any occurring on May 25, 2012.  Any assertion

that the averments made in paragraph 62 were based upon the first May 25, 2012 conversation is

contradicted by the affidavit itself.

Putting this discrepancy aside, and allowing for the possibility that the government was misrepresenting the source of its knowledge, it is nevertheless illogical that the content of paragraph 62 was gleaned from the government's interception of the first May 25, 2012 conversation. Paragraph 62 contains detailed information about how defendant used and controlled the property in Florida that is not disclosed in the first May 25, 2012 conversation, including, for example, that Palatine uses Avanti funds to maintain the property and defendant and his daughter are listed as the residents of the property. Such averments cannot be based upon the first May 25, 2012 conversation, which only references defendant's plans to travel to Florida with Franciscan University representatives to discuss forming a contractual relationship.

In contrast, and according to paragraph 62 and the paragraphs that precede it, information about the Florida property was gathered by meeting with the confidential informants, reviewing bank, tax, and real estate records, and listening to consensual recordings. (ECF No. 71-27 ¶¶ 58-62.) Under the circumstances, the record contradicts any suggestion that the government included the averment about defendant's "June 2012" trip to Florida with representatives from Franciscan University only because it listened to the first May 25, 2012 conversation, and not because it listened to other previously recorded and intercepted conversations, and met with and reviewed documents provided to it by the confidential informants. Paragraph 62 cannot, as a matter of fact, be based upon the first May 25, 2012 conversation.

Even if the record could support an assertion that paragraph 62 was based upon the first May 25, 2012 conversation, defendant fails to making any showing that the affidavit would not have been supported by probable cause if the averment about defendant's June 2012 trip to Florida was excised. The court concludes that defendant could not make such a showing

on this record. Defendant's control over the Florida property would have been adequately demonstrated based upon the remaining allegations in paragraph 62, and the prior paragraphs, about the purchase, and later transfer, of the property, and the personal use of the property by defendant and his family members. (ECF No. 71-27 ¶¶ 58-62.) These averments were based upon information provided to the government by the two confidential informants, public records, consensual recordings, and documents provided to the government by the confidential informants. (Id.) As the court concluded above when analyzing paragraph 50 of the June 19, 2012 wiretap affidavit, these additional paragraphs provide adequate and independent support for the government's averments about defendant's exertion of control over the Florida property. Removing the reference in paragraph 62 to defendant's use of the property to meet with officials from Franciscan University would not defeat the government's claim that defendant exercised control over the property in Florida even though he did not own it. Probable cause to issue the search warrants would still exist even if the portion of paragraph 62 related to the meeting with Franciscan University officials was removed. Paragraph 62 of the search warrant affidavits, therefore, could not support defendant's claim that he suffered actual and substantial prejudice as a result of the government's interception of the first May 25, 2012 conversation.

The record contradicts any suggestion that the averments made in paragraphs 73 and 96 were based upon the government's interception of the first May 25, 2012 conversation. Both paragraphs explicitly state that they are based upon recorded telephone conversations occurring respectively on June 15, 2012 and June 25, 2012. (ECF No. 71-27 ¶¶ 73, 96.) The June 15, 2012 conversation, which is recounted in paragraph 73, is between defendant and one of the confidential informants about moving profits from the Franciscan University contract from Avanti to Presidio so that defendant could access the money. (Id. ¶ 73.) This kind of information

is not revealed in the first May 25, 2012 conversation.  The June 25, 2012 conversation is between defendant and codefendant Prence about moving money (approximately $3,000,000) from Avanti to Presidio, or possibly a new company set up in defendant's sister's name, but leaving sufficient funds behind to pay the Avanti owners' quarterly taxes. (Id. ¶ 96.)  Again, this kind of information is not revealed in the first May 25, 2012 conversation.  Defendant could not establish that he suffered actual and substantial prejudice as a result of the government's interception of the first May 25, 2012 conversation based upon the averments made in these two paragraphs of the search warrant affidavits.

