# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 13-227 |
| | ) | |
| NICHOLAS TROMBETTA and | ) | |
| NEAL PRENCE, | ) | |
|           Defendants. | ) | |
| | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW CONCERNING AMOUNT OF RESTITUTION

CONTI, Chief District Judge.

In these findings and conclusions, the court will rule upon the disputes concerning the amount of restitution, which affects both defendants Nicholas Trombetta ("Trombetta") and Neal Prence ("Prence") (collectively, "defendants"). The court will make separate tentative findings and rulings concerning Trombetta's objections to his presentence investigation report and advisory guideline range.[1]

On August 24, 2016, Trombetta pleaded guilty to Count 6 of the indictment at criminal action number 13-227, which charged him with a *Klein* conspiracy[2] in violation of 18 U.S.C. § 371. On September 28, 2017, Prence pleaded guilty to the same *Klein* conspiracy at count 6 of the indictment at criminal action number 13-227. Each defendant entered his guilty plea pursuant to a plea agreement with the government.

A *Klein* conspiracy in violation of 18 U.S.C. § 371 involves defrauding the Internal Revenue Service ("IRS") of its property (i.e., tax dollars) and constitutes an "offense against

---

[1] Prence had no objections to his presentence investigation report. (ECF No. 287).
[2] *See United States v. Klein*, 247 F.2d 908, 915 (2d Cir. 1957).

property" that is covered by the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. §§ 3663, 3663A, 3664. *United States v. Turner*, 718 F.3d 226, 236 (3d Cir. 2013). Restitution in the full amount of the victim's loss, as determined by the court, shall be ordered in this case. 18 U.S.C. §§ 3663A, 3664(f)(1)(A).

The parties made numerous filings regarding the amount of restitution. (ECF Nos. 290, 294, 299, 354). On March 28, 2018, the court held a hearing on the amount of restitution. (Transcript, ECF No. 364). The parties filed post-hearing proposed findings of fact and conclusions of law (ECF Nos. 365, 366, 367). The determination of the amount of restitution in this case is ripe for decision.

**Legal Background**

In the case of an identifiable victim (such as the IRS), the court shall enter a restitution order for the full amount of the victim's actual loss without consideration of a defendant's ability to pay. *See Turner*, 718 F.3d at 236. The defendant's finances can be considered, however, in specifying the manner in which restitution is paid. 18 U.S.C. § 3664(f)(2). Unlike the "amount of loss" for the offense level calculation, the amount of restitution cannot exceed the actual, provable loss of the victim. *United States v. Wirth*, 719 F.3d 911, 915 (8th Cir. 2013).

> To obtain restitution for tax losses, the government must prove by a preponderance of evidence that the defendant caused the United States to suffer an actual loss. *See United States v. Ellefsen*, 655 F.3d 769, 782 (8th Cir. 2011); *Hirmer*, 767 F.Supp.2d at 1311–14. The actual loss would be the revenue loss to the United States—in other words, the amount the defendant should have paid in taxes to the United States. *See Ellefsen*, 655 F.3d at 782; *Hirmer*, 767 F.Supp.2d at 1311–14. Given that the loss is the tax liability of the defendant, determining the amount of restitution requires consideration of the applicable deductions, exemptions, penalties, and others intricacies of the tax code. *See Ellefsen*, 655 F.3d at 782 (noting that the government presented a "detailed explanation of the amount of taxes, penalties, interest, and additional payments, for each year," and

2

used the testimony and reports of IRS agents to establish the amount of restitution).

*United States v. Garza*, No. EP-11-CR-3021, 2012 WL 2027025, at *11 (W.D. Tex. June 5, 2012). Although Trombetta and Prence stipulated to the "amount of loss" for the purpose of the offense level in U.S.S.G. § 2T4.1, they may challenge the "actual loss" suffered by the IRS for the purpose of restitution.

