IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No. 13-227 |
| | ) |
| NICHOLAS TROMBETTA | ) |
| NEAL PRENCE | ) |

**GOVERNMENT'S RESPONSE TO
<u>DEFENDANT TROMBETTA'S SENTENCING MEMORANDUM</u>**

AND NOW comes the United States of America, by its attorneys, Scott W. Brady, United States Attorney for the Western District of Pennsylvania, and Robert S. Cessar, Stephen R. Kaufman and James R. Wilson, Assistant United States Attorneys in and for said district, and submits the following Response to Defendant Trombetta's Sentencing Memorandum, and in support thereof sets forth the following:

**BACKGROUND**

1. Defendant Trombetta was indicted on August 21, 2013, in an eleven count Indictment charging him with violations of federal law including three counts of mail fraud, two counts of theft concerning programs receiving federal funds, one (Klein) conspiracy count, five counts of filing false tax returns and a forfeiture allegation.

2. On August 24, 2016, defendant Trombetta, pursuant to a written plea agreement, entered a plea to Count Six of the Indictment, known generically as a Klein conspiracy, that is a criminal agreement to defraud the United States, in this case the IRS. Defendant Trombetta also acknowledged responsibility for the false tax returns charged at Counts Seven through Eleven of the Indictment. Also, at the time of his plea defendant Trombetta acknowledged under oath that he had reviewed Count 6 of the Indictment, had "fully discussed" the allegations in Count 6 with his attorney (Transcript July 24, 2016, pg. 11), and, pursuant to counsel's representations, agreed with the facts set forth in Count 6 of the Indictment (Tr. Pg. 31). This same stipulation to the

1

facts set forth in Count 6 is set out in the plea agreement at paragraph C. 3. "The parties further stipulate that the facts set forth in Count Six of the Indictment are true and correct [with identified minor modifications]."

## DISCUSSION

3.     Defendant has filed a Sentencing Memorandum at Doc. No. 379, with a series of attachments (344 pages). In the substantive portion of his Memorandum defendant Trombetta repeatedly makes factual assertions, and arguments therefrom, which have no support in the record.

4.     For instance, the defendant includes a long recitation of his personal history going back before the founding of PA Cyber, complete with square footage of buildings, numbers of students, discussions of numbers of schools and states and students. The narrative trumpets the defendant's lead role in the turnaround of Midland, Pennsylvania, the creation of jobs, and the resurgence of pride in the community. The government largely has no quibble with the defendant's accomplishments up through the founding and growth of PA Cyber as a significant player in the cyber charter school realm. The salient point, however, is that the defendant then employed the sterling reputation he had acquired to perpetuate the scheme charged in Count Six. It was the trust and admiration of him in the Midland community which enabled him to create NNDS, and later Avanti, with Boards of Directors who followed his direction with few if any questions. It is what enabled him to transfer his most trusted employees (who eventually became the four straw owners) from PA Cyber to NNDS to Avanti or other entities and gain their unquestioned willingness to hold millions of dollars in assets for him, and even file tax returns which grossly overstated their actual income. In sum, his deep reservoir of good will made the criminal scheme work.

5. Defendant makes the following wholly unwarranted assertion: "The government now concedes, by its actions, that the $8 million was legitimately earned by Mr. Trombetta." (Doc. 379, p. 16.)

6. The government most certainly does not agree that the $8 million was earned legitimately by Mr. Trombetta. To the contrary, as set forth at length in Count Six, the defendant engineered, over years, a clever way to divert public monies from PA Cyber, to NNDS, to Avanti, and finally a portion to One2One, where funds which began as public monies benefitted him personally. That scheme is not "legitimate" – it is classic dishonest self-dealing by a public official.