The information set forth in paragraph 31 of the search warrant affidavits likewise contradicts any possible claim that defendant suffered actual and substantial prejudice as a result of the government's interception of the first May 25, 2012 conversation.  That paragraph states that defendant "has formed" Presidio, an Ohio company, and "has told the Avanti 'owners'" that Presidio will replace Avanti and they will have to work for Presidio now, which is consistent with defendant's "long held and stated" plan to take over Avanti after he retired from PA Cyber. (ECF No. 71-27 ¶ 31.)  As an initial matter, the paragraph explicitly contradicts any inference that the information set forth therein is based upon the first May 25, 2012 conversation.  On its face, the information set forth in paragraph 31 is based upon information disclosed to the government by the confidential informants.  In addition, the content of paragraph 31 contradicts any assertion that it was based upon the first May 25, 2012 conversation.  The first May 25, 2012 conversation does not include any discussion about the Ohio company being named Presidio or about the company, regardless of its name, being used by defendant to "take over" or replace Avanti, as is set forth in paragraph 31.  It is illogical that the averments about these matters in the affidavit could be based upon a conversation during which those details were not discussed.

Defendant could not establish that he suffered actual and substantial prejudice from the government's interception of the first May 25, 2012 conversation due to the information set forth in paragraph 31 of the search warrant affidavits.

None of the averments made in the two affidavits to secure warrants to search residences and offices in Pennsylvania and Ohio could sustain a claim that the government caused defendant actual and substantial prejudice by intercepting the first May 25, 2012 conversation. The first May 25, 2012 conversation does not disclose the information set forth in paragraphs 31, 73, and 96, making it factually impossible for those three paragraphs to be based upon the first May 25, 2012 conversation. Although both May 25, 2012 conversations refer to defendant's plan to travel to Florida with and to contract with Franciscan University representatives, and paragraph 62 refers to a June 2012 meeting between defendant and Franciscan University officials, the record reflects that the amount of detail set forth in paragraph 62 cannot be gleaned from the May 25, 2012 conversations, and that, in contrast, the government gathered information about defendant's control over the Florida property from numerous sources, including bank and public records, consensual recordings, and the confidential informants. In any event, the record reflects that the affidavit's probable cause showing would be unaffected if the reference to the June 2012 meeting was excised from paragraph 62.

For these reasons, defendant could not demonstrate that the government's interception of the first May 25, 2012 conversation caused him actual and substantial prejudice because the information used by the government to secure warrants to search various residences and offices was obtained from other, prior conversations, as well as other independent sources.

### 4. **Investigation Lead/Grand Jury**

Defendant argues that he suffered prejudice because the government may have used the first May 25, 2012 conversation "to develop its case" or as a lead it its investigation, and could have presented testimony about it to the grand jury. (ECF No. 83 at 1, 10; ECF No. 133 at 1; ECF No. 171 at 5.) According to defendant, knowledge "of the contents of the tainted recordings… no doubt affected the prosecutors' decisions about how to investigate the case and under what theories it would prosecute the case." (ECF No. 94 at 31.) These arguments fail as a matter of fact.

As discussed above in detail, the first May 25, 2012 conversation reveals only that an unnamed Ohio company will be created so that it can be used by defendant to contract with Franciscan University. See supra III.A.2.b.(i). This information is innocuous, and, standing alone, reflects no illegal activity or intent. The first May 25, 2012 conversation does not disclose the details set forth by the government in the indictment and search warrant affidavits, such as that the name of the new company would be Presidio, that Avanti had a prior contractual relationship with Franciscan University, and that defendant planned to use Presidio to take over Avanti's contracts and to move funds out of Avanti and into Presidio for his personal use. In contrast, the March 26, 2012 conversation, which was recorded by one of the confidential informants almost two months before the first May 25, 2012 conversation, divulges many of these details. The March 26, 2012 recording, as well as the March 28, 2012 and April 30, 2012 consensual recordings, corroborate the fact that the confidential informants were privy to details about Presidio well before May 25, 2012.

There is no dispute that the confidential informants were cooperating with the government at the time, and sharing information, and documentation, with the government to assist with its investigation. The first May 25, 2012 conversation could not have been used as an investigative lead in this case because that conversation does not contain enough information to provide the government with any new information about what crimes to investigate or what theories to pursue, whereas prior recorded conversations, in which the confidential informants who were cooperating with the government participated, do contain such information. To characterize the first May 25, 2012 conversation as the "investigative lead" under these circumstances is factually implausible and contradicted by the record. There are no facts in dispute about this chronology of events or the content of the record. A further evidentiary hearing on Defendant's Motion is not required.