The procedure for issuance of a restitution order is governed by 18 U.S.C. § 3664. Disputes are resolved by the court by the preponderance of the evidence. The government has the initial burden to demonstrate the amount of the IRS' actual loss. 18 U.S.C. § 3664(e). Defendants have the burden to demonstrate their financial resources and needs. *Id.* The burden to demonstrate other matters is allocated by the court as justice requires. *Id.* In *United States v. Seligsman*, 981 F.2d 1418, 1421 (3d Cir. 1992), the court of appeals instructed that in determining restitution, the sentencing court should make findings on the record about: (1) the amount of loss actually sustained by the victim; (2) how the loss is connected to the offense of conviction; and (3) the defendant's financial needs and resources. The court explained that "difficulties of measurement" do not preclude the court from ordering restitution. If the exact amount owed is difficult to determine, the court should "reach an expeditious, reasonable determination of appropriate restitution by resolving uncertainties with a view toward achieving fairness to the victim." *Id.* (citations omitted). The findings of fact here relate only to the first and second matters, i.e., the actual loss and its relation to the offense of conviction. The third matter, defendants' respective financial needs and resources, will be addressed at the sentencing hearings.

The government relies largely on the factual allegations set forth in the indictment. In his

plea agreement, Trombetta stipulated that the facts set forth in count 6 were true and correct, with two minor modifications. Prence did not enter a stipulation of facts in his plea agreement, but did admit his guilt to count 6. At the restitution hearing, the government introduced a recorded statement in which Prence admitted that he prepared tax returns reflecting allocations of income in the names of straw owners of Avanti Management Group ("AMG") while knowing that Trombetta was the true owner of that income. Gov't Exh. 14. Prence fully participated as a co-conspirator by knowingly preparing false tax returns to conceal Trombetta's income from the IRS. The amount of the IRS' actual loss is the same for both Trombetta and Prence.[3]

**Findings of Fact**

1. Trombetta was the founder and chief executive officer of the Pennsylvania Cyber Charter School ("PA Cyber"). (Indictment ¶ 1, incorporated by ¶ 45).

2. Trombetta founded AMG in 2008. (Indictment ¶ 5, incorporated by ¶ 46). AMG is a limited liability company that filed its taxes on Form 1120S. AMG's income and deductions flowed through to the individual members' returns. (ECF No. 364 at 10, 18; Government Exh. 2). AMG provided the funds to pay the straw owners' taxes each year. (ECF No. 364 at 24; Indictment ¶ 64).

3. Nearly all of AMG's revenue came from a management services contract with the National Network of Digital Schools Management Foundation ("NNDS").[4] *Id.*

---

[3] The court will reserve ruling on whether to apportion liability for restitution pursuant to 18 U.S.C. § 3664(h) until sentencing. *United States v. Zander*, 319 F. App'x 146, 150 (3d Cir. 2009).

[4] As set forth in the indictment, NNDS was founded by Trombetta as a Pennsylvania non-profit corporation that provided educational management services and online curriculums. Indictment ¶ 4. From 2006-2011, NNDS had revenues ranging from $22,000,000 to in excess of $50,000,000 per year, the substantial majority of which came from a management services contract with PA Cyber. *Id.* Trombetta effectively controlled the management and operations of NNDS. *Id.* NNDS entered into a management services contract with AMG, whereby NNDS agreed to pay AMG a percentage of its revenue in exchange for various services. *Id.*

Trombetta was the controlling party on both sides of the transactions involving PA Cyber and NNDS, and then in turn, was the controlling party on both sides of the transactions between NNDS and AMG. (Indictment ¶ 51).

4. Trombetta selected four straw owners of AMG to be put in place to hold and manage assets for him until an unspecified future time when Trombetta would overtly assume ownership of AMG. Indictment ¶ 55.

5. One2One Enterprises ("One2One") was founded by Trombetta and his sister, Elaine Trombetta Neill ("Neill"). (Indictment ¶ 9, incorporated by ¶ 49; ¶ 53).

6. One2One is a Schedule C business, which is similar to a sole proprietorship. Its taxes were reported and paid by Neill and her husband on Schedule C to their Form 1040 individual tax returns. (ECF No. 364 at 11-12).