7. Yet the defendant argues "Mr. Trombetta did not convert or steal $8 million from public coffers, school budgets or anywhere else. Mr. Trombetta's crime was one of improper attribution --- not theft." (Doc. 379, p.15.) Defendant thus seeks to characterize his long term plan to siphon funds away from PA Cyber and into his own pocket as something akin to an accounting error – "improper attribution". That phrase, by the way, is found nowhere in the Indictment. And while it is true that both parties and the Court have used the word "attributed" to discuss what was done with money that the defendant diverted from PA Cyber to his own pocket, it is what was done to create that income stream in the first place that illuminates the defendant's pervasive criminal intent. In contrast to defendant's characterization of "improper attribution", paragraph 56 from the Indictment, to which the defendant stipulated, provides clarity as to what the underlying facts are:

> 56. It was a part of the conspiracy that through management contracts between PA Cyber and NNDS, and between NNDS and AMG, both of which were put in place by Defendant NICHOLAS TROMBETTA, that Defendant NICHOLAS TROMBETTA created a multi million dollar revenue stream that started at PA Cyber and flowed through to AMG. It was further a part of the conspiracy that Defendant NICHOLAS TROMBETTA did not disclose to the boards of directors at PA Cyber and NNDS that he was personally profiting from the revenues that flowed from PA Cyber to NNDS to AMG.

8. In contrast to defendant's unsupported proclamations about his not having engaged in theft or conversion, the Indictment / Stipulation sets out, in clear, logical and unmistakable terms, an outrageous course of hidden self dealing that resulted in millions of dollars flowing from a public school entity, over which the defendant had nearly total supervisory authority as the CEO / Superintendent, to a private for profit business, that he effectively controlled and the funds of which he could access virtually at will. Simply stated, the defendant, as CEO of PA Cyber (Paragraphs 1, 11), was the moving force behind PA Cyber entering into a consulting/management contract with the non profit NNDS, which he also effectively controlled (Paragraph 4), which resulted in millions in tax dollars flowing to NNDS (Paragraphs 3, 4). He, Nicholas Trombetta, and not anyone else, then put in place the similar management contract between NNDS and Avanti. This step is critical because both PA Cyber and NNDS had boards of directors (though they were largely inattentive and/or complicit) and publicly audited financial statements -- PA Cyber as a public school receiving taxpayer dollars subject to review by the PA Department of Education and NNDS as a non profit subject to oversight by the office of the PA Attorney General. Thus, even though the defendant could engineer a contract that took millions of tax dollars out of PA Cyber to NNDS, the money still wasn't immediately available directly to him.[1] Which of course is where his creation of Avanti Management Group and his hand selected crew to run it came in (See the Indictment stipulations at paragraphs 5 and 6). By selecting "straw owners" who would be compliant and agree to "take direction regarding the operation and management of AMG from [the Defendant]", the defendant could now access the funds that he could never have touched at PA Cyber, with no scrutiny from

---

[1] Which is why Defendant's phrase of choice, "improper attribution", doesn't begin to capture the full scope of his actions. One can hardly imagine Defendant going to the board of PA Cyber or the board of NNDS to ask them to buy his girlfriend's house, or pay off the lien on his own house, or forward more than $620,000 to his sister so they (defendant and his sister) could spend it as they please. But once AMG was created all this and more became immediately possible.

a board of directors or any public entity. Indeed, he has stipulated to the fact that he had "full access to and use of the funds of…AMG" which allowed him to then do things like cause AMG to purchase his girfriend's house for more than $70,000, or pay off the lien on his own house for over $110,000, or issue a $90,000 check from the AMG account to his sister's company One2One simply because he said to do so. (See paragraph 57.)

9. The government does not argue that the defendant's scheme was so clumsy that he attempted to convert tax dollars by buying his girlfriend's house directly with PA Cyber funds.[2] He clearly understood that there were limits to his reach even as CEO at PA Cyber. He had a burnished reputation and public appearances to maintain. But once he moved the money from the public entity he controlled to the private one he created and controlled, it was no holds barred and his spending was essentially uncontrolled. The Court need look no further for proof of this than the money that went directly from AMG to One2One for no legitimate purpose and for no reason other than the defendant wanted it to be so. The defendant has stipulated that One2One did not render any service to AMG and did not provide anything of value to AMG (paragraphs 57(d) and 58); nevertheless he caused AMG to issue checks to One2One over the period 2008 to 2012 for more than $620,000 (paragraph 67 e-i).

10. The pipeline which defendant Trombetta constructed from PA Cyber to AMG amounted to an enormous (undisclosed) conflict of interest. The Court will recall that in the recordings which were played at the restitution hearing (March 21, 2018), a recording was played for the Court in which co-defendant Prence articulated the obvious and advised Mr.