A further hearing is not required with respect to defendant's allegation that the government caused him prejudice by presenting evidence about the first May 25, 2012 conversation to the grand jury. Even if every word uttered during the first May 25, 2012 conversation was offered to the grand jury, that information, standing alone, could not have prejudiced defendant. The conversation does not reveal any criminal enterprise, and instead indicates that defendant planned to create an out-of-state company to contract with Franciscan University. That plan, without more, would not provide a sufficient factual predicate for any of the counts charged in the indictment. As has been stated several times in this opinion, the first May 25, 2012 conversation does not reveal the name of the new company to be Presidio, and includes no details about Avanti's relationship to Franciscan University or to Presidio, or about defendant's plan to use Presidio to put Avanti out of business and divert Avanti's funds to his personal benefit. The record cannot support a finding that defendant was prejudiced even if the

first May 25, 2012 conversation was disclosed to the grand jury.  Under the circumstances, this theory of prejudice cannot support defendant's governmental misconduct claim under any circumstances.  There are no facts in dispute about this matter, making an evidentiary hearing unnecessary.

     **5.**   **General Wrongdoing**

In opposition to the Government's Motion, defendant contends that the government's misconduct "deserves close judicial scrutiny, which it has not received thus far." (ECF No. 171 at 1.)  Examples of the government's alleged "ethical impropriety" are dispersed throughout defendant's opposition brief, often in the footnotes, and include that the government recorded allegedly privileged conversations between attorneys and clients other than himself, refused to grant immunity to Joseph Askar, lied about when it learned that Barry personally represented defendant, mistranscribed a sentence spoken by Barry on a March 8, 2012 consensual recording, and failed to ensure that its confidential informants did not "record[] lawyers." (Id. at 1-5, 7 & nn.1, 3-5.)  In support of his position that these allegations are sufficient to warrant further evidentiary hearings in this case, defendant cites to the court's statement in Voigt that "Voigt's moving papers raised enough of a specter of ethical impropriety on the government's part to warrant closer scrutiny." (Id. at 8.)  Defendant's argument is flawed, both as a matter of law and fact.

In Voigt, defendant John Voigt ("Voigt") was convicted of using a fraudulent trust to execute an investment scheme.  Voigt, 89 F.3d at 1059.  Voigt filed a pretrial motion alleging governmental misconduct based upon the government's use of codefendant Mercedes Travis ("Travis") as a confidential informant.  Id. at 1062-63.  Voigt contended that Travis was his personal attorney, as well as the trust's attorney, and that the government deliberately

intruded into his personal attorney-client relationship with her by using her as a confidential informant. Id.

After reviewing the documentary and testimonial evidence concerning the various contacts between Travis and the government's lead agent, Alvin Powell ("Powell"), and between Travis and Voigt, much of which conflicted, the appellate court concluded that the relationships between Travis and Voigt and Travis and Powell were "highly disputed." Voigt, 89 F.3d at 1067. It was after these disputes of fact were identified that the court took note of the "specter of ethical impropriety" raised by Voigt's pretrial motion papers, and concluded that the district court should have held an evidentiary hearing prior to trial. Id. at 1068. The appellate court, however, ultimately ruled that the failure to conduct that hearing was harmless error because Voigt's claim of outrageous governmental misconduct could not be sustained on the record created at trial because, among other reasons, Voigt made no showing of prejudice. Id. at 1068-70.

The court of appeals did not hold in Voigt that generalized claims of wrongdoing or unethical conduct could sustain a governmental misconduct claim, without proof of actual and substantial prejudice. The court, in fact, reached the opposite conclusion by specifically rejecting Voigt's "where there's smoke, there must be fire" argument. Voigt, 89 F.3d at 1071. The court of appeals likewise rejected Voigt's argument that the government's intrusion into his attorney-client relationship, standing alone, was per se prejudicial, relying upon the Supreme Court's holding that "even where government conduct is deliberate, defendant must demonstrate prejudice to obtain a remedy." Voigt, 89 F.3d at 1070-71 & n.9 (citing United States v. Morrison, 449 U.S. 361, 365-66 (1981)); see United States v. Carter, 966 F.Supp. 336, 345 (E.D. Pa. 1997) (citing Voigt for the proposition that intrusion into the attorney-client relationship, standing

alone, is not per se prejudicial). Defendant provides no other legal support for his contention that

he can establish the actual and substantial prejudice prong of his governmental misconduct claim

by demonstrating that the government engaged in instances of generalized wrongdoing, some of

which occurred after he was indicted.