7. One2One was never treated as a partnership and never filed a Form 1065 to report partnership income. *Id.*

8. "One2One served as a vehicle to allow Defendant Nicholas Trombetta to use his position of influence over PA Cyber, NNDS, AMG, BOSS, Wingspan and other entities in the private sector to covertly channel money to himself, to Elaine Trombetta Neill, to other family members and to other persons." *Id.*

9. The object of the conspiracy was to conceal the true nature, source and amount of Trombetta's income "by diverting such income to AMG, where it accumulated for his future use, and to One2One, where it was available as current income" in order to defraud the IRS. (Indictment ¶ 51).

10. In so doing, Trombetta "concealed his position as the direct beneficiary and recipient of

funds generated by PA Cyber, the school wherein he held the position of CEO." *Id*.

11. Trombetta "also attempted to avoid public discovery and scrutiny of his conflict of interest as the controlling party" on both sides of the relevant transactions involving PA Cyber, NNDS, AMG and One2One. *Id*.

12. In this manner, Trombetta was able to ensure the continued flow of money from PA Cyber to entities he controlled and which benefited him. *Id*.

13. "[T]hrough management contracts between PA Cyber and NNDS, and between NNDS and AMG, both of which were put in place by Defendant Nicholas Trombetta, . . . Defendant Nicholas Trombetta created a multi million dollar revenue stream that started at Pa Cyber and flowed through to AMG." (Indictment ¶ 56).

14. From "2006 through 2012, Defendants Nicholas Trombetta and Neal Prence shifted more than $8,000,000 in income attributable to Defendant Nicholas Trombetta to the federal income tax returns of other persons, that is his sister, Elaine Trombetta Neill and the four 'on paper' owners of AMG, so that the true income of Defendant Nicholas Trombetta was concealed from legitimate taxing authorities." (Indictment ¶ 66).

15. In his plea agreement, Trombetta and the government agreed to change the term "more than $8,000,000" to "approximately $8,000,000."

16. Trombetta and Prence caused income attributable to Trombetta to be reported on the tax returns of the straw owners of AMG, instead of on Trombetta's tax returns, as it should have been reported. (Indictment ¶ 62).

17. Trombetta did the work and performed the services that resulted in the income reported as having been earned by One2One. (ECF No. 365 ¶¶ 72-98 & n.1).

18. Trombetta and Prence caused income attributable to Trombetta to be reported on Schedule C, Profit or Loss from Business (One2One), attached to the tax returns of Elaine Trombetta Neill, instead of on Trombetta's tax returns, as it should have been reported. (Indictment ¶ 61).

19. The government's expert, IRS revenue agent Christian Ehehalt ("Ehehalt"), prepared revenue agent reports ("RARs") for Trombetta and the "on paper" owners of AMG. Ehehalt also created summary exhibits in support of the government's calculation of the net tax loss to the IRS. Defendants challenged some of the underlying assumptions Ehehalt was asked to make, but did not challenge the accuracy of his calculations. Prence's expert in forensic taxes and accounting, Kenneth C. McCrory ("McCrory"), testified that Ehehalt's RARs were "fairly standard" and that he reviewed the RARs briefly "to see that they appeared to be reasonably correct." (ECF No. 364 at 81).

20. Ehehalt's testimony was credible and persuasive.

21. Ehehalt determined the net amount of income attributable to Trombetta by: (1) taking the amounts on the Form 1120S and Schedule K federal tax returns prepared for AMG each year by Prence and shifting that income from the four "on paper" owners to Trombetta; and (2) examining the deposits into the One2One bank account to determine which deposits should be attributed or excluded as income to Trombetta. (ECF No. 364 at 26-28; Gov't Exh. 5, 6, 7). Defendants did not challenge any of the income attribution/exclusion decisions. Ehehalt determined that from 2006-2011, Trombetta shifted $7,226,664 in income to AMG and shifted $1,170,014 in income to One2One, for a total of $8,396,678. (Gov't Exh. 5).

22. The AMG income Ehehalt attributed to Trombetta reflected a reduction for all of AMG's claimed expenses. (ECF No. 364 at 17). For example, the reported gross income of AMG in 2011 was $9,987,541, but AMG claimed almost $5,000,000 in business deductions, including but not limited to compensation of officers, salaries paid to the "on paper" owners, repairs and maintenance, rents, depreciation, advertising, pension, and employee benefits. (ECF No. 364 at 17; Gov't Exh. 2). The government did not challenge the legitimacy of these business expenses and attributed only AMG's 2011 net income of $5,103,345 to Trombetta. (Gov't Exh. 5).