---

[2] The Court can readily imagine an academic argument concerning when the money flowing from PA Cyber to other entities ceased to be "taxpayer funds." That is, once the money passed to NNDS did it no longer retain its character as 'taxpayer funds'? How about further downstream when it reaches AMG or when it is thereafter transferred to One2One? This discussion is mooted by the simple realization that the defendant controlled the flow of the stream from both ends and was, by virtue of his position at PA Cyber, abundantly aware of what was happening with PA Cyber monies that were ending up at AMG.

Geibel that they could all be in some trouble.  Immediately after Prence advises the CEO of AMG, Mr. Geibel, that he (Prence) could be "in trouble" because he is putting money on Geibel's tax return that Prence knows is not Geibel's actual income, the following exchange takes place:

> BG: And, it sounds like, it sounds like potentially um, it sounds like we could both be in some trouble here, yeah, if something were to…
> NP: Dr. T (UI) more than any because he really is the one that has the knowledge.
> BG: Sure.
> NP: What do you think?  What's your take? Don't you see that, I mean forget the tax issues altogether, just think, you have a company that's his (UI)
> BG: Yeah.
> NP: And he has this school which controls NNDS which controls Avanti…
> BG: PA Cyber.
> NP: And (UI) he benefits from it.  The accumulation is his.
> BG: Sure.
> NP: Nick has a giant conflict of interest.
>
>> Excerpted portions of 1D-19, from March 28, 2012
>> Presented at the March 21 restitution hearing as Exhibit #

11. In determining how the Court should characterize the defendant's actions in wielding his authority and esteem in so self-serving a manner there is one other factor the Court should consider.  That is, the defendant stipulated that he sought to keep his scheme of self-dealing from becoming public knowledge.  Defendant did not disclose to either the board of PA Cyber of the board of NNDS that he was personally profiting from the income stream that he created (paragraph 56).  Moreover, he has stipulated that it was his purpose to conceal the fact that he was receiving this money personally (paragraph 51), clearly he wanted no public scrutiny of what it was he was doing.[3]

12. Defendant makes these assertions as well, which require response:

---

[3] This Court has already made findings of fact regarding the defendant's purpose of concealment of his scheme.  See Doc. No. 370, findings of fact numbers 10-12.

1) "[I]t appears that the approximately $8 million of improperly attributed income is still intact and under the custody and control of four of the other participants[4] in the tax conspiracy…". (Doc. No. 379, p.15) There is absolutely no record evidence of this from any source whatsoever.

2) Defendant asserts that the government has allowed the four straw owners "to retain the improperly attributed income…". (Doc. 379, p. 16.) Again, no evidence of this, period.

13. When search warrants were executed by the federal government in July 2012, after a covert investigation which began when Brett Geibel and Jane Price stepped forward to report the activities of defendant, the scheme came to an end. With Trombetta no longer able to control the affairs of PA Cyber, NNDS and Avanti, the former officers and directors of those entities, as advised by attorneys, had to manage those entities without control or manipulation by Mr. Trombetta.

14. Those directors and officers have fiduciary duties and responsibilities to properly manage the assets of those entities. Those entities have the ability to bring civil actions, if appropriate, regarding any assets to settle any outstanding questions. With respect to the criminal case, this prosecution has effectively removed Mr. Trombetta's interference and control. PA Cyber, NNDS and Avanti are obligated, and have been obligated since July 2012, to conduct their affairs in an honest and good faith manner with fidelity to all fiduciary duties.

15. Defendant argues that a downward variance from the advisory guideline range of sentence "is the standard." (Doc. 379, p. 20.) The government urges that there is a history in

---

[4] This Court found that the four straw owners were not participants in the way that term is employed in the USSG. (Doc. 371, pgs. 4-5.)

this District of sentencing tax offenders to significant periods of incarceration. The following sample is offered for the Court's consideration:

- Wayne P. Scholar, Cr. No. 9-258, 27 months incarceration, $414,000 tax loss;
- James L Vautar, Cr. No. 10-28, 30 months incarceration, $117,000 tax loss;
- Elenni Berger, Cr. No. 9-32, 36 months incarceration, $118,000 tax loss;
- David P. Allen, Cr. No. 10-160, 21 months incarceration, $222,000 tax loss;
- Don K. Turner, Cr. No. 01-106, 60 months incarceration, $408,000 tax loss (371 conspiracy to obstruct the IRS);
- Thomas D. Tuka, Cr. No. 11-134, 30 months incarceration, $60,000 tax loss;
- Martin Bujaky, Cr. No. 11-241, 24 months incarceration, $211,000 tax loss;
- Debra J. Feather, Cr. No. 14-96, 24 months incarceration, $38,000 tax loss.