Despite the fact that defendant's legal contention that Voigt requires this court to

conduct further evidentiary hearings because defendant's briefing raises a generalized specter of

unethical conduct is unsubstantiated, the court examines defendant's specific allegations of

misconduct to determine if any, were they factually substantiated, could rise to the level of actual

and substantial prejudice. The court identifies five areas of alleged governmental wrongdoing in

defendant's opposition brief: (1) recording privileged conversations between attorneys and

clients other than defendant; (2) refusing to grant immunity to Joseph Askar so that he could

testify; (3) misrepresenting to the court when the government learned that Barry personally

represented defendant; (4) misrepresenting to the court a statement made by Barry on a March 8,

2012 consensual recording; and (5) failing to ensure that its confidential informants did not

"record[] lawyers." (ECF No. 171.) As will be demonstrated immediately below, none of these

allegations could qualify as actual and substantial prejudice in this case.

With respect to the first allegation, defendant acknowledges, as he must, that he

does not have standing to assert attorney-client privileges held by PA Cyber, NNDS, or any other

third party. (ECF No. 171 at 2 & n.1, 3.) Defendant identifies no legal authority that would

enable him to demonstrate prejudice as a result of the government's alleged intrusion into a third

party's attorney-client relationships. Defendant's position is, in fact, contrary to the court of

appeals' decision in Voigt which rejected Voigt's attempts to establish prejudice based upon the

government's interception of conversations in which the trust held the privilege, instead of

defendant personally. <u>Voigt</u>, 89 F.3d at 1071. Defendant, nevertheless, contends that he is entitled to relief because the government recorded conversations between PA Cyber and NNDS officials, and those companies' attorneys. This claim is not legally sustainable. A further evidentiary hearing cannot be required based upon this claim of prejudice. Even if defendant's allegation was proven to be true, it would not be probative of prejudice to defendant.

Defendant's second accusation is that the government acted wrongfully by refusing to grant immunity to Joseph Askar ("Askar"), NNDS's corporate counsel, so that Askar could testify that he acted as defendant's personal attorney. (ECF No. 171 at 3.) Defendant neglects to identify any legal authority that supports his argument, or even that sets forth the proper legal standards to apply under the circumstances. The decision to grant immunity to a witness lies solely with the government. <u>United States v. Quinn</u>, 728 F.3d 243, 253-54 (3d Cir. 2013). By statute, the government is required only to assess whether the witness' testimony "may be necessary to the public interest." 18 U.S.C. § 6003. The government's decision could violate a defendant's due process rights, but only where the defendant demonstrates that the decision was made with the deliberate intention of distorting the judicial fact-finding process. <u>United States v. Herman</u>, 589 F.2d 1191, 1203-04 (3d Cir. 1978). Defendant does not set forth these legal standards, but summarily argues that the "inescapable conclusion" to be drawn from the facts that Askar was not indicted and the government failed to "articulat[e] any governmental interest that could countervail against obtaining Askar's truthful testimony" is that the government sought "to prevent the Court from hearing Askar's truthful testimony." (ECF No. 171 at 3.) Defendant does not identify the source of the government's duty either to indict a witness or articulate a "countervailing governmental interest" when refusing to grant immunity.

Although Askar has not been indicted, the record leaves no doubt that he was a target of the investigation that led to the filing of the instant indictment. (see e.g., ECF No. 71-20 ¶ 4 (wiretap affidavit listing Askar as a target subject).) According to the government, Askar was interviewed by government personnel, with his counsel present, on August 20, 2013, which is the day before the indictment in this case was filed. (ECF No. 86 at 71-73.) Askar's conversations were intercepted on consensual recordings and Title III wiretaps during the investigation of this case. (see e.g., Def. Exs. X, A6, A6-Trans.) Askar invoked his Fifth Amendment right not to testify at the prior evidentiary hearings on Defendant's Motion. There will be a hearing on other pretrial motions and there will be a trial in this matter. Under the circumstances, defendant's bald accusation that the "inescapable conclusion" is that the government refused to grant immunity to Askar only in order to prevent defendant from establishing that Askar was his personal attorney is contradicted by the record. It follows that it is impossible for defendant to demonstrate prejudice based upon this allegation.