23. The One2One income Ehehalt attributed to Trombetta was similarly reduced by the expenses claimed by One2One. Ehehalt testified that Trombetta was attributed "the net amount of One2One income for each year, which would have included expenses taken against the reported gross earnings." (ECF No. 364 at 44, 45-46).[5] Ehehalt did not challenge the legitimacy of these business expenses and reduced One2One's income by the full amount of the expenses claimed on Neill's tax returns.[6] (ECF No. 364 at 46).

24. Based on the record, the amount of $8,396,678 in shifted income attributable to Trombetta is reasonable.

25. Ehehalt prepared RARs that recalculated the straw owners' tax liability each year after removing the flow-through income directed by Trombetta to AMG. (ECF No. 364 at 21-23; Gov't Exh. 4). Ehehalt compared his calculation to the straw owners' actual tax returns and gave defendants full credit for the extra amounts paid in taxes by AMG on

---

[5] Because the parties did not provide the Schedule C tax forms submitted by Neill on behalf of One2One, the court cannot confirm this statement.
[6] While Ehehalt testified that giving Trombetta credit for the taxes Neill paid was not exactly the same as listing those expenses on the RAR as deductions (ECF No. 364 at 58-59), illegitimate expenses were used to reduce the net income attributed to Trombetta. For example, Neill pleaded guilty to the Information in Crim. No. 13-217, which stated that One2One falsely claimed deductible business expenses of $90,600 in 2010 when she well knew that One2One had almost no legitimate business expenses. (Gov't Exh. 15; Trombetta Exh. U).

behalf of the "on paper" owners for the flow-through income. (ECF No. 364 at 23-24). For example, in 2011, Robert and Judy Babish actually paid $458,120 in taxes; after removing the AMG income the Babishes' corrected tax liability was only $39,427; so defendants were credited with an overpayment of $418,693. (ECF No. 364 at 23-24; Gov't Exh. 4, 10). Trombetta also was credited for the taxes paid by Neill and her husband on behalf of One2One. (ECF No. 364 at 11-12, 42; Gov't Exh. 10).

26. Ehehalt also prepared a RAR that recalculated Trombetta's tax liability each year after including the income he shifted to AMG and One2One. (ECF No. 364 at 37-40; Gov't Exh. 9). Ehehalt credited the amounts Trombetta actually paid in taxes each year in determining his corrected tax liability. (Gov't Exh. 9).

27. Government Exhibit 10 is a summary chart of Ehehalt's calculation of the IRS' net tax loss. It reflects the amounts underpaid by Trombetta each year and the credits for taxes paid on the PA Cyber income stream through NNDS each year by the "on paper" owners of AMG and Elaine Neill on behalf of One2One. Ehehalt explained that even though the "on paper" owners of AMG paid tax on the redirected income, additional tax is owed when income is reported on one person's return versus splitting the same amount of income over four people because of marginal tax rates. (ECF No. 364 at 43).

28. The total net tax loss calculated by Ehehalt is $437,632. (ECF No. 364 at 42-43; Gov't Exh. 10).

**Conclusions of Law**

1. The "first principle of income taxation" is that "gains should be taxed to those who earned them." *C.I.R. v. Banks*, 543 U.S. 426, 433 (2005). "The dominant purpose of the revenue laws is the taxation of income to those who earn or otherwise create the right to receive it and enjoy the benefit of it when paid." *Helvering v. Horst*, 311 U.S. 112, 118 (1940).

2. *Banks* involved the tax treatment of litigation recoveries involving attorney contingent fee agreements. In *Banks*, the Supreme Court held that if a litigant's recovery is taxable, the entire recovery constitutes taxable income to the litigant, including the portion of the recovery paid to the litigant's attorney as a contingent fee. 543 U.S. at 429. The Court based its decision on the "anticipatory assignment doctrine" and concluded that "a contingent-fee agreement should be viewed as an anticipatory assignment to the attorney of a portion of the client's income from any litigation recovery." *Id.* at 434.