It is, of course, a given that every case is defined by its own facts and circumstances but non prison sentences are not the norm in this District in tax related matters. It is also notable that, insofar as can be gleaned from the docket, the above cases were garden variety tax matters and none appeared to involve the significant breach of public trust that underlies this matter.

## CONCLUSION

16. Candor requires that the government acknowledge that the defendant has significant and laudable accomplishments in both the field of education and in his (apparent) endeavor to assist in the resuscitation of his community. But the query the government has relative to the abundance of supportive letters and the proffered history of accomplishment is this, what is there about that history that mitigates the seriousness of the offense in question? What is there about the supportive material that offers the Court any insight on how this person came to engage in this crime?

17. No person is just one thing; nor is any individual only the sum of their actions on their worst day nor their best. But what must be grappled with in this case is one clear, resonant

and overwhelming fact – parallel with the actions and circumstances set forth in the supportive letters, even as Nicholas Trombetta was exercising his gifts as a teacher, coach, principal, administrator, neighbor and friend, even as he was creating job opportunities and offering a supportive word of encouragement, and concurrent with his actions to assist his school or his community – he was engaged in a massive scheme to enrich himself to the tune of $8,396,678 (Doc. 370, this Court's Findings of Fact and Conclusions of Law, FF#21) at the expense of his school, his community and his own integrity, over a very long period of time (December 2006 -- the first deposit to the One2One account, through July 2012 – the date the search warrants which made the investigation public were executed).

18.     This was not an opportunistic or happenstance crime where an otherwise good man was ensnared in a moment of weakness.  This was a calculated, long term, well thought out, finely tuned manipulation  of literally dozens of people which required that the defendant actively seek to compromise friends, family members, long term associates and employees. And the tools of his accomplishment, the manner and means by which this scheme was brought to fruition?  These were the same things about which the friends and colleagues in the supportive letters lauded him – trust, fidelity, integrity, compassion.  Brett Geibel, Jane Price, Robert Babisch and Rebecca Manning[5] didn't suddenly decide to forfeit careers of integrity in education in order to create an unnecessary company that could be used to stockpile money for Nick Trombetta.  They were lured into participation by an enormous reservoir of trust and high regard which the defendant cynically manipulated.  Why should Elaine Trombetta Neill be a federal

---

[5] Defendant argues inaccurately that "a number of individuals participated in the same offense to which Mr. Trombtta pled guilty." (Doc. 379, pg.19)  As the defendant is no doubt keenly aware, there is a gaping difference in culpability   He solicited their participation, he manipulated their loyalty and trust, he used them in every sense of the word and he took the money.  Moreover, two of them came forward to law enforcement to expose the scheme and turn off the pipeline and all cooperated with law enforcement.

felon? Why should Neal Prence be headed to prison? The answer is as sad as it is clear – because they were useful to the defendant in accomplishing his scheme to loot money from PA Cyber and send it somewhere he could get at it, but not have to account for it to anyone.

19. The government respectfully suggests that the focus should be on what the defendant did, who he damaged along the way, the breach of his fiduciary duty to the taxpayers of the Commonwealth of Pennsylvania and his breach of faith with all of the many good folks who trusted in and supported him. At a minimum, a guideline sentence is clearly in order.

        Respectfully submitted,

        SCOTT W. BRADY
        United States Attorney

        s/ Robert S. Cessar
        ROBERT S. CESSAR
        Assistant U.S. Attorney
        PA ID No. 47736

        s/ Stephen R. Kaufman
        STEPHEN R. KAUFMAN
        Assistant U.S. Attorney
        PA ID No. 42108

        s/ James R. Wilson
        JAMES R. WILSON
        Assistant U.S. Attorney
        PA ID No. 27648