Defendant's next allegation of generalized wrongdoing is that the government misrepresented to the court when it learned that Barry personally represented defendant. (ECF No. 171 at 4 n.3, 7 n.5.) Again, as an initial matter, defendant does not explain how this alleged misrepresentation, which allegedly occurred in 2014 or 2015, caused him actual and substantial prejudice in a case that was investigated and charged in 2012 and 2013. Regardless, the court previously addressed defendant's accusations about this alleged misrepresentation. (ECF No. 94 at 5; see ECF No. 87 at 43 n.15.) In the July 20, 2015 opinion, the court found that although the government was informed in September 2012 – after the interception of the conversations in issue - that Barry claimed to represent defendant personally, it received no details about the scope or subject matter of this purported representation until August 2014. (ECF No. 165 ¶ FOF

67.)  The court did not then accept defendant's allegation that the government made misrepresentations to the court about this issue, and will not do so now.  The factual record, therefore, cannot support any inference that the government lied to this court about this matter. It follows that it is impossible for defendant to demonstrate prejudice based upon this allegation.

Defendant also contends that the government made a misrepresentation to the court about the content of a particular consensual recording during the prior proceedings on his motion to dismiss or suppress.  According to defendant, "the testimony of Barry proved that the government was wrong when it contended that during a March 8, 2012 meeting among counsel, [defendant], and Geibel, Barry had purportedly stated that he had given [defendant] advice 'not' as his lawyer." (ECF No. 171 at 7 n.5.)  The briefing on Defendant's Motion, which occurred in June and August 2014, reflects that there was a genuine dispute between the parties about whether Barry stated that he gave defendant certain advice "as long as his attorney" or "not as his attorney." (ECF Nos. 71 and 83 at 13; ECF No. 86 at 46-47.)  At the evidentiary hearings, Barry listened to the recording and testified that "I heard 'And I've given Nick the advice as long as' -- there's a gap -- 'his attorney.'  That's what I heard." (ECF No. 118 at 36.)  The court listened to the recording several times.  The recording is distorted and reasonably susceptible to the different transcriptions offered by the parties.  Under the circumstances, the court could not characterize the government's transcription of the recording as a misrepresentation to the court. In any event, as both parties recognized, the recording itself was the evidence, not the transcript, which is offered only as a listening aid.  Defendant never alleged that the government tampered with the recording of this conversation.  The factual record, therefore, cannot support any inference that the government lied to this court about this matter, assuming for the sake of argument that such a misrepresentation could support a governmental misconduct claim, as a

67

matter of law. It follows that it is impossible for defendant to demonstrate actual and substantial prejudice based upon this allegation.

Defendant's final contention is that the government acted wrongfully by failing to ensure that the confidential informants did not record lawyers. (ECF No. 171 at 4 n.3.) Although defendant makes this accusation only in a footnote in his brief in opposition to the Government's Motion, defendant alleges throughout his original brief in support of his motion to dismiss or suppress that the government used the confidential informants to actively elicit privileged communications from various attorneys and defendant. (ECF No. 83 at 10, 12, 34-37.) As an initial matter, this contention, even if true, establishes the "deliberate intrusion" prong of defendant's governmental misconduct claim, not the actual and substantial prejudice prong of it. Deliberate intrusion into the attorney-client relationship, however, is not per se prejudicial. Morrison, 449 U.S. at 365-66; Voigt, 89 F.3d at 1070-71 & n.9.

Putting aside this point of law, the court examines the record to assess whether a further evidentiary hearing is warranted on this issue. In opposition to the Government's Motion, defendant does not identify a single conversation in which one of the confidential informants purportedly elicits privileged communications concerning Barry's legal advice to defendant about his revised exit strategy, which is the only personal attorney-client privilege that this court found that defendant established during the prior proceedings on his motion. (ECF No. 165 ¶¶ COL 54, 61.) In the original brief filed in support of defendant's motion to dismiss or suppress, defendant argued that the government "had to have known" that defendant received legal advice from various attorneys, including Barry, yet "proceeded to make…recordings." (ECF No. 83 at 9-10.) In support of this contention, defendant referenced approximately ten conversations recorded by one of the confidential informants between

68

January 9, 2012, and April 17, 2012, and characterized the informant as "press[ing]" for details about legal advice that Barry gave to defendant (ECF No. 83-3), "tr[ying] to get Attorney Askar to divulge attorney-client communications, including communications from Attorney Barry" (ECF No. 83-5), and "tr[ying] repeatedly to elicit communications that [defendant] had with his attorneys" (ECF No. 83-9). (ECF No. 83 at 11, 12, 14.) The court will evaluate these allegations, but only as they pertain to any alleged attempts to elicit advice Barry gave to defendant about his revised exit strategy.