3. *Helvering* involved the tax treatment of a gift of bond interest coupons. The owner of negotiable bonds detached interest coupons shortly before their due date and gifted them to his son, who collected them the same year at maturity. The Supreme Court held that this interest income was taxable to the father and noted there was no basis to distinguish a gift of interest coupons from a gift of salary or commissions. 311 U.S. at 120.

4. The Internal Revenue Code broadly defines "gross income" for federal tax purposes as "all income from whatever source derived." *Banks*, 543 U.S. at 433 (quoting 26 U.S.C. § 61(a)).

5. Typically, a taxpayer who acquires the right to receive income is taxed when he

"realizes" the income, regardless of when his right to receive payment accrues. The rule that income is not taxable until realized does not mean that a taxpayer who has fully enjoyed the benefit of the economic gain represented by his right to receive income can escape taxation merely because he has not himself received payment. *Helvering*, 311 U.S. at 115-16.

6. As the Court explained, income is "realized" when a taxpayer who owns or controls the source of the income, also controls the disposition of that income and diverts the payment from himself to others. The taxpayer has equally enjoyed the fruits of his labor whether he collects and uses the income himself, or directs the income to somebody else. *Id.* at 116-17.

7. The power to dispose of income is equivalent to ownership of that income. *Id.* at 118. The exercise of that power to direct payment of income to another constitutes "realization of the income by him who exercises it." *Id.*

8. A taxpayer "cannot exclude an economic gain from gross income by assigning the gain in advance to another party." *Banks*, 543 U.S. at 433. By way of analogy, an employee's salary is taxable even if it is immediately and automatically diverted to pay the mortgage, credit card bills, utilities, etc., so that the employee never sees the money. The employee realized the benefit of the diverted money in that their mortgage, credit card bills, utilities, etc. were paid.

9. The anticipatory assignment doctrine prevents taxpayers "from avoiding taxation through arrangements and contracts however skillfully devised" to prevent income from coming into the physical possession of the person who earned that income. *Id.* at 434.

10. Ordinarily, attribution of income is resolved by asking whether a taxpayer exercises complete dominion over the income in question. In the context of anticipatory assignments, however, "the question becomes whether the assignor retains dominion over the income-generating asset, because the taxpayer who owns or controls the source of the income, also controls the disposition of that which he could have received himself and diverts the payment from himself to others as the means of procuring the satisfaction of his wants." *Id.* (citations omitted). Assigning tax liability to the person who exercises control over the income "preserves the principle that income should be taxed to the party who earns the income and enjoys the consequent benefits." *Id.* at 435.

11. In *Gail Vento, LLC v. United States*, 595 F. App'x 170 (3d Cir. 2014), the Third Circuit Court of Appeals explained that under the anticipatory assignment doctrine, "an assignment of income is not effective to shift the incidence of tax to the assignee because the power to dispose of income is equivalent to its ownership. Under the assignment of income doctrine, once a right to receive income has 'ripened' for tax purposes, the taxpayer who earned or otherwise created that right, will be taxed on any gain realized from it, notwithstanding the fact that the taxpayer has transferred the right before actually receiving the income." *Id.* at 173 n. 6. (citations omitted).

12. In *Mazzei v. Commissioner of Internal Revenue*, No. 16702-09, 2018 WL 1168766 (T.C. Mar. 5, 2018), the United States Tax Court recently summarized this "old and well-developed body of law" as follows: "In cases where a right to receive income is allegedly transferred before the income arises, courts have held that a taxpayer received income if the taxpayer controlled the source of the income, even where the taxpayer did "not have

dominion over the income at the moment of receipt." 2018 WL 1168766 at *13 (citing *Banks* and *Helvering*). The Tax Court confirmed that the anticipatory assignment doctrine applies "to efforts to shift income not only among individuals but also among entities." *Id.* at n. 33.