The law is clear. The government cannot plant a confidential source into the attorney-client relationship or encourage, even tacitly, a confidential informant to obtain and reveal attorney-client confidences. Nieves, 1997 WL 447992, at *6. Defendant's factual assertions that the government planted the confidential informants into defendant's attorney-client relationship, or allowed or encouraged them to obtain and reveal privileged confidences, however, are not supported by the record. In conducting this analysis, the court accepts the evidence submitted by defendant with his motion as true, making an evidentiary hearing on this aspect of defendant's motion unnecessary. The conversations identified by defendant do not reflect that the confidential informants inserted themselves into conversations that did not concern them or their business interests, or solicited information from attorneys or about attorney advice. To the contrary, the record reflects that defendant, codefendant Neal Prence, Askar, and others, sought out the informants and volunteered information to them about various matters, some of which involved their ownership share in Avanti (ECF No. 83-3) and NNDS's relationship with Avanti (ECF No. 83-5). These matters were discussed openly with the informants, and reflect that the informants were expected to be conversant in the matters being discussed. Any inquiries made by the informants concern nonsubstantive matters, such

69

as when defendant met with certain attorneys and how meetings generally went, or summarize legal advice already willingly disclosed to them. (ECF No. 83-3, -5, -9.) These inquires cannot be characterized as wrongful solicitation of privileged conversations under the circumstances. In addition, the bulk of the conversations identified by defendant do not concern Barry's advice to defendant about his revised exit strategy, making them legally inconsequential to defendant's governmental misconduct claim. The record is devoid of any evidence from which the court could conclude that the government, whether by artifice or deceit, purposefully inserted the confidential informants into defendant's personal attorney-client relationship with Barry, or "sat back while its informants invaded [defendant's] attorney-client relationship[]" with Barry. (ECF No. 83 at 37.) In opposition to the Government's Motion, defendant fails to identify any such evidence.

The record developed at the prior hearings on Defendant's Motion, however, reflects that the government admonished the confidential informants about recording potentially privileged conversations and had discussions with the informants about whether certain attorneys were acting as lawyers to certain clients during the investigation. (ECF No. 109 at 126-31.) Even by defendant's own account, the government was not informed before September 2012 that Barry was defendant's personal attorney, at which time conversations between Barry and defendant were being autominimized. (ECF No. 165 ¶ COL 80.) Under the circumstances, defendant could not establish actual and substantial prejudice based upon this accusation of governmental wrongdoing.

Even if allegations of generalized governmental wrongdoing could be used to establish actual and substantial prejudice, the categories of wrongdoing identified by defendant are either not factually supported by the record or are contrary to law, or both. Defendant cannot establish the need for a further evidentiary hearing based upon these allegations of misconduct.

## IV.  Conclusion

In opposition to the Government's Motion, defendant failed to identify any legal authorities or record evidence to support his claim that he suffered actual and substantial prejudice as a result of the government's alleged intrusion into his personal attorney-client relationship with Barry. Defendant does not dispute that the record contains a total of three recorded conversations between Barry and defendant. Defendant does not provide any analysis of why or how those conversations qualify as privileged communications. The court concludes that the May 23, 2012 conversation and the first May 25, 2012 conversation are not privileged, and that the second May 25, 2012 conversation is not privileged personally as to defendant. These findings are dispositive of defendant's governmental misconduct motion. Voigt, 89 F.3d at 1070.

The court, however, assumed for the sake of argument that the first May 25, 2012 conversation, to the extent it discussed defendant's plans to form a new company in Ohio, named Presidio, to do business with Franciscan University, was privileged, as defendant contends. Defendant's governmental misconduct claim is still not sustainable because defendant failed to identify any specific and articulable harm, negative consequence, or ill-effect that flowed from the government's interception of that conversation. The record contradicts any suggestion that the first May 25, 2012 conversation, as opposed to earlier

consensual and Title III recordings the ongoing cooperation of the confidential informants, and documentary evidence, was the source of the government's knowledge about Presidio and caused the government to take any specific action during its investigation and prosecution of this case. The existence and content of those earlier recordings, and the informants' cooperation, are not in dispute.

Defendant cannot meet his burden to establish actual and substantial prejudice based upon the undisputed record. A further evidentiary hearing is unnecessary under the circumstances. The Government's Motion must be granted, and Defendant's Motion must be denied.

An appropriate order will be filed contemporaneously with this opinion.


Dated: November 16, 2015                              BY THE COURT:

                                                      */s/ Joy Flowers Conti*
                                                      Joy Flowers Conti
                                                      Chief District Judge