13. In this case, Trombetta made an anticipatory assignment of his income. He realized income when he created the revenue stream that flowed from PA Cyber to NNDS, and from NNDS to AMG, as well as income that flowed into One2One. Trombetta controlled the source of the income, and controlled the arrangements by which that income was diverted into AMG and One2One. Trombetta could not exclude those revenues from his gross income by assigning them in advance to AMG and to One2One. The anticipatory assignment at issue in this case is more readily attributable to Trombetta than the gift at issue in *Helvering* because the income was channeled to entities over which Trombetta maintained control.

14. Defendants argue that it was "AMG's income that the IRS attributes to Trombetta." (ECF No 367 ¶ 19). This is incorrect. AMG was created to receive and hide Trombetta's income and to attribute that income to the straw owners for Trombetta's benefit. In other words, it was Trombetta's income to do with as he directed.

15. McCrory's opinion that Trombetta should be taxed on only one half of the income of One2One is similarly flawed. The government is not seeking restitution for income generated *by* One2One; rather, it seeks restitution on income Trombetta generated from PA Cyber and others and directed *to* One2One.

16. Defendants' argument that the restitution obligation should be reduced because the AMG

"on paper" owners still have the money is fundamentally flawed. It does not matter, for tax purposes, who has the money now; the important fact is that Trombetta realized income when he controlled the funds from PA Cyber sent to NNDS and exercised his power to dispose of it by directing it through transactions he controlled to AMG.

17. The "constructive receipt" doctrine supports the government's position on restitution. Pursuant to 26 C.F.R. § 1.451-2:

Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions.

18. McCrory's application of the "constructive receipt" doctrine is misplaced. McCrory opines that there were substantial restrictions on Trombetta's ability to obtain the monies that were directed to AMG. This contention is contrary to the factual record, because Trombetta stipulated to controlling the relevant transactions. (Indictment ¶¶ 51, 56, 57, 60).

19. The decision relied on by defendants, *Johnson v. Commissioner*, 25 T.C. 499 (1955), is easily distinguishable. The taxpayer in that case did not constructively receive income because the checks at issue were delivered to him with substantial restrictions, i.e., "with the strict understanding and their mutual consent that the checks were not to be presented for payment until authorized by the president." *Id*. at 503.

20. As explained above, Trombetta's tax liability was triggered when he directed funds from PA Cyber through NNDS to AMG to be passed through and reported as income to the

straw owners and similarly when he directed funds from various entities to One2One to be passed through and reported as income to his sister. There is no evidence of any limitations (let alone "substantial restrictions") on Trombetta's ability to exercise dominion and control over the PA Cyber, NNDS, AMG or One2One revenue streams.

21. It is important to examine the facts in light of the tax years in question. In each of the years at issue (2006-2011), Trombetta, through the various companies he founded, substantially controlled the income streams into AMG and One2One, which passed through those entities and after netting out deductions was reported as income, respectively, by the straw owners and Elaine Neill instead of Trombetta. Under the Internal Revenue Code, he was required to pay the tax due on that level of income. He failed to do so. The IRS suffered an actual loss of taxes in each of those years, as calculated by Ehehalt.

22. That Trombetta today no longer controls the funds he directed to AMG and which are still held by AMG is not relevant to the determination of the actual taxable amount. Tax liability is not eliminated when the money is later spent, lost or placed in the control of another. *See, e.g., United States v. Sebold*, 547 F. App'x 278, 279 (4th Cir. 2013) (conviction for tax evasion upheld where money stolen from employer was lost on gambling and day-trading activities); *United States v. Woodman*, 115 F. App'x 840, 842 (6th Cir. 2004) (conviction upheld where "loans" were directed to defendants through shell companies, despite testimony that charitable corporation controlled by defendants "planned to eventually forgive the putative loans and pay the taxes on them at that time").

23. The IRS' total net tax loss of $437,632, as calculated by Ehehalt, is accurate.

24. The IRS' entire actual loss is directly connected to the *Klein* conspiracy offense of conviction.

25. The total amount of restitution owed by defendants Trombetta and Prence is $437,632.[7]

BY THE COURT:

/s/ *Joy Flowers Conti*
Joy Flowers Conti
Chief United States District Judge

Dated: June 26, 2018

---

[7] Defendants' respective financial needs and resources and the decisions whether to apportion the restitution liability will be addressed at their sentencing hearings.